No. 24-_____

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

In the Matter of JOHN DOE CORPORATION,

*Petitioner*

_____

On Petition for a Writ of Mandamus to the
United States District Court for the
Southern District of Texas, Houston Division
No. H-24-1103

_____

## JOHN DOE CORPORATION'S SECOND PETITION FOR A WRIT OF MANDAMUS AND REQUEST FOR AN ADMINISTRATIVE STAY OF OUT-OF-CIRCUIT TRANSFER

_____

Jacob S. Frenkel
Brooks T. Westergard
DICKINSON WRIGHT PLLC
1825 I Street N.W., Suite 900
Washington, D.C. 20006
(202) 466-5953
JFrenkel@dickinsonwright.com
BWestergard@dickinsonwright.com

*Counsel for Petitioner*
*John Doe Corporation*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Petitioner John Does Corporation is not aware of any persons or entities that have an interest in the outcome of this case that would bear on any Judge of this Court's evaluation of disqualification or recusal.

# TABLE OF CONTENTS

APPENDIX .......................................................................................... iii

TABLE OF AUTHORITIES .................................................................. v

INTRODUCTION AND SUMMARY ....................................................1

STATEMENT OF RELIEF SOUGHT ...................................................4

ISSUE PRESENTED ............................................................................4

RELEVANT FACTS .............................................................................4

REASONS FOR GRANTING THE WRIT ..........................................12

    I.    DOE CORPORATION HAS NO OTHER ADEQUATE
        MEANS FOR RELIEF. ..........................................................13

    II.    DOE CORPORATION HAS A CLEAR AND
        INDISPUTABLE RIGHT TO THE WRIT. ..........................14

        A.    The private interest factors do not support transfer..17

                1.    The first three private factors do not
                     support transfer………………………………18

                2.    The fourth private interest factor does not
                     support transfer………………………………22

        B.    The public interest factors do not support transfer…28

    III.    WRIT RELIEF IS APPROPRIATE UNDER THE
        CIRCUMSTANCES ..........................................................30

CONCLUSION ..................................................................................32

CERTIFICATE OF SERVICE............................................................34

CERTIFICATE OF COMPLIANCE....................................................37

# **APPENDIX**

Exhibit A.    United States District Court Southern District of Texas, General Order 2024-2 to stay civil case for 21 days (February 28, 2024) ....................................................1

Exhibit B.    Complaint filed in the United States District Court for the Southern District of Texas Houston Division (March 27, 2024)...........................................................................2

Exhibit C.    Defendant's Rule 12(b) Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Transfer (June 17, 2024)....................................................................28

Exhibit D.    Plaintiff's First Amended Complaint (August 15, 2024)....................................................................65

Exhibit E.    Memorandum and Order by Judge Lee H. Rosenthal, transferring case to the District Court for the District of Columbia (August 22, 2024).....................................98

Exhibit F.    Plaintiff John Doe Corporation's Notice of District of Columbia Ordering Return of Case to Southern District of Texas (November 19, 2024) ...............................101

Exhibit G.    Plaintiff John Doe Corporation's Request for Status Conference (November 20, 2024)............................104

Exhibit H.    Notice Setting Status Conference for December 17, 2024 (November 20, 2024).............................................110

Exhibit I.    Order to Transfer Back to the District Court for the Southern District of Texas (November 19, 2024)........112

Exhibit J.    Order to Transfer Back to the District Court for the District of Columbia (August 22, 2024)....................114

Exhibit K.    Order by United States District Court Southern District
of Texas to stay civil for 21 days at Request of District
Court of the District of Columbia ……………………...115

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Chamber of Com. of United States of Am.*, 105 F.4th 297
(5th Cir. 2024) ................................................................*passim*

*Clarke*, 94 F.4th 502 (5th Cir. 2024).....................................*passim*

*Def. Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022) .......................... 32

*Fort Worth Chamber of Commerce*, 100 F.4th 528 (5th Cir. 2024)
(Oldham, J., concurring) ........................................................ 28

*Free Enter. Fund v. PCAOB*, 537 F.3d 667 (D.C. Cir. 2008) (Kavanaugh,
J., dissenting), *rev'd*, 561 U.S. 477 (2010) ................................ 5

*Google LLC*, 58 F.4th 1379 (Fed. Cir. 2023) ............................................ 22

*Humane Soc'y of U.S. v. Perdue*, No. 20-cv-01395, 2024 WL 736729 (N.D.
Cal. Feb. 22, 2024).............................................................. 26

*Planned Parenthood*, 52 F.4th 625 (5th Cir. 2022) ........................ 19, 22, 23

*Radmax, Ltd.*, 720 F.3d 285 (5th Cir. 2013).............................................. 18

*Red Barn Motors, Inc.,* 794 F.3d 481 (5th Cir. 2015) .............................. 32

*TikTok, Inc.*, 85 F.4th 352 (5th Cir. 2023)............................13, 15, 18, 19

*U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022) ................... 26

*Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004)............................. 15, 18, 19

*Volkswagen of Am., Inc.,* 545 F. 3d 304 (5th Cir. 2008)........... 18, 19, 20, 21

**Statutes**

28 U.S.C. § 1404 ...........................................................................*passim*

42 U.S.C. § 7607(b)(1)............................................................................ 25

**Other Authorities**

"Guided by Mission To Protect Investors, PCAOB Approves 2025
    Budget," PCAOB, Nov. 21, 2024 ........................................................... 21

## INTRODUCTION AND SUMMARY

Petitioner John Doe Corporation ("Doe Corporation"), a Texas accounting firm headquartered in the Southern District of Texas, seeks a second writ of mandamus from this Court in connection with a decision by the U.S. District Court for the Southern District of Texas ("SDTX") that improperly and prematurely transferred the case below to the U.S. District Court for the District of Columbia ("DDC") on August 22, 2024.[1] This Court granted Doe Corporation's first mandamus petition last month (No. 24-20407, October 3, 2024), agreeing with Doe Corporation that the district court had violated its own internal orders by immediately transferring the case within minutes of the transfer order, rather than automatically staying the transfer for the required 21 days to allow Doe Corporation an opportunity to seek this Court's review of the transfer order. Prompted by this Court's mandamus order, the district court requested return of the case, and DDC obliged by order dated November 19, 2024.

---

[1] Upon filing its SDTX complaint, Doe Corporation filed a motion for leave to proceed pseudonymously for reasons stated therein. (ECF Dkt. No. 2). That motion remains unresolved, and, by agreement of the parties (ECF Dkt. No. 6), the pseudonymity motion will not be considered for resolution until at least six weeks after resolution of the Rule 12 Motion in the SDTX.

Mandamus relief is now warranted again. The district court issued its out-of-circuit transfer order in late August without affording Doe Corporation any opportunity to brief or argue the question and without addressing any of the numerous new venue-specific allegations contained in Doe Corporation's amended complaint filed just days earlier. As an inevitable result, the district court's three-page transfer order was misinformed and plainly wrong on the merits. Its three-sentence rationale for transfer rested primarily on the fact that the defendant below, a quasi-governmental regulator called the Public Company Accounting Oversight Board (the "Board"), is incorporated and headquartered in the District of Columbia, and on the district court's resulting speculation that "any discovery against the Board will most easily take place there" and that the District of Columbia "has a strong interest in the challenges to the Board's authority."

Upon DDC's return of the case to the SDTX, Doe Corporation promptly filed an unopposed request for a status conference with the district court to address procedures and a schedule for future proceedings. Specifically, Doe Corporation sought "to address the parties' respective positions regarding the Transfer Order in the first instance, or

whether this Court would prefer that Plaintiff immediately seek review from the Fifth Circuit Court of Appeals." The request continued: "If [the district court] prefers to address the parties' positions in the first instance, then Plaintiff would appreciate guidance from this Court regarding whether this Court would prefer the parties present their positions through a motion for reconsideration of the Transfer Order, or through a separate motion to transfer based on the Amended Complaint." In response to Doe Corporation's request, the district court unfortunately scheduled the status conference for December 17—one week after expiration of the mandatory 21-day stay of effectiveness of its transfer order—thus providing the parties no timely or meaningful guidance.

So, yet again, a Texas plaintiff seeking to challenge the power of a D.C.-based federal regulator in the most logical Texas venue has no choice but to burden this Court with another emergency mandamus petition to halt premature and clearly erroneous out-of-circuit transfer of its case to DDC before it's too late. *E.g., In re Chamber of Com. of United States of Am.*, 105 F.4th 297 (5th Cir. 2024); *In re Clarke*, 94 F.4th 502 (5th Cir. 2024). This Court should stop the transfer again in this case, because the injustice here, where the trial court allowed Doe Corporation

no briefing or argument and did not even acknowledge 15 detailed new venue-related paragraphs of allegations in Doe Corporation's amended complaint, was even more egregious than in prior cases.

## STATEMENT OF RELIEF SOUGHT

Doe Corporation seeks an emergency writ of mandamus vacating the district court's transfer of the case below to DDC under 28 U.S.C. § 1404.

## ISSUE PRESENTED

Whether the district court committed legal error, procedural error, and/or an abuse of discretion by transferring Texas-based Doe Corporation's case to DDC under 28 U.S.C. § 1404 without affording Doe Corporation any opportunity to oppose the transfer and without addressing numerous venue-related allegations contained in Doe Corporation's amended complaint.

## RELEVANT FACTS

In its First Amended Complaint in the district court, Plaintiff Doe Corporation seeks declaratory and injunctive relief to stop the Board from enforcing an excessively intrusive and burdensome investigative demand ostensibly authorized by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). The Board is a bespoke quasi-governmental

4

regulator created by Sarbanes-Oxley to regulate the public auditing profession; then-DC Circuit Judge Kavanaugh once aptly described the Board as an "unprecedented extra-constitutional stew." *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd*, 561 U.S. 477 (2010).

The Board's Accounting Board Demand ("ABD") at issue—the *sixth* in a succession of similar administrative subpoena-equivalent demands issued to Doe Corporation by the Board's nongovernmental staff employees over the course of a multi-year nonpublic investigation—is not just abusive, retaliatory, and excessively burdensome; it is the most recent salvo in a secretive, unaccountable Board staff investigative process that: (i) is the product of an unlawful delegation of legislative power to the Board; (ii) is structurally unconstitutional in allowing private staff to exercise extraordinary executive law-enforcement powers without meaningful supervision by any presidentially-appointed, Senate-confirmed principal officer of the United States; and (iii) deprives Doe Corporation of the due process of law guaranteed by the Fifth Amendment and the "fair procedures" mandated by Sarbanes-Oxley.

The Board's most recent ABD, which triggered the lawsuit, yet again purported to command Doe Corporation to turn over reams of private documents or suffer fines, debarment, additional punishment, and potential criminal prosecution for purported "noncooperation." Among other fatal constitutional flaws in the Board's process, it provides no avenue for pre-enforcement Article III judicial intervention before the Board can arbitrarily and capriciously impose these dire and career-ending penalties for "noncooperation."

In response to the Board's June 2024 motion to dismiss or transfer the case (ECF Dkt. No. 17, **Exhibit C**), Doe Corporation filed an unopposed motion for leave to amend its complaint to add comprehensive details supporting venue and personal jurisdiction as most proper and relevant in SDTX. (ECF Dkt. No. 36).  The district court granted leave to amend on August 16 and deemed Doe Corporation's First Amended Complaint filed as of that day, thus mooting the Board's then-pending motion to dismiss or transfer.  (ECF Dkt. Nos. 37 and 38).

However, on August 22, 2024, a week after allowing and docketing Doe Corporation's First Amended Complaint and with no prior notice to the parties, the district court abruptly transferred the case to DDC

pursuant to 28 U.S.C. §1404(a), purportedly for the convenience of the parties. (ECF Dkt. No. 40, **Exhibit E**). First, the court posted a docket entry in ECF ordering that the case be transferred to DDC. (ECF Dkt. No. 39) (**Exhibit J**). Three minutes later, the case was gone, and approximately an hour later—after the court had already relinquished control of the case—the court issued a three-page opinion and order explaining its reasons for having transferred the case. (ECF Dkt. No. 40).

All of this activity occurred without prior notice to the parties and without affording Doe Corporation any opportunity to brief or argue why the case should stay in its chosen and proper local district court. The immediate transfer to DDC also was *ultra vires* because it violated the district court's General Order No. 2024-2, which mandates that "an order that transfers a civil case or civil miscellaneous matter to a district court outside the Fifth Circuit is stayed for 21 days from the date the order is entered on the docket." (*See* **Exhibit A**).

Equally problematic about the transfer decision was the district court's failure to acknowledge, much less address, Doe Corporation's recently filed First Amended Complaint, which added substantial new details demonstrating both overwhelmingly proper venue in the district

court and court's permissible exercise of personal jurisdiction over the Board, including details about both Doe Corporation's and the Board's substantial contacts with the district and with Texas more broadly. *See* ECF Dkt. No. 38, Exhibit D, Para. 4-18. Among other details, the First Amended Complaint alleges that:

- At all times relevant to the case, Doe Corporation was—and still is—incorporated in Texas, headquartered in the Southern District of Texas, and licensed to perform accounting services by the State of Texas;

- Doe Corporation maintains and retains all audit and other attest engagement files in the Southern District of Texas;

- All certified public accountants who are partners in and employees of Doe Corporation are licensed as Certified Public Accountants by the State of Texas;

- At all relevant times the Board had at least two offices in Texas, one in the Southern District of Texas;

- The Board has registered, and now regulates and inspects 58 accounting firms in Texas, 27 of which are based in the Southern District of Texas, including 26 in the greater Houston area;

- The Board also regulates countless individual accountants based in Texas, including those at firms based in the Southern District of Texas and those at firms based elsewhere with offices in Texas;

- The accounting firms registered with the Board and located in the Southern District of Texas, as is true for all registered accounting firms, are required to comply with the Board's Rules, Auditing Standards, and document demands under threat of enforcement sanctions and possible criminal prosecution;

- The Board's Division of Registration and Inspections staff inspection team-leader for the inspection that led to the

investigation at issue in Doe Corporation's lawsuit was assigned to the Board's Houston, Texas office;

- Prior to the Covid pandemic, Board staff conducted inspections of Doe Corporation onsite at Doe Corporation's headquarters office in the Southern District of Texas, reviewing audit workpapers and interviewing Doe Corporation partners and staff in person in the Southern District of Texas;[2]

- All documents and business records, including audit workpapers, that Doe Corporation and its partners and employees produced pursuant to requests and demands issued to them in connection with Board inspections and the investigation at issue in Doe Corporation's lawsuit were created in, maintained in, and produced from within the Southern District of Texas, and were obtained by Board staff pursuant to requests and demands purposefully sent into the Southern District of Texas;

- Doe Corporation issued all audit opinions relevant to the investigation at issue in Doe Corporation's lawsuit in the Southern District of Texas;

- Doe Corporation has never been licensed to perform accounting services in the District of Columbia and has never conducted an audit of an issuer headquartered in the District of Columbia;[3] and

- Pursuant to its "PCAOB Scholars" program, through which the Board diverts penalties it collects away from the public fisc into private scholarships for college and graduate students, the Board, since 2015, has awarded such scholarships to dozens of students attending Texas-based colleges and universities.[4]

---

[2] Ironically, just this month, the Board conducted another onsite, in-person inspection, *in the Southern District of Texas*, on the premise of Doe Corporation's sole office, from November 4 through November 8, 2024.

[3] Doe Corporation has never conducted audit procedures in the District of Columbia.

[4] These allegations are largely indisputable; most or all are based either on Doe Corporation's own knowledge or on data published on the Board's own public website. In any event, at this preliminary stage of the case

*Id.*

Instead of focusing on those well-pled facts, the district court's August transfer decision referenced assertions made in the Board's then-moot motion to dismiss or transfer Doe Corporation's *original* complaint. *See* Exhibit B at 28-64 ("The Board responds that Doe's allegations fail to identify any Texas connection that would allow personal jurisdiction over the Board in Texas" (citing ECF Dkt. No. 17 at 15)). This strongly suggests that, in its decision to transfer the case, the district court did not consider the new venue-specific allegations in Doe Corporation's First Amended Complaint and instead considered only the *original* complaint and the Board's then-moot motion to dismiss or transfer that original complaint.[5]

On September 19, 2024, Doe Corporation filed its first mandamus petition requesting this Court to direct the district court to request that the case be returned from DDC. *In re John Doe Corporation*, No. 24-

---

(before discovery or any evidentiary hearing), SDTX should have accepted these allegations as true for relevant purposes.

[5] Coincidentally, on the same day the district court transferred the case to DDC, counsel for the parties had already agreed to a stipulated briefing schedule for the Board's anticipated renewed motion to dismiss or transfer the case in light of the First Amended Complaint, but counsel for the Board did not file the stipulation before the case was unexpectedly transferred later that day.

20407, Dkt. 5. On October 3, 2024, this Court granted the petition and directed the district court "to request that DDC transfer Doe Corporation's case against the Board back to SDTX to allow for the requisite 21-day stay period." *Id*. Dkt. 40. In its Order, this Court "expresse[d] no view as to the merits of SDTX's transfer to DDC, and further recognize[d] that the ultimate decision regarding whether to transfer the case back to SDTX to allow for the 21-day stay period, remains the prerogative of DDC." *Id*.

On October 4, 2024, the district court requested that DDC return the case. Dkt. 45 (**Exhibit K**). On November 19, DDC honored the district court's request and ordered the case returned to its original venue in Texas (**Exhibit I).**

The following day, as previously noted, Doe Corporation requested a status conference to seek guidance from the district court. On November 20, 2024, the district court set the requested status conference for December 17, 2024. Dkt. 48 (**Exhibit H**). By doing so, however, the district court exacerbated the urgency and uncertainty surrounding its premature out-of-circuit transfer of the case. Assuming the mandatory 21-day stay of the transfer began to run when DDC returned the case to

the district court, the stay would automatically expire on December 10, 2024, seven days *before* the scheduled status conference. With no direction, the district court left Doe Corporation with no choice but to seek this Court's intervention again, as the district court has made clear that it does not intend to review its decision to transfer the case or otherwise engage with the parties before the automatic stay expires. Both Doe Corporation and the Board agree that the 21-day automatic stay period expires on December 10, 2024.

## REASONS FOR GRANTING THE WRIT

The district court's decision to transfer this case from Doe Corporation's local district in Texas to the home court of the federal government was both erroneous and premature. Doe Corporation satisfies all three factors necessary to obtain writ relief from this Court. First, Doe Corporation "[has] no other adequate means to attain the relief [it] desires." *In re Chamber of Com. of United States of Am.*, 105 F.4th at 311. Second, Doe Corporation's "right to issuance of the writ is clear and indisputable." *Id*. Finally, "the writ is appropriate under the circumstances." *Id*.

# I.     DOE CORPORATION HAS NO OTHER ADEQUATE MEANS FOR RELIEF.

Given the combination of bizarre procedural irregularities that led the district court to transfer the case to DDC only to have it returned following this Court's mandamus directive, Doe Corporation has no adequate means of relief other than seeking a second mandamus order. Indeed, under an ordinary briefing schedule, it would be impossible for the parties to fully brief and obtain a decision from the district court on a motion for reconsideration before the automatic stay period expires. Doe Corporation promptly requested a status conference to obtain direction from the district court in advance of the December 10th expiration of the automatic 21-day stay of the transfer order, but that too was effectively denied when the district court scheduled the conference for a week *after* the automatic stay would expire. Under such circumstances, this Court's precedent is clear that "the first mandamus requirement is satisfied in the motion-to-transfer context." *In re Chamber of Com. of United States of Am.*, 105 F.4th at 311 (quoting *In re TikTok, Inc.*, 85 F.4th 352, 357 (5th Cir. 2023)).

## II.   DOE CORPORATION HAS A CLEAR AND INDISPUTABLE RIGHT TO THE WRIT.

This Court has recently granted mandamus relief under comparable yet less egregious circumstances involving improper immediate transfers to out-of-circuit districts. *In re Chamber of Com. of United States of Am.*, 105 F.4th 297; *In re Clarke*, 94 F.4th 502. "Transfer under 28 U.S.C. § 1404(a) is properly granted *only if* the moving party *clearly* establishes good cause by *clearly* demonstrating that a transfer is for the convenience of parties and witnesses, in the interest of justice." *Clarke*, 94 F.4th at 508 (emphasis added and internal quotation marks omitted). As this Court recently reiterated, "[i]t is the movant's burden— *and the movant's alone*—to adduce evidence and arguments that *clearly* establish good cause for transfer based on convenience and justice." *Id.* (internal quotation marks omitted and emphasis added). Neither the Board nor the district court has met this burden.

In any event, there was no good cause supporting the transfer, much less the required *clear* good cause that *clearly* demonstrated transfer would serve the convenience of parties and witnesses and the interest of justice. "[T]o establish "good cause," a movant must clearly show: "(1) that the marginal gain in convenience will be *significant*, and

(2) that its evidence makes it plainly obvious—*i.e.*, clearly demonstrated—that those marginal gains will *actually* materialize in the transferee venue." *Id*. (emphasis in original). Neither the Board nor the district court made such a showing of good cause.

In assessing whether a movant "clearly" has carried its burden, a district court should consider eight public- and private-interest factors. The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 315 (5th Cir. 2004). The public interest factors are: "(5) the administrative difficulties flowing from court congestion; (6) the local interest in having localized interests decided at home; (7) the familiarity of the forum with the law that will govern the case; and (8) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re TikTok, Inc*., 85 F.4th at 358.

At most, the district court arguably found two of these eight factors favoring transfer to DDC. Based entirely on the undisputed fact that the

Board is headquartered in the District of Columbia, the district court surmised that "any discovery against the Board will most easily take place there" and that the District of Columbia has "a strong interest in the challenges to the Board's authority." The district court also accepted the Board's representation that a purportedly "similar" case is currently pending in DDC, without addressing what practical benefit, if any, would actually be gained by having the two cases under one roof (factor 4 above) or how, if at all, the pendency of that case proved DDC's greater "familiarity" with the law that will govern *this* case (factor 7). If the district court's cursory analysis of the transfer factors justified transfer here, it is difficult to imagine any case challenging the power of any D.C.-based federal regulator that would ever be litigated outside the nation's capital.

Recall that Doe Corporation, all of its personnel, and all of its records are located in the Southern District of Texas. Doe Corporation has no connection whatsoever to the District of Columbia. By contrast, the Board purposefully conducts regular, ongoing regulatory activities in the Southern District of Texas, including the inspection and investigation that directly led to this lawsuit as well as the Board's ongoing regulatory

16

oversight over more than 50 other Texas-based accounting firms and their innumerable Texas-based CPA employees.  Indeed, just weeks ago, Board staff were *again* physically present in Doe Corporation's Southern District of Texas headquarters inspecting the firm, because that is the only location where Board staff can access Doe Corporation's records and personnel.  By contrast, according to the Board's public website, there is only one Board-regulated accounting firm headquartered in the District of Columbia.

The district court's failure to acknowledge any of the Board's many contacts with Texas, or most of the private and public interest factors relevant to a transfer decision, is reason enough to vacate its transfer order and remand the case.  This Court should not be in the position of weighing all those factors in the first instance.   Nevertheless, Doe Corporation demonstrates below why the vast majority of them are either irrelevant here or favor honoring Doe Corporation's chosen venue and keeping the case here.

## A.    The private interest factors do not support transfer.

As noted above, the district court appears to have determined that at least one of the private interest factors supported transfer "because

the Board is in the District of Columbia [and] any discovery against the Board will most easily take place there" and because DDC "is already handling a similar case." (*Id.*) The court erred on both points.  In fact, all of Doe Corporation's witnesses are located in the Southern District of Texas, and certain Board employees whose depositions Doe Corporation intends to seek in discovery either worked in or readily availed themselves of the privilege of performing their regulatory activities in that district.  And this case is markedly different than the case pending in DDC and another similar case pending in the Middle District of Tennessee, Nashville Division.

### 1.  The first three private interest factors do not support transfer.

"The first factor focuses on the location of 'documents and physical evidence relating to the [case].'" *In re TikTok, Inc.*, 85 F.4th at 358 (quoting *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 316 (5th Cir. 2008)). "'The question is *relative* ease of access, not *absolute* ease of access.'" *Id.* (quoting *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013) (emphasis in original). "[T]his factor weighs in favor of transfer where the current district lacks any evidence relating to the case," but "when 'the vast majority of the evidence [is] electronic, and therefore equally accessible

in either forum[,]' this factor bears less strongly on the transfer analysis."

*Id.* (quoting *In re Planned Parenthood Fed'n Am., Inc.*, 52 F.4th 625, 630

(5th Cir. 2022)) (second and third alterations in original). All records and

employees of Doe Corporation are located in the Southern District of

Texas.  And the Board's ongoing regulatory activities in that district,

including its investigation and regular inspections of Doe Corporation

there, suggest that even discoverable evidence from the Board may be in

the Southern District of Texas.

The second factor focuses on "the availability of compulsory process

to secure the attendance of witnesses." *Volkswagen*, 545 F.3d at 315.  This

factor cuts in favor of transfer where "non-party witnesses" are outside a

court's subpoena power and an alternative venue has "absolute"

subpoena power. *Id.*  However, "the availability of compulsory process

receives less weight when it has not been alleged or shown that any

witness would be unwilling to testify." *Planned Parenthood*, 52 F.4th at

630-31.  Indeed, this factor weighs against transfer where, as here, the

moving party has "failed to identify any unwilling non-party witness." *In*

*re TikTok, Inc.*, 85 F.4th at 361. Here too, relevant employees of Doe

Corporation as well as witnesses and parties associated with the Board

upon whom Doe Corporation intends to serve discovery are located in the Southern District of Texas or elsewhere within this Circuit. Additionally, other employees of the Board willingly subjected themselves to the jurisdiction of the district vis-à-vis Doe Corporation just weeks ago by conducting their on-premises regulatory inspection there, at the firm's only office. Neither the Board nor the district court identified any witness in or near the District of Columbia who would be unwilling to testify in Houston.

The third factor—the cost of attendance for willing witnesses—"attempts to internalize and minimize those costs by favoring the venue that is more convenient from the perspective of willing witnesses." *In re Clarke*, 94 F.4th at 514. While the district court did not address explicitly this factor, the court implicitly held that this factor weighed in favor of transfer because the "Board is in the District of Columbia, and any discovery against the board will most easily take place there." (Transfer Ord. at 3). However, as with its failure to identify potential unwilling witnesses, the court similarly failed to identify any willing witnesses, or why travel to Houston for those witnesses would be inconvenient.  The irony here is that, unlike the Board, Doe Corporation is a one-office

certified public accounting firm in the Southern District of Texas. For its partners and employees to travel more than a thousand miles away to the District of Columbia would present a significant financial burden. On the other hand, the Board writes its own budget and is lavishly funded— primarily by shareholders of publicly traded corporations—and thus appears willing and able to commit vast resources to defending this case regardless of location. In its recently released 2025 budget, for example, the Board estimates total outlays of nearly $400 million, including more than $30 million for professional and consulting fees. *See*, Board Press Release: "Guided by Mission To Protect Investors, PCAOB Approves 2025 Budget," Nov. 21, 2024, *available at* https://pcaobus.org/news-events/news-releases/news-release-detail/guided-by-mission-to-protect-investors--pcaob-approves-2025-budget.

The district court's speculation that convenience of the witnesses in this case militates in favor of transfer ignored that "Section 1404(a)'s good-cause requirement prohibits a district court from relying on 'conclusory assertions' in considering the transfer factors." *In re Clarke*, 94 F.4th at 513. Here, the facts directly contradict the district court's conclusory speculation. The *Clarke* court stated: "But speculation is all

the district court used to consider the private interest factors." Here, the district court apparently took at face value the Board's assertion that witnesses and documents are "likely" to be located in the District of Columbia, and accepted that representation without even allowing Doe Corporation a chance to respond to the Board's arguments and address its lack of evidence. The Board has known at all times, as it is the Board conducting the investigation at issue, that most relevant evidence—documentary and testimonial—is in the Southern District of Texas.

### 2.    The fourth private interest factor does not support transfer.

The district court also took at face value the Board's assurances that DDC "is already handling a similar case." (Transfer Ord. at 3). This too was factually and legally erroneous and an abuse of discretion.

First, this and other courts have recognized that the pendency of a similar action in a different forum does not automatically render transfer appropriate. Indeed, as the Federal Circuit explained, "judicial economy considerations could not undermine the clear case [against] transfer in light of the imbalance on the other factors" this Court reviews in considering a district court transfer order. *In re Google LLC*, 58 F.4th 1379, 1383 (Fed. Cir. 2023). This Court has similarly declined to give

significant weight to the possibility of co-pending cases when those cases "involve[d] different parties [] [and] different claims," "although some factual issues may be similar." *Planned Parenthood*, 52 F.4th at 632 n.5. This language from *Planned Parenthood* aptly describes this case. The district court erroneously accorded outsized weight to the pendency of a purportedly similar case in DDC.

The other case currently pending in DDC, however, is not as similar as the Board suggested and the district court assumed, and is no more advanced than the one in the Southern District of Texas. While there is some overlap between some of the claims made in that case and some in this case, overlap of some but not all claims alone is not dispositive of similarity. There are material differences between the two cases, and the respective plaintiffs in the two cases have no connection whatsoever. In this case, the Board has not yet commenced any formal disciplinary proceeding against Doe Corporation or its partners, and such a proceeding may never happen. The other case in DDC—also transferred at the Board's behest and over that plaintiff's objection (from the Northern District of Texas, not the Southern District)—involves an already pending disciplinary proceeding, and thus includes several

claims not asserted here.[6]  Specifically, the case pending in DDC, which is now also pending before the United States Court of Appeals for the District of Columbia Circuit on the sole issue of pseudonymity, challenges among other things the unconstitutional appointment and tenure protection of the Board's hearing officer, the Board's inherent adjudicative bias, and violation of Article III of the Constitution and due process in connection with an already-filed adversarial disciplinary proceeding.  Doe Corporation's case, on the other hand, asserts claims not asserted in the DDC case, including unconstitutional delegation of legislative power, unconstitutional compelled production of personal papers with no opportunity for pre-enforcement judicial review, and unconstitutional lack of notice as to the potential basis for alleging audit violations when there were no on-point auditing standards or auditing guidance for cryptocurrency, crypto-mining equipment and crypto-asset issuers.

More importantly, the logic of the district court's transfer decision is upside-down with respect to the case pending in DDC.  Good

---

[6] The case pending in DDC is far more similar to a case pending in the Middle District of Tennessee, Nashville Division. *Doe v. PCAOB*, No. 24-cv-254 (M.D. Tenn.)

jurisprudence welcomes the opportunity to have important and novel issues affecting constitutional liberties and national public policy decided by multiple courts in the first instance—not funneled to a single district court in the nation's capital for uniform outcomes before those issues can properly percolate among diverse courts with diverse perspectives, thereby maximizing the likelihood of getting the right answers, or a circuit split that ultimately invites uniformity from the Supreme Court. When Congress wishes to create an exception and funnel similar cases to a single court, it knows exactly how to do so and it does so explicitly, either by creating specialized courts (such as the Tax Court, the Court of Claims, and the Federal Circuit) or by otherwise specifying mandated venue by statute. *E.g.*, 42 U.S.C. § 7607(b)(1) (establishing venue in the D.C. Circuit for Clean Air Act rules with "nationwide scope or effect").

The district court's approach, taken to its logical conclusion, would allow the Board to funnel every constitutional challenge against it into DDC as a supposedly related case, no matter what precise constitutional objections were raised and no matter where the plaintiff(s) worked or lived. In other words, from the Board's perspective, having a "K Street" address is all it needs to ensure venue in DDC.  No other district or circuit

court would ever weigh in on any of the issues raised, and every American who deigned to challenge the Board would be forced to litigate in DDC, even if that litigant preferred to litigate in its own local federal courts, with proper venue. That may be the Board's preferred approach, but the courts should reject it soundly.

The instant case fits a recent pattern whereby federal regulators with an active presence and formal base of operations in the SDTX have routinely attempted to deprive Americans, including *bona fide* SDTX residents in all respects, of their chosen local venue by having cases that challenge their authority moved to DDC. *See, e.g., Clarke*, 94 F.4th at 508 (rejecting motion to transfer challenge to CFTC licensing determination with nationwide effect); *In re Chamber of Com. of United States of Am.*, 105 F.4th at 301 (rejecting motion to transfer challenge to nationwide Certified Financial Planning Board rule regulating credit card late fees); *Humane Soc'y of U.S. v. Perdue*, No. 20-cv-01395, 2024 WL 736729, at *1 (N.D. Cal. Feb. 22, 2024) (rejecting motion to transfer challenge to nationwide Department of Agriculture rule regulating chicken slaughterhouses); *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 345 n.7 (5th Cir. 2022) (rejecting motion to transfer challenge to nationwide

Department of Defense rule regarding vaccination requirements). This Court (among others) has caught on, however, and rightly has condemned this tactic. More broadly, courts nationwide, including the United States Supreme Court, have rejected roundly the practice of requesting a transfer of venue to secure a perceived favorable forum or judge.

In *In re Chamber of Commerce*, for example, this Court determined that transferring to the District of Columbia a case challenging a nationwide rule was "a clear abuse of discretion." 105 F.4th at 300. As this Court explained, "[i]f Congress wants to enshrine D.D.C. as a venue for [federal Administrative Procedure Act] challenges or cases where a federal agency or other D.C.-based government actor is the defendant, it can easily do so. But it hasn't." *Id.* at 306. No differently, here, where the Board requires public accounting firms to register and file annual reports, nowhere in those forms does the Board require consent to jurisdiction and venue in DDC. Applying this Court's reasoning from *In re Chamber of Commerce*, Congress has never "enshrined" DDC for litigation by or against the Board; Congress easily could have done so, but it did not. Instead of "amass[ing] judicial power in the District of

Columbia," Congress determined that the standard for transfer motions should "apply no differently" in cases involving challenges to rules promulgated by regulators based in the District of Columbia. *Id*. Given Congress's standard for transfer motions, the Board cannot carry its heavy burden to "demonstrate that its chosen venue is clearly more convenient." *Id*. at 310 (cleaned up); *accord In re Fort Worth Chamber of Com.*, 100 F.4th 528, 540 (5th Cir. 2024) (Oldham, J., concurring) (warning that routine transfers of cases against federal regulators to their home venue of Washington, DC "would concentrate federal judicial power in D.C. and undermine our federalist system").

As such, the private interest factors all weigh against transfer; none weigh in favor of a transfer to DDC.

### B.   The public interest factors do not support transfer.

The district court did not identify any concerns related to court congestion, DDC's familiarity with the law that will govern this case, nor avoiding problems with conflict of laws or in the application of foreign law. (Transfer Ord. (Exhibit E) at 3). In fact, no DDC precedent exists regarding the constitutionality, or lack thereof, of the Board's investigative process at issue in this case. Not surprisingly, therefore, the

court did not find that those factors clearly favored transfer to DDC. Instead, the district court held only that "the public interest factors are *consistent with* transfer to the District of Columbia, which has a strong interest in the challenges to the Board's authority, given that the Board is headquartered and has its principal place of business in the District of Columbia." *Id.* (emphasis added). Yet many districts in the United States, including the Southern District of Texas, also have a strong interest in challenges to the Board's authority, because, as set forth by example in the Amended Complaint, the Board can exercise both its inspection and enforcement authority across the entire United States (and globally). And, clearly, the Board has exercised that inspection and enforcement authority as to Doe Corporation within the Southern District of Texas, both before Doe Corporation filed this lawsuit and even after the Board filed its motion to dismiss.

Contrary to the district court's reasoning, the fact that the Board is headquartered in the District of Columbia is largely immaterial to whether this case should be transferred there. This Circuit "do[es] *not* consider the parties' connections to the venue because the local interest analysis is a public interest factor," and "the local interest inquiry is

concerned with the interest of *non-party citizens* in adjudicating the case." *In re Chamber of Com. of United States of Am.*, 105 F.4th at 308 (emphasis in original). And in cases like this, with potential national impact, a district court abuses its discretion when it determines that "D.C. residents ha[ve] a localized interest in the case just because" agency rules or procedures were promulgated in the District of Columbia. *Id.* Most relevant to this factor is that dozens of Board-regulated accounting firms are headquartered in Texas, whereas only one is headquartered in the District of Columbia.

## III.    WRIT RELIEF IS APPROPRIATE UNDER THE CIRCUMSTANCES

In *In re Chamber of Commerce*, this Court determined that writ relief was appropriate under the circumstances because that "was a case where the issues implicate[d] not only these parties' interests, but the interests of all parties who litigate against government defendants located in D.C. and seek to have their cases heard by judges and juries outside the nation's capital." 105 F.4th at 312. This Court also held that

writ relief is appropriate when "we clarify to this district court and others how to engage in the § 1404(a) transfer analysis." *Id.*

As was the case in *In re Chamber of Commerce*, this case has wide-reaching implications, beyond the immediate case, for parties that seek to litigate against government and quasi-government defendants in their chosen forum. As was the case in *In re Chamber of Commerce*, this case presents yet another opportunity for this Court to provide guidance to district courts facing requests for out-of-circuit transfers.

This is the type of case that warrants the relief requested herein. The district court abruptly transferred the case to DDC only one week after docketing Doe Corporation's Amended Complaint, without prior notice to the parties and without affording Doe Corporation an opportunity to oppose the Board's transfer request, which the filing of the Amended Complaint had mooted. The district court's analysis of the private and public interest factors consisted of only three sentences, with outsized weight given to the Board's headquarters location in the nation's capital.

Additionally, Doe Corporation has been diligent in seeking mandamus relief upon return of the case to the Southern District of

Texas.  DDC returned the case on November 19, 2024.  Doe Corporation filed its request for an expedited status conference with the district court the following day, and within hours the district court set the status conference for nearly a month later, on December 17, 2024. *See Def. Distributed v. Bruck*, 30 F.4th 414, 425 (5th Cir. 2022) (finding petitioning party acted diligently when it sought mandamus relief 39 days after transfer order was entered); *Cf. In re Red Barn Motors, Inc.* 794 F.3d at 485 (finding that petitioning party was not diligent because it waited "more than three months before filing any petition for review"). Here, Doe Corporation is seeking mandamus relief within five business days of the district court's effective denial of its request for a prompt status conference, recognizing the impending expiration of the 21-day clock on December 10, 2024.

## CONCLUSION

For the foregoing reasons, Doe Corporation respectfully requests that the Court grant this petition for a writ of mandamus and vacate the district court's August 22, 2024 order transferring the case to DDC.

Doe Corporation also respectfully requests that the Court order an immediate administrative stay of the transfer order pending resolution of this petition.

Dated:  November 26, 2024          Respectfully submitted,

/s/ *Jacob S. Frenkel*
Jacob S. Frenkel
Brooks T. Westergard
DICKINSON WRIGHT PLLC
1825 I Street N.W., Suite 900
Washington, D.C. 20006
(202) 466-5953
JFrenkel@dickinsonwright.com
BWestergard@dickinsonwright.com

*Counsel for Petitioner John Doe Corporation*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on November 26, 2024, I filed the foregoing document and appendix documents via the Court's CM/ECF system and also caused the foregoing to be served by email on the following counsel for respondents and for intervenor:

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Rachel G. Miller-Ziegler
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
Telephone: (202) 220-1100
Fax: (202) 220-1100
*Served via email to:*
donald.verrilli@mto.com
elaine.goldenberg@mto.com
ginger.anders@mto.com
rachel.miller-ziegler@mto.com

Jeffrey A. Lamken
Robert K. Kry
MoloLamken LLP
600 New Hampshire Ave., N.W., Suite 500
Washington, D.C.  20037
Telephone: (202) 556-2000
*Served via email to:*
jlamken@mololamken.com
rkry@mololamken.com

John Kiley Edwards
Gabriela Maria Barake
Jackson Walker LLP
1401 McKinney St., Suite 1900
Houston, TX  77010
713-752-4319
Fax: 713-752-4221
*Served via email to:*
jedwards@jw.com
gbarake@jw.com

John Robinson
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington D.C. 20005
(202) 616-8489
*Served via email to:*
john.j.robinson@usdoj.gov, fedprog.ecf@usdoj.gov

Daniel David Hu
Office of the United States Attorney
1000 Louisiana Ave., Suite 2300
Houston, TX 77002
(713) 567-9518
Fax: 713-718-3303
*Served via email to:*
daniel.hu@usdoj.gov

/s/ *Jacob S. Frenkel*

Jacob S. Frenkel
DICKINSON WRIGHT PLLC
1825 I Street N.W., Suite 900
Washington, D.C. 20006
(202) 466-5953
JFrenkel@dickinsonwright.com

Pursuant to Fed. R. App. P. 21(a), I hereby certify that on November 26, 2024, I filed a notice of Petition for Writ of Mandamus via the Court's CM/ECF system to the United States District Courts for the District of Columbia and email to the United States District Court for the Southern District of Texas to Lisa Eddins, Case Manager for Judge Lee H. Rosenthal at lisa_eddins@txs.uscourts.gov and Darlene Hansen, Deputy Clerk-in-Charge at darlene_hansen@txs.uscourts.gov.

/s/ *Jacob S. Frenkel*
Jacob S. Frenkel
DICKINSON WRIGHT PLLC
1825 I Street N.W., Suite 900
Washington, D.C. 20006
(202) 466-5953
JFrenkel@dickinsonwright.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of Fed. R. App. P. 21 because it contains fewer than 7800 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. Additionally, I certify that any required redactions have been made in compliance with 5th Cir. R. 25.2.13. I certify that the facts supporting emergency consideration of the motion are true and complete.

/s/ *Jacob S. Frenkel*
Jacob S. Frenkel
DICKINSON WRIGHT PLLC
1825 I Street N.W., Suite 900
Washington, D.C. 20006
(202) 466-5953
JFrenkel@dickinsonwright.com

<u>**Exhibit A**</u>

United States District Court
Southern District of Texas
E N T E R E D
**February 28, 2024**
Nathan Ochsner, Clerk of Court
By Deputy Clerk_____

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| IN THE MATTER OF | § | |
| INTER-CIRCUIT TRANSFER | § | GENERAL ORDER NO. 2024-2 |
| OF CASES | § | |
|  | § | |
|  | § | |

## <u>ORDER</u>

IT IS ORDERED that unless all affected parties consent to the transfer, an order that transfers a civil case or civil miscellaneous matter to a district court outside the Fifth Circuit is stayed for 21 days from the date the order is entered on the docket.

Signed the __28th__ day of February, 2024.

RANDY CRANE
CHIEF JUDGE

**Exhibit B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JOHN DOE CORPORATION, | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : |
| PUBLIC COMPANY ACCOUNTING | : |
| OVERSIGHT BOARD, | : |
| | : |
| *Defendant.* | : |
| | : |

No.   _____4:24-cv-1103_____

**COMPLAINT FOR INJUNCTIVE**
**AND DECLARATORY RELIEF**

Plaintiff John Doe Corporation[1] seeks declaratory and injunctive relief to stop defendant Public Company Accounting Oversight Board (the "Board") from enforcing an excessively intrusive and burdensome investigative "Accounting Board Demand" ("ABD") ostensibly authorized by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  As explained herein, the Board's ABD—the sixth in a succession of similar demands issued by the Board's non-governmental staff employees over the course of a prolonged investigation—is not just abusive, retaliatory, and excessively burdensome; it is the most recent salvo in a secretive, unaccountable Board investigative process that (i) is the product of an unlawful delegation of legislative power to the Board; (ii) is structurally unconstitutional; and (iii) deprives Plaintiff of the due process of law mandated by the Fifth Amendment and the "fair procedures" mandated by Sarbanes-Oxley.

Through its most recent ABD, the Board yet again purports to command Plaintiff to turn over reams of private documents or suffer fines, debarment, additional punishment, and potentially even criminal prosecution for purported "noncooperation."  Absent the declaratory and injunctive

---

[1] "John Doe Corporation" is a pseudonym used to protect Plaintiff's true identity.  Accompanying this Complaint is a motion for leave to allow Plaintiff to prosecute this lawsuit pseudonymously.

relief sought herein, Plaintiff will have no opportunity to obtain pre-enforcement judicial review of the ABD and will be left with the Hobson's choice of either obeying the Board's unconstitutional demand or "betting the farm" on potential future judicial review that would occur, if ever, long after the Board has effectively put Plaintiff out of business.

The Court should declare the Board's investigative demand unconstitutional and enjoin its enforcement.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction under Article III, section 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651.  *See also Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 489-91 (2010) ("*Free Enterprise Fund*"); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 897 (2023).

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and because the Board is subject to the court's personal jurisdiction with respect to the claims asserted herein.

## PARTIES

3.      Plaintiff John Doe Corporation is registered with the Board as a "registered public accounting firm" within the meaning of Sarbanes-Oxley § 2(a)(12), 15 U.S.C. § 7201(a)(12).

4.      Defendant Board is a private, nonprofit corporation created by Sarbanes-Oxley § 101, 15 U.S.C. § 7211 and organized under the laws of the District of Columbia.  The Board is headquartered in the District of Columbia and has at least a dozen other offices across the United States, including at least two in Texas.  The Board has more than 800 employees and claims regulatory jurisdiction over more than 1,500 registered public accounting firms worldwide, including 59 in Texas, along with innumerable individuals employed by and associated with those firms.

## FACTS

**A.    "This Unprecedented Extra-Constitutional Stew"[2]**

5.    The Board is not a federal agency, although it is treated as such for constitutional purposes. Sarbanes-Oxley created the Board as a private, nonprofit, non-governmental corporation under the laws of the District of Columbia:

> The Board shall not be an agency or establishment of the United States Government, and, except as otherwise provided in this Act, shall be subject to, and have all the powers conferred upon a nonprofit corporation by, the District of Columbia Nonprofit Corporation Act.  No member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service.

15 U.S.C. § 7211(b).  As the Supreme Court noted in *Free Enterprise Fund*, this allows the Board to "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale."  561 U.S. at 485.

6.    The Board is led by five members whom the Securities and Exchange Commission ("SEC"), acting collectively as a "Head of Department" within the meaning of the Appointments Clause of the Constitution, appoints as "inferior" constitutional officers. 15 U.S.C. § 7211; *see generally Free Enter. Fund*, 561 U.S. at 484-87.

7.    Notwithstanding its legal status as a private corporation, the Board "is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry."  *Id.* at 484-85.

> Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards. To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of

---

[2] *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477 (2010).

new business and the continuation of old, internal inspection procedures, professional ethics rules, and "such other requirements as the Board may prescribe."

*Id*. at 485 (internal citations omitted).

8.    The Board's investigative, prosecutorial, and pseudo-judicial adjudicative powers are massive and largely unchecked.  Although the Board may claim to be accountable to the SEC, the Board in fact operates as a rogue and secretive entity with a track record of suffocating and punishing small and mid-sized auditing firms.  After years of investigation, the Board can impose severe punitive sanctions against individual accountants and accounting firms within its regulatory reach, up to the permanent revocation of a firm's registration, a permanent ban on an individual associating with any Board-registered accounting firm, and civil monetary penalties of up to $1.1 million per violation for natural persons and $22 million per violation for firms. 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001.  These felony-sized penalty amounts are *five times higher* for natural persons and *20 times higher* for firms than the maximum penalties SEC itself can impose. *See, e.g.*, 15 U.S.C. § 78u-2(b); 17 C.F.R. § 201.1001.

9.    Employment bans, termed "bars from association," imposed by the Board on individual accountants can be extremely broad and onerous—and frequently career-ending.  For example, the Board can bar individual accountants from being "associated with" registered public accounting firms in even a non-accounting capacity; bar them from associating with any issuer, broker, or dealer in any financial capacity; and even require them to obtain prior Board or SEC approval before taking any job whatsoever (professional or otherwise) with any issuer, broker, or dealer. 15 U.S.C. § 7215(c)(7)(B).  Although a barred auditor may apply to the Board for reinstatement and the ability to resume association with a registered firm, it is widely known that a time-limited bar is illusory, as any "bar from association" functionally operates as a lifetime bar.  Moreover, it is widely known that the Board, as currently constituted, rarely permits a barred

4

**Appendix**
**Page 5**

auditor to re-associate with a registered firm. Thus, the imposition of even a time-limited bar or suspension frequently operates as a lifetime deprivation of an auditor's ability to ever again audit financial statements of public companies. And only the fortunate few are able to sell their practices in a fire sale to meet the start-date of the bar or suspension.

10. As nominally private actors, the Board and its staff function beyond the purview of many of the basic checks, balances, and transparency requirements designed to protect individuals from overzealous governmental coercion and punishment. For example, upon information and belief, the Board and its staff are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, the Paperwork Reduction Act, and countless other laws applicable to nearly all other regulators. Ironically, these constraints do apply directly to the SEC, which has limited oversight responsibility for the Board, but not to the Board itself. Upon information and belief, Board staff members (other than perhaps hearing officers), unlike their governmental counterparts, are not even required to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same." 5 U.S.C. § 3331.

11. Congress has increasingly relied on various similar models of outsourcing vast governmental powers to private actors who are neither elected by the citizenry nor appointed by the President with the Senate's advice and consent. The trend has elicited understandable scorn from several current Supreme Court justices in cases involving other nominally private regulators:

> One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern. Given this incentive to regulate without saying so, everyone should pay close attention when Congress "sponsor[s] corporations that it specifically designate[s] not to be agencies or establishments of the United States Government."

> . . . .

> When it comes to private entities . . . there is not even a fig leaf of constitutional justification. Private entities are not vested with "legislative Powers." Art. I, § 1. Nor are they vested with the "executive Power," Art. II, § 1, cl. 1, which belongs to the President . . . . By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form."

*Dept. of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57, 62 (2015) (Alito, J., concurring) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995) and *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). *Accord Texas v. Comm'r of Internal Revenue*, 596 U.S. __, 142 S. Ct. 1308, 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch, J.) ("To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity" (internal citations omitted)).

12.     The Board is subject to at least *some* constitutional limitations, such as the requirement that its leadership be constitutionally appointed and accountable to the President. *See Free Enter. Fund*, 561 U.S. at 492. After all, the Board exercises vast powers that are "typically carried out" by governmental officials. *Id*. at 504-05. As one scholar explains, Congress initially considered creating the Board as a division or office within the SEC, a government agency; instead, Congress deliberately rejected that model because it wished to create a "strong, independent" private regulator that would wield "massive power, unchecked power, by design." *See* Donna M. Nagy, *Is the PCAOB a "Heavily Controlled Component" of the SEC?: An Essential Question in the Constitutional Controversy*, 71 U. Pitt. L. Rev. 361, 375-85 (2010) (quoting statement of Sen. Gramm). It is no surprise, therefore, that current Supreme Court justices have variously described the Board as "highly unusual," *Free Enter. Fund*, 561 U.S. at 505, "uniquely structured," *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 668 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), and an "unprecedented extra-constitutional stew," *id*. at 713.

**B.     The Board's Unsupervised Exercise of Executive and Pseudo-Judicial Powers**

**Appendix
Page 7**

13.     One of the few theoretical checks on the Board's autonomy and massive power is the direction, oversight, and supervision purportedly exercised by the presidentially appointed, Senate-confirmed SEC Commissioners who are "principal" constitutional officers under the Appointments Clause of the Constitution.  When the Board flexes its delegated *legislative* muscle through rulemaking, for example, SEC Commissioners play a critical preemptive gatekeeper function:  Before any Board rule can become effective and bind anyone, the SEC Commissioners first must approve the rule through the public rulemaking process.  15 U.S.C. § 7217(b).

14.     But SEC Commissioners play no similar gatekeeper role when the Board flexes its enormous *executive* and *pseudo-judicial* powers—*i.e.*, the investigative and looming disciplinary and adjudicative powers challenged in this case.  To the contrary, the Board wields those executive and pseudo-judicial powers autonomously and unilaterally, with *zero* real-time direction, oversight, supervision, or framework for prompt review by the Presidentially-appointed SEC Commissioners.

15.     For example, upon information and belief, SEC Commissioners—the only "principal" constitutional officers anywhere in sight—play no role in deciding whom the Board will investigate; what should be investigated; what documentary evidence and testimony should be demanded; from whom documents and testimony should be demanded; how voluminous and burdensome those demands should be; whether to accomplish the request through voluntary means or by the threat-centered compulsory ABD process at issue here; whether formal disciplinary charges should be filed; if so, who should be charged and what charges should be alleged; what evidence should be admitted and considered; how to weigh that evidence; whether to accept a negotiated settlement; and what sanctions, if any, should be imposed in any settlement.

16.     All those executive and pseudo-judicial powers are left to the largely unfettered discretion of the Board—or more precisely, as explained below, pushed down to the unfettered

**Appendix**
**Page 8**

discretion of wholly unaccountable private citizens employed by the Board.  Upon information and belief, the Board has never rejected a recommendation by the Board's Division of Enforcement and Investigations ("DEI") to initiate a formal investigation or to institute a formal disciplinary (enforcement) action.  Moreover, as explained below, the Board has adopted no formal rules or procedures through which recipients of ABDs and other DEI staff investigative demands can seek the Board's intervention to retract or limit the scope and burden of any unreasonable demands.

17.     Upon information and belief, the only time SEC Commissioners play any meaningful role in a typical Board investigation or disciplinary proceeding is in the exceptionally rare case where the "target" of a Board investigation:  (1) is charged formally with wrongdoing after investigation by DEI staff; (2) neither agrees to settle charges nor defaults; (3) is sanctioned after a full disciplinary proceeding, including an evidentiary hearing on the merits before a Board hearing officer; (4) appeals the hearing officer's decision to the Board members; (5) loses the appeal at the Board level; *and only then* (6) subsequently appeals the adverse result to the SEC Commissioners (or SEC reviews the sanctions on its own initiative—a theoretical possibility under the relevant statute but one that, to Plaintiff's knowledge, never has in fact happened).  This full gauntlet typically takes many years and is extraordinarily punitive given the financial expense and stress for the exceptionally rare Board targets who endure the entire process.  Moreover, DEI staff, as agents of the Board, take advantage of this imbalance, in particular against smaller and mid-sized audit firms and the persons associated with them, making it effectively impossible for a target to defend itself through the laborious, time-consuming, and cost-prohibitive process.

18.     For these reasons among others, most Board investigative targets settle rather than defend themselves.  Over the Board's entire 22-year history, only *eight* of the Board's several hundred disciplinary cases—about two percent—have ever been appealed to the SEC Commissioners.  (A ninth appeal was filed on January 30, 2024, but it will likely be several

**Appendix
Page 9**

months—and perhaps a year more—before the SEC Commissioners decide that case.)  The last time the SEC Commissioners decided such an appeal was nearly five years ago in May 2019.  And only two of the eight Board cases ever reviewed by the SEC—that is, less than one half of one percent of all Board enforcement cases thus far made public—have ever been reviewed subsequently by any federal court of appeals.[3]  In its hundreds of other enforcement cases, the Board has investigated, charged, and penalized its targets with no meaningful direction, oversight, supervision, or after-the-fact review by even the SEC Commissioners, much less by any Article III Judge.

19.     This absence of SEC direction and supervision is especially problematic because even the five SEC-appointed Board members—the Board's only validly appointed constitutional officers—play only a limited, episodic role in typical Board investigative or disciplinary proceedings.  Upon information and belief, those proceedings are conducted and supervised almost entirely by the Board's private staff employees within DEI, none of whom is constitutionally appointed even as an inferior officer.   Upon information and belief, these non-governmental employees make countless significant, discretionary, legally binding decisions over the years-long course of typical Board investigations and disciplinary proceedings, without any day-to-day direction or supervision by even the SEC-appointed Board members, much less by the SEC's Commissioners.  Also upon information and belief, rather than respect an investigative target's assertion of rights in response to investigative demands, DEI staff routinely react by threatening "noncooperation" either as a stand-alone or companion charge.  To use a criminal law analogy,

---

[3] In one of the two cases to reach federal court, the court ultimately set aside the Board's sanctions and the charges were dismissed, but that result came more than *nine years* after the Board initiated the case.  *Laccetti v. SEC*, 885 F.3d 724 (D.C. Cir. 2018).  In the other, the court upheld the Board's sanctions in an unpublished order issued more than six years after the Board initiated the case.  *Kabani & Co. v. SEC*, 733 F. App'x 918 (9th Cir. 2018).

**Appendix**

**Page 10**

that reaction is akin to treating the assertion of rights by a criminal investigative target as obstruction of justice.

20.     Upon information and belief, the SEC-appointed Board members are involved meaningfully at only three discrete points in a typical Board investigation and disciplinary proceeding: (1) they typically review and approve DEI staff's decision to commence a formal investigation, which then unleashes DEI staff's unfettered discretion to issue an unlimited number of investigative demands of any breadth and burden without further approval from Board members—and to threaten recipients with severe punishment for "noncooperation" if the recipients object to those demands or fail to comply; (2) after the staff's investigation is completed, they typically review and approve DEI staff's decision to file formal charges (and in most cases they approve one or more contemporaneous settlement agreements already negotiated and finalized by DEI staff); and (3) after a hearing officer has conducted any necessary hearings and issued a decision, they decide any appeals from that decision. With respect to appeals from hearing officer decisions, upon information and belief, the Board often overturns hearing officer decisions favorable to a charged firm or individual, but rarely (if ever) overturns hearing officer decisions favorable to DEI.  At all other times throughout the years-long process, upon information and belief, Board members are largely oblivious to what private DEI staff are doing in any given investigation or disciplinary proceeding.

21.     Yet the coercive and discretionary power wielded by these private Board employees is extraordinary.  For example, when conducting investigations, DEI employees routinely issue multiple intrusive and burdensome ABDs that can force recipients to search for and produce troves of private documents and other information, and to submit to multiple days of interrogation under oath, all backed by the threat of punishment for "noncooperation"—which can include loss of livelihood, substantial monetary penalties, and even incarceration—if recipients fail to obey DEI

10

**Appendix**
**Page 11**

staff's commands.  The cost and burden of complying with these demands can be staggering.  And the Board allows no process by which recipients of these intrusive and coercive DEI staff demands can seek even the Board members' intervention (much less that of the SEC Commissioners or a court) to challenge the appropriateness or breadth of the demands.  Unsurprisingly, most Board targets cannot afford to risk their livelihoods and life savings—not to mention the wrath of their principal regulator and potential incarceration—so they predictably choose to obey DEI staff's demands, thereby forgoing any meaningful opportunity to challenge those demands as unconstitutional or otherwise improper.

22.     Board disciplinary proceedings that follow staff investigations are no less coercive and no less expensive to defend.  The Board's procedural rules and hearing officer orders require respondents to comply with numerous commands and deadlines, again upon threat of punishment for noncooperation or being found in default.  At the end of a process that typically involves voluminous briefing and live testimony at a hearing, the hearing officer is empowered to punish the accused with fines, industry suspensions or bars, and other potential sanctions, which become final and enforceable unless appealed to the Board members.

23.     To reiterate, *all* of this core executive and pseudo-judicial activity is performed and superintended by *private* citizens, none of whom is constitutionally appointed as even an "inferior" officer of the United States.  Upon information and belief, the activity is subject to only limited, sporadic direction and supervision by the Board members, while the SEC's Commissioners—the only principal constitutional officers in the vicinity—are entirely uninvolved and oblivious to the facts and proceedings as this vast and coercive power is wielded against regulated accountants and accounting firms over the course of a multi-year process.

24.     The target of an investigation and disciplinary prosecution by the Board's private-sector employees theoretically has the right to appeal any sanction imposed by the hearing officer

**Appendix**

**Page 12**

to the SEC-appointed Board members (and then to the SEC Commissioners and, finally, to a federal appeals court, as previously noted), but for most targets that remote prospect of eventual appellate review is not only cost-prohibitive but also ephemeral. Of the several hundred targets investigated and prosecuted by Board staff members over the Board's 22-year history, very few have had the resources and perseverance to appeal their sanctions even to the Board members, much less to SEC or a federal court. As best Plaintiff can tell from the available public record, targets in only 12 Board enforcement cases have ever appealed their sanctions even to the Board members, and the last time Board members decided such an appeal on the merits appears to have been more than six years ago (in December 2017).

**C.    The Unavailability of a Venue, Process, or Mechanism to Challenge Board Staff-Issued ABDs**

25.    Sarbanes-Oxley authorizes the Board to investigate suspected violations of the Act, Board rules, the securities laws applicable to preparing and issuing audit reports, the obligations and liabilities of accountants concerning them (including SEC rules issued under Sarbanes-Oxley), and professional auditing standards. Sarbanes-Oxley § 105(b)(1), 15 U.S.C. § 7215(b)(1).

26.    Sarbanes-Oxley further empowers the Board to: (a) compel testimony from a firm or its associated persons about any matter that the Board considers relevant to the investigation; (b) require a firm or its associated persons to produce audit work papers and other documents or information in their possession that the Board considers relevant to the investigation, and inspect the books and records of the firm or its associated persons to verify the accuracy of the documents or information supplied; (c) with appropriate notice, request testimony and document production from third parties, including a firm's audit clients, concerning any matter that the Board considers relevant to the investigation; and (d) establish procedures for seeking subpoenas from the SEC for testimony or documents. Sarbanes-Oxley § 105(b)(2), 15 U.S.C. § 7215(b)(2).

27.     The Board also may punish firms and their associated persons for refusing to cooperate with investigations. Potential sanctions include public censures; draconian fines; industry bars or suspensions; and "other lesser sanctions."  Any such sanctions can be appealed in the first instance only to the SEC, but only after the sanctions become "final" with the Board. Sarbanes-Oxley §§ 105(b)(3), 107(c)(2), 15 U.S.C. §§ 7215(b)(3), 7217(c)(2); 17 CFR § 201.440(a).

28.     Sarbanes-Oxley also directed the Board to promulgate rules to provide "fair procedures" for investigating and disciplining registered public accounting firms and their associated persons. Sarbanes-Oxley § 105(a), 15 U.S.C. § 7215(a).  But the statute did not define "fair procedures" and provided no intelligible principle to guide or constrain the Board in promulgating such rules.  As a predictable result, the Board's investigative and disciplinary process is notoriously one-sided and abusive—and anything but fair.

29.     As relevant here, for example, neither Sarbanes-Oxley nor Board rules impose any limit on the number of years DEI staff can investigate a targeted firm or individual.  Unlike federal rules governing civil litigation, Board rules also do not limit the number of ABDs and other investigative demands DEI staff may issue during an investigation, nor the scope of those demands, nor the cost and burden inflicted upon recipients to comply with those demands.  There are likewise no limits on the number of hours the recipient of an ABD may be interrogated under oath by the Board's DEI staff. Not surprisingly, therefore, the Board's overall investigative and disciplinary process typically takes many years to complete, features multiple successive ABDs requiring targeted firms and auditors to produce reams of private documents at great burden and expense, and compels witnesses to endure lengthy testimony sessions—often for several days on end.  DEI's investigation of Plaintiff has been no exception.

**Appendix**
**Page 14**

30.     Particularly troublesome is that neither Sarbanes-Oxley nor Board rules provide any process, procedure, or mechanism for a party to challenge the validity, scope, or legality of a Board investigation or of any ABD issued by DEI staff in connection with a Board investigation. This blatant denial of due process of law is sharply contrasts with the judicial relief available in the context of government investigations, particularly those conducted by the SEC.

31.     Under the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC must invoke the jurisdiction of a court of the United States to secure compliance with a subpoena issued in connection with one of its own investigations. 15 U.S.C. § 78u(c). Stated otherwise, "such subpoenas are unenforceable absent a court order." *Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983). Then, "[t]o win judicial enforcement of an administrative subpoena, the SEC 'must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required ... have been followed....'" *RNR Enters. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)).

32.     This crucial constitutional safeguard—the availability of Article III judicial review *before* testimony or production of documents can be compelled—is completely absent in the context of Board staff-issued ABDs, which thereby become self-executing. Indeed, with staff-issued ABDs in Board investigations, Board rules do not even allow recipients to seek prior review of the ABD by the SEC-appointed Board members or the SEC Commissioners before obedience is compelled, much less by an Article III court. ABD recipients have only two options: (1) obey the staff-issued ABD, and thereby effectively forgo any meaningful opportunity to challenge it; or (2) disobey the ABD and be punished (and possibly even criminally prosecuted) for violating Board rules that prohibit "noncooperation." As previously discussed, punishment for

14

**Appendix**
**Page 15**

noncooperation could eventually be challenged through belated judicial review, but any such review comes far too late to provide meaningful relief or to satisfy the constitutional requirement of due process of law and the statutory requirement of fair procedures.

33.    Another crucial due process safeguard is "fair notice," a "basic principle of administrative law." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). As the Fifth Circuit stated in an oft-cited case, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). The agency "must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Id*. "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp*., 867 F.3d 564, 578 (5th Cir. 2017) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)).

34.    The Board's investigation of Plaintiff relates to the audit of cryptoassets. Despite the explosive growth of the cryptocurrency industry, prior to the audits now under scrutiny in the Board's investigation of Plaintiff, the Board never promulgated any auditing standards expressly governing crypto-related assets and issuers; so, auditors like Plaintiff had no fair notice of regulatory expectations for such audits. Of the Board's nearly 60 auditing standards, three quality control standards, and 17 Board staff interpretations, none expressly addresses audits of cryptoassets, cryptocurrency, or crypto-mining issuers. Without Board standards or rules providing fair notice, auditors are left only with the option of selecting from a wide range of

15

**Appendix**
**Page 16**

opinions on the best method of auditing assets of crypto-related issuers.[4] In fact, in November 2023, one SEC Commissioner criticized the practice of "regulation by enforcement," and focused precisely on the absence of notice in the cryptoassets arena.[5] Commissioner Mark T. Uyeda, "Remarks to the 2023 Conference on SEC Regulation Outside the United States: Fifth Annual Scott Friestad Memorial Lecture" (Nov. 6, 2023), https://www.sec.gov/news/speech/uyeda-remarks-sec-reg-outside-us-5th-annual-scott-friestad-memorial-lecture. Commenters have likewise recognized the "absence of recognized accounting standards for cryptoassets." *See* Elizabeth Chan, Nicole Tang, Edward Taylor, *Crypto Disputes: The Valuation Challenge*, 17 Disp. Resol. Int'l 21, 39 (2023).

35. Because there are no formal standards, rules, or regulations articulating any regulatory expectations related to cryptocurrencies, cryptoassets, or crypto-mining issuers, Plaintiff did not have fair notice of the audit expectations underlying DEI staff's now expanded substantive investigation through its new ABD and any potential future disciplinary proceedings. And, with the absence of such fair notice, the applicable auditing standards effectively are whatever the Board's DEI staff claim them to be.

**D.     Plaintiff's "Here-and-Now" Constitutional Injury**

---

[4] In December 2023, well after the audits at issue, the Financial Accounting Standards Board ("FASB") issued ASU No. 2023-08, "Intangibles—Goodwill and Other—Crypto Assets (Subtopic 350-60): Accounting for and Disclosure of Crypto Assets." FASB makes clear that "[t]he FASB issues an Accounting Standards Update (ASU) to communicate changes to the FASB Codification, including changes to non-authoritative SEC content. ASUs *are not authoritative* standards." (emphasis added)

[5] "[O]ne of the most discussed areas of the U.S. federal securities laws when someone mentions regulation by enforcement [is] cryptocurrencies and digital assets. For years, market participants have expressed concern about a lack of regulatory guidance in the crypto space. Let's be clear about it—enforcement actions are not well-suited for providing guidance…. Accordingly, the Commission should consider proposing rules or issuing interpretive guidance with respect to cryptocurrencies and digital assets. It's unfortunate that, despite the large number of rule proposals issued by the SEC during the last two years, cryptocurrency was not among them. A responsible regulator considers how the laws and rules apply to new types of securities and then develops or modifies those provisions so that the regulatory requirements can be satisfied….The SEC could have proactively contributed to the creation of a body of law regarding cryptocurrencies and digital assets. Unfortunately, the SEC did not take this approach and instead is pursuing a case-by-case approach through enforcement actions."

**Appendix**

**Page 17**

36.    Plaintiff's ongoing nightmare in the Board's enforcement maw is not atypical, with the exception that Plaintiff possesses the rare degree of fortitude and resolve necessary to fight back and challenge the Board.

37.    Following an informal request in October 2021, non-compliance with which would have resulted in immediate entry of an order of formal investigation and the issuance of ABDs, DEI staff have issued Plaintiff and its personnel six compulsory ABDs (including the ABD of March 14, 2024 challenged by this Complaint) requiring them to produce tens of thousands of pages of documents in an onerous format not even required by the SEC, and to sit for seven full days of formal, on-the-record sworn testimony so far.  Yet DEI staff remains unsatiated, so it now seeks to expand and prolong its investigation even further.  DEI's most recent ABD demands audit documentation and information from an entirely different year's audit than what had consumed the preceding two-and-one-half years of investigation.

38.    When the Board issued its Order of Formal Investigation on August 16, 2022, the Board set forth a kitchen-sink list of possible violations to investigate without providing any notice as to the precise issues under investigation.  None of the auditing standards or quality control standards cited in the investigation order included the word "crypto," let alone cryptocurrencies, cryptoassets, or crypto-mining.  Nevertheless, the investigation, in substance, was entirely about the audit of crypto-mining assets and cryptocurrencies.

39.    Each ABD issued by DEI staff during its investigation—including the most recent one—has featured similar threats of punishment for "noncooperation":

> Noncooperation with the Board in connection with an investigation may result in the imposition of sanctions as described below. Conduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand….[I]f a *registered public accounting firm* refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or revoke the registration of the firm, or invoke such lesser sanctions as the Board considers appropriate. Similarly, if a

**Appendix
Page 18**

*person associated with* a registered public accounting firm refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or bar such person from being associated with a registered public accounting firm, or may require the registered public accounting firm to end such association…."

40.    In October 2023, DEI staff notified Plaintiff's counsel that DEI staff intended to recommend that the Board initiate a formal disciplinary proceeding that would charge various violations of Board rules.

41.    In November 2023, Plaintiff's counsel submitted a formal written statement of position that vigorously challenged DEI staff's proposed charges and disputed the analysis underlying DEI's recommendation.

42.     DEI staff subsequently informed counsel that DEI staff was not persuaded by the statement of position.  Following several weeks of further discussion, DEI staff informed counsel, on February 8, 2024, that DEI staff would proceed with recommending to the Board the initiation of a formal disciplinary proceeding.  DEI staff further informed counsel that the next notification to counsel would be upon the initiation of the formal disciplinary proceeding. At the time, DEI staff knew unequivocally that anyone accused in the anticipated proceeding intended to contest vigorously DEI's charges.

43.    Over a month later, on March 14, 2024, rather than advising counsel of the initiation of a formal disciplinary proceeding, DEI staff issued *yet another* ABD compelling Plaintiff to produce *still more* documents within two weeks, under renewed threat of punishment for noncooperation.  The newest ABD would expand DEI's endless investigation to probe an entirely different audit than the previous subject matter of the investigation.

44.    Upon information and belief, DEI staff issued its latest ABD in the middle of March, with only a two-week compliance deadline, knowing that it would cause severe burden and disruption to Plaintiff during the busiest period of the year for Plaintiffs and most other audit

18

**Appendix**
**Page 19**

firms and auditors. Many year-end issuer audits need to be completed by mid- to late March to comply with SEC statutes and regulations, and tax season follows just around the corner in April. At a minimum, DEI staff's strategic timing shows little regard for the Board's professed mission to improve audit quality.

## FIRST CLAIM FOR RELIEF

### (Unlawful Delegation of Legislative Power Without an Intelligible Principle)

45.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

46.     Article I of the Constitution vests all legislative powers in Congress. Under existing Supreme Court precedent, Congress may delegate its legislative powers only if it provides the delegatee with an "intelligible principle" to direct the delegatee in exercising those delegated powers.

47.     Sarbanes-Oxley delegated vast legislative power to the Board, including the power to promulgate rules governing virtually every audit of every publicly traded corporation and broker-dealer with access to U.S. securities markets, and virtually every audit firm and individual participating in those audits.

48.     Sarbanes-Oxley also delegated to the Board the legislative power and mandate to establish, by rule, "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." As previously discussed, however, Congress did not define "fair procedures" and provided the Board with no intelligible principle to direct or constrain the Board in exercising this delegated legislative function. The Board's resulting rules for investigating and disciplining registered public accounting firms and their associated persons, including Plaintiff, are therefore constitutionally illegitimate and unenforceable.

19

## Appendix
## Page 20

49.    By enforcing and continuing to exploit its illegitimate and unenforceable rules, thereby prolonging its investigation of Plaintiff with yet another compulsory ABD and threatening Plaintiff with punishment for "noncooperation" if it fails to comply with the ABD, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article I of the Constitution, inflicting substantial here-and-now injury against Plaintiff.

## SECOND CLAIM FOR RELIEF

### (Exercise of Private, Unsupervised Executive Power in Violation of Article II of the Constitution)

50.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

51.    "A cardinal constitutional principle is that federal power can be wielded only by the federal government.  Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).  "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion."  *Id.* at 880 (quoting THE FEDERALIST No. 51); *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("When it comes to private entities . . . there is not even a fig leaf of constitutional justification" for delegation).

52.    The Board's investigation of Plaintiff, including the succession of compulsory ABDs issued by the private citizens employed in the Board's DEI and the anticipated prosecution of Plaintiff in a forthcoming formal disciplinary proceeding, constitute exercises of core governmental executive power under color of federal law.  However, as detailed above, these

20

**Appendix
Page 21**

exercises of core executive power are being performed, and continue to be performed, by private actors without any meaningful supervision, oversight, or direction by SEC or any other governmental agency within the Executive Branch led by principal officers of the U.S. government, much less by the President.  Worse yet, they are being performed, and will continue to be performed, with only minimal, sporadic supervision and direction from the inferior officers who were appointed by the SEC to lead the Board.

53.     By exercising core executive law enforcement power against Plaintiff without meaningful direction, oversight, and supervision by principal officers of the Executive Branch, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article II of the Constitution, inflicting substantial ongoing harm against Plaintiff.


**THIRD CLAIM FOR RELIEF**

**(Denial of Due Process of Law in Violation of the Fifth Amendment to the Constitution)**

54.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

55.     Due process of law forbids a person from being compelled to produce personal papers or to provide involuntary testimony in a federal investigation or proceeding unless and until directed to do so by an independent court of law after notice and an opportunity to be heard.

56.     In violation of these requirements, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board staff-issued ABDs, including the one recently issued to Plaintiff as described herein.  Board rules provide no guidelines or limits on the number of ABDs the Board's staff can issue, nor on the cost and burden that those ABDs can impose on their recipients.  Board rules likewise provide no meaningful process or procedure for recipients of staff-issued ABDs to obtain Article III judicial review of those ABDs,

21

nor even administrative review by the Board members or the SEC Commissioners. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential criminal prosecution for "noncooperation," the Board is depriving Plaintiff of due process of law in violation of the Fifth Amendment, and will continue to do so unless enjoined.

## FOURTH CLAIM FOR RELIEF

### (Denial of Fair Procedures in Violation of Sarbanes-Oxley § 105(a))

57. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

58. Sarbanes-Oxley Section 105(a) requires the Board to establish "fair procedures" for its investigative and disciplinary proceedings.

59. In violation of this requirement, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board staff-issued ABDs, including the one recently issued to Plaintiff as described herein. Board rules provide no guidelines or limits on the number of ABDs the Board's staff can issue, nor on the cost and burden that those ABDs can impose on their recipients. Board rules likewise provide no meaningful process or procedure for recipients of staff-issued ABDs to obtain Article III judicial review of those ABDs, nor even administrative review by the Board members or the SEC Commissioners. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential criminal prosecution for "noncooperation," the Board is depriving Plaintiff of fair procedures in violation of Sarbanes-Oxley § 105, and will continue to do so unless enjoined.

22

**Appendix**
**Page 23**

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor granting the following relief:

(i)     A declaratory judgment, pursuant to 28 U.S.C. § 2201(a), declaring that the ABD issued to Plaintiff on March 14, 2024 is unconstitutional, unenforceable, void, and quashed;

(ii)    An injunction prohibiting the Board or its staff from (a) enforcing the ABD issued to Plaintiff on March 14, 2024; (b) threatening or imposing punishment or sanctions for "noncooperation" in connection with the ABD; and/or (c) issuing any further ABDs to Plaintiff in connection with its ongoing investigation unless and until it promulgates rules or other protocols disclaiming any power to sanction Plaintiff for failure to comply with the ABD before seeking judicial review and enforcement of the ABD;

(iii)   An award of attorneys' fees and costs to Plaintiff; and

(iv)    Such other and further relief as the Court deems just and appropriate.

Dated:  March 27, 2024                    Respectfully submitted,

                                          By:     /s/ *John R. Nelson*
                                                  John R. Nelson
                                                  State Bar No. 00797114
                                                  Federal ID No. 32683
                                                  DICKINSON WRIGHT PLLC
                                                  607 West 3rd Street, Suite 2500
                                                  Austin, TX 78701
                                                  Tel: (512) 770-4200
                                                  Fax: (844)-670-6009
                                                  jnelson@dickinsonwright.com

                                                  Jacob S. Frenkel (*pro hac vice forthcoming*)
                                                  MD Bar No. 199206092
                                                  DICKINSON WRIGHT PLLC
                                                  International Square

23

**Appendix**
**Page 24**

1825 I St., N.W., Suite 900
Washington, DC 20006
Tel: (202) 466-5953
Fax: (844)-670-6009
jfrenkel@dickinsonwright.com

Brooks T. Westergard
(*pro hac vice forthcoming*)
NV Bar No. 14300
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, NV 89501
Tel:  (775) 343-7510
Fax: (844)-670-6009
bwestergard@dickinsonwright.com

Russell G. Ryan (*pro hac vice forthcoming*)
Sheng Li (*pro hac vice forthcoming*)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street, N.W., Suite 450
Washington, DC  20036
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff John Doe Corporation*

24

**Appendix
Page 25**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOHN DOE CORPORATION

**DEFENDANTS**

Public Company Accounting Oversight Board

**(b)** County of Residence of First Listed Plaintiff    N/A
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    N/A
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

John R. Nelson, Dickinson Wright PLLC, 607 W. Third Street, Suite 2500, Austin, TX 78701

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | **FEDERAL TAX SUITS** | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1331 et seq.

Brief description of cause:
Unconstitutional proceeding.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
3/27/2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ JOHN R. NELSON

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**Appendix**
**Page 26**

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Exhibit C**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 4:24-cv-1103 |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, | § | |
| | § | |
| *Defendant.* | § | |

## DEFENDANT'S RULE 12(b) MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, TO TRANSFER

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................1

STATEMENT OF THE CASE ................................................................................1

ISSUES PRESENTED.............................................................................................4

STANDARD OF REVIEW .....................................................................................4

ARGUMENT ...........................................................................................................5

I.    This Court Should Dismiss For Lack Of Personal Jurisdiction Or, In The Alternative, Transfer This Case Pursuant To Section 1404(a) ......................5

    A.    Doe Fails To Plead Facts Showing Personal Jurisdiction Over The Board............5

    B.    Even If The Court Concludes That It Has Jurisdiction, The Court Should Transfer This Case To The U.S. District Court For The District Of Columbia ........8

        1.    The Private Interest Factors Favor Transfer ...................................9

        2.    The Public Interest Factors Favor Transfer ...............................10

II.    Each Of Doe's Claims Must Be Dismissed ................................................11

    A.    Doe's Due Process And "Fair Procedures" Claims Must Be Dismissed For Lack Of Subject-Matter Jurisdiction And Failure To State A Claim (Claims 3 And 4)............11

        1.    This Court Lacks Subject-Matter Jurisdiction Over Doe's Due Process And "Fair Procedures" Claims .......................11

        2.    Doe's Due Process Claim Fails To State A Claim For Relief ..................15

        3.    Doe's "Fair Procedures" Claim Fails To State A Claim For Relief .........18

    B.    Doe Cannot State A Claim Based On The Nondelegation Doctrine (Claim 1) ........19

    C.    Doe Cannot State A Claim For Unlawful Exercise Of Governmental Power By A Private Entity (Claim 2) ................21

III.    The Complaint Should Be Dismissed Because Doe Failed To Exhaust Administrative Remedies And Lacks Any Cause of Action .......................23

IV.    Doe Cannot Establish Entitlement To Injunctive Or Declaratory Relief Given The Pendency Of Agency Proceedings.......................25

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andrade v. Chojnacki,*
934 F. Supp. 817 (S.D. Tex. 1996) ..........................................................5

*Armstrong v. Exceptional Child Ctr.,*
575 U.S. 320 (2015)................................................................................25

*Axon Enter. v. FTC,*
598 U.S. 175 (2023) ...................................................................... *passim*

*Big Time Vapes v. FDA,*
963 F.3d 436 (5th Cir. 2020) .........................................................19, 20

*BNSF v. Tyrrell,*
581 U.S. 402 (2017).................................................................................5

*Carmona v. Leo Ship Mgmt.,*
924 F.3d 190 (5th Cir. 2019) ..................................................................5

*Carr v. Saul,*
593 U.S. 83 (2021)................................................................................24

*Church of Scientology of Cal. v. United States,*
506 U.S. 9 (1992)..................................................................................15

*Citadel Sec. v. CBOE,*
808 F.3d 694 (7th Cir. 2015) ................................................................24

*Clarke v. CFTC,*
74 F.4th 627 (5th Cir. 2023) .................................................................24

*In re Clarke,*
94 F.4th 502 (5th Cir. 2024) .................................................................11

*Cody v. SEC,*
693 F.3d 251 (1st Cir. 2012) .................................................................18

*D'Alessio v. SEC,*
380 F.3d 112 (2d Cir. 2004)..................................................................18

*Def. Distributed v. Grewal,*
971 F.3d 485 (5th Cir. 2020) ..............................................................7, 8

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
575 U.S. 43 (2015)..................................................................21, 22

*Doe v. PCAOB,*
2024 WL 1096546 (N.D. Tex. Mar. 13, 2024) ...............................8, 9

*Doe v. PCAOB,*
No. 24-cv-0780 (D.D.C. Jan. 19, 2023)...........................................10

*Elgin v. Dep't of Treasury,*
567 U.S. 1 (2012)........................................................................11, 13

*Elsensohn v. St. Tammany Par. Sheriff's Off.,*
530 F.3d 368 (5th Cir. 2008) .............................................................5

*Endicott Johnson v. Perkins,*
317 U.S. 501 (1943).........................................................................17

*Epstein v. SEC,*
416 F. App'x 142 (3d Cir. 2010) .....................................................18

*Ex parte Young,*
209 U.S. 123 (1908).........................................................................25

*First Jersey Sec. v. Bergen,*
605 F.2d 690 (3d Cir. 1979).............................................................24

*FPC v. Hope Nat. Gas,*
320 U.S. 591 (1944).........................................................................20

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) .................................................................. *passim*

*FTC v. Standard Oil,*
449 U.S. 232 (1980)....................................................................16, 24

*Gold v. SEC,*
48 F.3d 987 (7th Cir. 1995) .............................................................18

*Graceba Total Commc'ns v. FCC,*
115 F.3d 1038 (D.C. Cir. 1997).......................................................14

*Green Valley v. City of Schertz,*
969 F.3d 460 (5th Cir. 2020) ...........................................................25

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Gundy v. United States,*
588 U.S. 128 (2019)...................................................................................20

*Harris Cnty. v. MERSCORP,*
791 F.3d 545 (5th Cir. 2015) ...................................................................24

*Houston Trial Reps. v. LRP Publ'ns,*
85 F. Supp. 2d 663 (S.D. Tex. 1999) .....................................................10

*J.W. Hampton, Jr. v. United States,*
276 U.S. 394 (1928)...................................................................................19

*Jarkesy v. SEC,*
34 F.4th 446 (5th Cir. 2022) .............................................................20, 21

*Judulang v. Holder,*
565 U.S. 42 (2011).....................................................................................14

*Lebron v. Nat'l R.R. Passenger Corp.,*
513 U.S. 374 (1995)...................................................................................22

*Markwell v. Equitybuild,*
2018 WL 4334011 (S.D. Tex. July 30, 2018).........................................5

*Mathews v. Eldridge,*
424 U.S. 319 (1976).............................................................................14, 17

*McFadin v. Gerber,*
587 F.3d 753 (5th Cir. 2009) .....................................................................5

*Merrill Lynch, Pierce, Fenner & Smith v. NASD,*
616 F.2d 1363 (5th Cir. 1980) .................................................................23

*Mistretta v. United States,*
488 U.S. 361 (1989)...................................................................................19

*Mohlman v. FINRA,*
977 F.3d 556 (6th Cir. 2020) ...................................................................24

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
53 F.4th 869 (5th Cir. 2022) ...............................................................21, 23

*NBC v. United States,*
319 U.S. 190 (1943)...................................................................................20

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015)................................................................20

*Plaquemines Par. v. Chevron USA,*
   84 F.4th 362 (5th Cir. 2023) ...............................................17

*Posada v. Lamb Cnty.,*
   716 F.2d 1066 (5th Cir. 1983) .............................................25

*Quick Techs. v. Sage Grp.,*
   313 F.3d 338 (5th Cir. 2002) .................................................4

*Renegotiation Bd. v. Bannercraft Clothing,*
   415 U.S. 1 (1974).................................................................16

*Richards v. McLane,*
   2023 WL 6533453 (5th Cir. Oct. 6, 2023)..........................18

*Sandsend Fin. Consultants v. Fed. Home Loan Bank Bd.,*
   878 F.2d 875 (5th Cir. 1989) ...............................................17

*SEC v. Jerry T. O'Brien,*
   467 U.S. 735 (1984).............................................................16

*Seminole Tribe v. Florida,*
   517 U.S. 44 (1996)...............................................................25

*Serrano v. Customs & Border Patrol,*
   975 F.3d 488 (5th Cir. 2020) ...............................................17

*Seville v. Maersk Line, Ltd.,*
   53 F.4th 890 (5th Cir. 2022) .................................................8

*State v. Rettig,*
   987 F.3d 518 (5th Cir. 2021) ...............................................22

*Stockman v. FEC,*
   138 F.3d 144 (5th Cir. 1998) .................................................4

*Stroman Realty v. Wercinski,*
   513 F.3d 476 (5th Cir. 2008) .............................................6, 7

*Swirsky v. NASD,*
   124 F.3d 59 (1st Cir. 1997)..................................................24

## TABLE OF AUTHORITIES
### (Continued)

*Swish Mktg. v. FTC*,
  669 F. Supp. 2d 72 (D.D.C. 2009) ............................................................25

*Thunder Basin Coal v. Reich*,
  510 U.S. 200 (1994) ............................................................11, 13, 16

*Total Gas & Power N. Am. v. FERC*,
  2016 WL 3855865 (S.D. Tex. July 15, 2016) ..............................25

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) ............................................................23

*Veldhoen v. U.S. Coast Guard*,
  35 F.3d 222 (5th Cir. 1994) ............................................................25

*Vermont Yankee Nuclear Power v. Nat. Res. Defense Council*,
  435 U.S. 519 (1978) ............................................................20

*In re Volkswagen AG*,
  371 F.3d 201 (5th Cir. 2004) ............................................................9, 10

*In re Volkswagen of Am.*,
  545 F.3d 304 (5th Cir. 2008) ............................................................4, 9

*Walden v. Fiore*,
  571 U.S. 277 (2014) ............................................................7

*Yakus v. United States*,
  321 U.S. 414 (1944) ............................................................19, 20

**FEDERAL STATUTES**

5 U.S.C. § 704 ............................................................24

7 U.S.C. § 21(b)(9) ............................................................18

15 U.S.C. § 77v ............................................................8

15 U.S.C. § 78aa(a) ............................................................8

15 U.S.C. § 78f(b)(7) ............................................................18

15 U.S.C. § 78*o*-3(b)(8) ............................................................18

## TABLE OF AUTHORITIES
### (Continued)

15 U.S.C. § 78q-1(b)(3)(H) ........................................................................18

15 U.S.C. § 78s(c) ....................................................................................23

15 U.S.C. § 78s(d) ......................................................................................2

15 U.S.C. § 78s(d)(2) ...............................................................................12

15 U.S.C. § 78s(e) ......................................................................................2

15 U.S.C. § 78s(e)(1) ................................................................................12

15 U.S.C. § 78u(d) ....................................................................................24

15 U.S.C. § 78u-2 ......................................................................................24

15 U.S.C. § 78u-3 ......................................................................................24

15 U.S.C. § 78y(a) ..................................................................2, 12, 15, 25

15 U.S.C. § 80a-41 ......................................................................................8

15 U.S.C. § 80b-9 ........................................................................................8

15 U.S.C. § 7202(b)(1) .............................................................................24

15 U.S.C. § 7211(a) ............................................................................ *passim*

15 U.S.C. § 7211(b) ..................................................................................24

15 U.S.C. § 7211(e)(1) .............................................................................22

15 U.S.C. § 7211(e)(2) .............................................................................22

15 U.S.C. § 7211(e)(4) .............................................................................22

15 U.S.C. § 7211(h) ..................................................................................22

15 U.S.C. § 7212(a) .................................................................................2, 7

15 U.S.C. § 7212(b)(3) .............................................................................18

15 U.S.C. § 7213(a)(1) ...........................................................................2, 22

## TABLE OF AUTHORITIES
### (Continued)

                                                                    **Page(s)**

15 U.S.C. § 7213(a)(2)................................................................22

15 U.S.C. § 7215....................................................................24

15 U.S.C. § 7215(a) .......................................................... *passim*

15 U.S.C. § 7215(b)..................................................................7

15 U.S.C. § 7215(b)(1) .........................................................2, 20

15 U.S.C. § 7215(b)(2) ............................................2, 18, 19, 20

15 U.S.C. § 7215(b)(2)(A).........................................................19

15 U.S.C. § 7215(b)(2)(B).........................................................19

15 U.S.C. § 7215(b)(2)(D).........................................................19

15 U.S.C. § 7215(b)(3) .....................................................12, 19, 20

15 U.S.C. § 7215(b)(3)(A)..........................................................2

15 U.S.C. § 7215(b)(3)(B)..........................................................2

15 U.S.C. § 7215(b)(4).............................................................23

15 U.S.C. § 7215(c) ..........................................................2, 12, 20

15 U.S.C. § 7215(c)(4).............................................................19

15 U.S.C. § 7215(d)...............................................................23

15 U.S.C. § 7215(e) ...............................................................2, 16

15 U.S.C. § 7215(e)(1).............................................................13

15 U.S.C. § 7217(b)...............................................................15

15 U.S.C. § 7217(b)(2)...........................................................22, 23

15 U.S.C. § 7217(b)(5).............................................................23

15 U.S.C. § 7217(c) ......................................................12, 15, 19, 23

15 U.S.C. § 7217(c)(1).............................................................25

## TABLE OF AUTHORITIES
### (Continued)

| | Page(s) |
|---|---|
| 15 U.S.C. § 7217(c)(2) | 2, 23, 25 |
| 15 U.S.C. § 7217(c)(3) | 2, 24, 25 |
| 15 U.S.C. § 7217(d) | 23 |
| 28 U.S.C. 1391(b) | 8 |
| 28 U.S.C. § 1404(a) | 4, 5, 8, 9 |
| 28 U.S.C. § 1406(a) | 8 |
| 33 U.S.C. § 1318 | 15 |
| 33 U.S.C. § 1319 | 15 |
| 49 U.S.C. § 44903(j)(2)(G)(i) | 20 |
| 49 U.S.C. § 44909(c)(6)(B)(i) | 20 |

**FEDERAL RULES**

| | |
|---|---|
| Fed. R. Civ. P. 12(b) | 1, 5 |

**CONSTITUTIONAL PROVISIONS**

| | |
|---|---|
| U.S. CONST. art. II | 4, 13 |

**OTHER AUTHORITIES**

| | |
|---|---|
| U.S. Dist. Cts–Nat'l Judicial Caseload Profile, U.S. Courts, https://www.uscourts.gov/file/71612/download (12-Month Period Ending Mar. 31, 2023) | 10 |

Defendant Public Company Accounting Oversight Board ("PCAOB" or "Board") respectfully moves to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(1) and (b)(6).

## INTRODUCTION

John Doe Corporation ("Doe"), a public accounting firm subject to the Board's oversight, filed this lawsuit to derail a Board investigation into its auditing practices. But Doe's complaint has not pleaded facts sufficient to establish personal jurisdiction over the Board; this Court lacks subject-matter jurisdiction over many of Doe's claims; and the remainder fail to state a claim and are deficient for additional reasons. The law provides Doe with substantial substantive and procedural protections and ample opportunities for appropriate judicial review of any Board action. The complaint is a transparently improper effort to evade normal and appropriate regulatory oversight. It should be dismissed or, at minimum, transferred. The Board believes that oral argument would assist resolution of this motion.

## STATEMENT OF THE CASE

On March 27, 2024, Doe filed a complaint in this Court against the Board (the "Complaint") seeking declaratory and injunctive relief. The Complaint claims that the Board has issued to Plaintiff an investigative "Accounting Board Demand" ("ABD")—*i.e.*, a request to produce documents and testimony—via a process that violates the law.

*Legal background*. Congress established the Board in the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ("Sarbanes-Oxley Act" or "Act"), to oversee audits of public companies subject to the securities laws. 15 U.S.C. § 7211(a). Organized as a nonprofit corporation under D.C. law, the Board carries out its functions under the supervision of the Securities and Exchange Commission ("SEC" or "Commission") much like self-regulatory organizations ("SROs") such as the New York Stock Exchange help regulate the securities markets with SEC oversight. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484 (2010). Accounting

firms that audit publicly traded companies and certain broker-dealers must register with the Board and comply with auditing and other professional standards.  15 U.S.C. §§ 7212(a), 7213(a)(1).

The Board may investigate any act or omission by a registered public accounting firm or associated person that may violate the Act, the Board's rules, or securities-law provisions relating to preparation and issuance of audit reports.  *Id.* § 7215(b)(1).  The Board also may institute disciplinary proceedings and impose sanctions for violations of those provisions.  *Id.* § 7215(c).

One type of *investigation* involves issuance of an order of "formal investigation" ("OFI") into potential violations by registered firms and associated persons.  PCAOB R. 5101(a)(1).  When an OFI issues, the Board may designate staff members to issue "accounting board demands to, and otherwise *require* or request cooperation of, any person."  PCAOB R. 5101(a)(2) (emphasis added); *see* 15 U.S.C. § 7215(b)(2).  Accounting board demands ("ABDs") are limited to seeking documents and information "that the Board or its staff considers relevant or material to the investigation," PCAOB R. 5103(a), and recipients of ABDs are permitted to object to responding to ABDs based on an assertion of privilege, PCAOB R. 5106.

A finding *that* a firm failed to cooperate with a formal investigation, including an ABD, may result in suspension or revocation of a firm's registration by the Board or lesser sanctions as appropriate.  15 U.S.C. § 7215(b)(3)(A).  Any such sanctions are subject to immediate review by the SEC and are automatically stayed when SEC review is sought.  *Id.* §§ 7215(b)(3)(B), 7215(e), 7217(c)(2)-(3) (citing *id.* § 78s(d)-(e)).  The SEC's order, in turn, is subject to review in a federal court of appeals.  *Id.* § 78y(a).

*The Complaint's allegations*.  Doe is "a 'registered public accounting firm' within the meaning of Sarbanes-Oxley."  Compl. ¶ 3.  Doe does not allege where it is incorporated or headquartered, or where it maintains offices or does business.  *See id.*

The Board is a *District* of Columbia nonprofit corporation that is "headquartered in the District of Columbia." Compl. ¶ 4. The Board is alleged to have "at least a dozen other offices across the United States, including at least two in Texas," with "regulatory jurisdiction over more than 1,500 registered public accounting firms worldwide, including 59 in Texas." *Id.*

Doe alleges that the Board has been engaged in a long-running investigation into Doe's "audit of crypto-mining assets and cryptocurrencies." Compl. ¶ 38. The investigation allegedly began in October 2021, when Board staff informally requested documents and/or testimony from Doe. Compl. ¶ 37. Doe does not allege whether it voluntarily complied with that request. The Board then issued an OFI regarding Doe in August 2022. Compl. ¶ 38. Between August 2022 and February 2024, Doe received five ABDs for documents and testimony. Compl. ¶ 37. Doe alleges that on February 8, 2024, Board staff informed Doe that they intended to recommend that the Board initiate a formal disciplinary proceeding. Compl. ¶ 42.

On March 14, *2024*, Board staff issued the ABD that is the sole focus of the Complaint (the "March ABD"). *See* Compl. ¶ 37; Compl. at 23, Relief Requested ¶¶ (i)-(ii). Purportedly, the March ABD concerned an additional audit performed by Doe that the Board had not previously investigated. Compl. ¶ 43. Like prior ABDs Doe received, the request contained language notifying Doe that noncooperation with the ABD "may result in the imposition of sanctions," including suspension or revocation of the firm's registration. Compl. ¶ 39.

Doe does not *allege* that any part of the Board's investigation occurred in Texas or was conducted by any Board employee located in Texas. Nor does Doe allege that it is located in Texas or that any of the documents or deponents subject to the March ABD are located in Texas.

*Claims asserted in Complaint.* Doe seeks declaratory and injunctive relief, claiming that (1) Congress unconstitutionally delegated legislative authority to the Board to establish "fair procedures"; (2) the Board is violating Article II of the Constitution by "exercising core executive law enforcement power"; (3) the Board's ABD procedures violate the Due Process Clause because they do not provide pre-enforcement judicial review; and (4) those procedures are not "fair" within the meaning of Sarbanes-Oxley § 105(a). Compl. ¶¶ 48, 53, 56, 58, 59.

## ISSUES PRESENTED

Whether this *Court* lacks personal jurisdiction over the Board or, in the alternative, should transfer this case pursuant to 28 U.S.C. § 1404(a).

Whether this Court lacks subject-matter jurisdiction over Doe's due process and "fair procedures" claims or should dismiss them for failure to state a claim.

Whether Doe's claim for violation of the public and private nondelegation doctrines should be dismissed for failure to state a claim.

Whether the Complaint should be dismissed because Doe failed to exhaust administrative remedies and lacks a cause of action.

## STANDARD OF REVIEW

The "plaintiff 'bears the burden'" of "presenting a *prima facie* case that personal jurisdiction is proper." *Quick Techs. v. Sage Grp.*, 313 F.3d 338, 343 (5th Cir. 2002) (citations omitted). If personal jurisdiction is established, "district courts have 'broad discretion'" in deciding whether to transfer under 28 U.S.C. § 1404(a). *In re Volkswagen of Am.*, 545 F.3d 304, 311 (5th Cir. 2008) (citation omitted). As to subject-matter jurisdiction, the plaintiff likewise "bears the burden of demonstrating that jurisdiction is proper." *Stockman v. FEC*, 138 F.3d 144,

151 (5th Cir. 1998).[1]  Finally, "[t]o survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Elsensohn v. St. Tammany Par. Sheriff's Off.*, 530 F.3d 368, 372 (5th Cir. 2008) (citation omitted).

## ARGUMENT

**I.    This Court Should Dismiss For Lack Of Personal Jurisdiction Or, In The Alternative, Transfer This Case Pursuant To Section 1404(a)**

**A.    Doe Fails To Plead Facts Showing Personal Jurisdiction Over The Board**

*No general personal jurisdiction over the Board.*  A court may assert general jurisdiction over a corporation only if its "affiliations with the State are so 'continuous and systematic' as to render [the corporation] essentially at home in the forum State"—a condition satisfied only in the State where a corporation is incorporated or maintains its principal place of business.  *BNSF v. Tyrrell*, 581 U.S. 402, 413 (2017) (citation omitted).  The Complaint contains no allegations that the Board is incorporated in or has its principal place of business in Texas—because neither is true.  The Court therefore lacks general personal jurisdiction over the Board.

*No specific personal jurisdiction over the Board.*  To establish specific jurisdiction, Doe must show that (1) the Board "purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there"; (2) Doe's "cause of action arises out of or results from the defendant's forum-related contacts"; and (3) "the exercise of personal jurisdiction is fair and reasonable."  *Carmona v. Leo Ship Mgmt.*, 924 F.3d 190, 193 (5th Cir. 2019) (citation omitted).  Specific personal jurisdiction is a "claim-specific inquiry."  *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

The Complaint contains no allegations that would support a finding of specific personal

---

[1] This Court has "discretion about the order in which to address personal and subject-matter jurisdiction," *Markwell v. Equitybuild*, 2018 WL 4334011, at *1 (S.D. Tex. July 30, 2018), but transfer under Section 1404(a) is impermissible unless the Court has subject-matter jurisdiction, *Andrade v. Chojnacki*, 934 F. Supp. 817, 824 (S.D. Tex. 1996).

jurisdiction. The Complaint does not, for instance, allege Doe's location; any relevant contacts between the Board and Texas; or any connection between the Board's conduct allegedly giving rise to Doe's injuries and Texas. Compl. ¶¶ 5-44. Those failures warrant dismissal. And amendment would be futile. Even if, for instance, Doe were to allege that it resides in Texas, a plaintiff may not establish specific jurisdiction based on nothing more than an out-of-state agency's investigation of a Texas-based entity.

In *Stroman Realty v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), the Fifth Circuit held that this District lacked personal jurisdiction over the Commissioner of the Arizona Department of Real Estate, where the Commissioner had sent Stroman—a Texas corporation—an order directing Stroman to cease its Texas-based activities that allegedly violated Arizona law. *Id.* at 480. The court acknowledged that "the Commissioner has 'reached out' to assert her authority" over Stroman's Texas activities, and that Stroman would have to modify its Texas activities to comply. *Id*. at 480, 484. Nevertheless, the Commissioner "has not 'purposefully availed' herself of the benefits of Texas law like someone actually 'doing business' in Texas." *Id.* at 484. Unlike a private party engaged in a commercial transaction with a Texas corporation, the court explained, a government regulator seeking to enforce non-Texas law in Texas does not satisfy the critical prerequisites for a finding of minimum contacts: it does not avail itself of the privileges of Texas law or otherwise derive benefits from its activities relating to Texas. *Id*. at 485. Rather, the agency's contacts with Texas were immaterial and fortuitous: the Commissioner had effectively "assert[ed] nationwide authority" over Arizona-related transactions against a company that had chosen to do business with Arizona residents but happened to be located in Texas. *Id.* at 485-86. In that sense, the Commissioner had not "'expressly aim[ed]' her actions" at Texas. *Id.*

*Stroman*'s reasoning applies with full force here. The Board, in the exercise of its

nationwide authority to regulate public-company accounting, *e.g.*, 15 U.S.C. § 7215(b), has served ABDs on Doe to investigate compliance with nationwide statutory and regulatory provisions governing Doe's conduct. Even assuming that Doe is located in and has complied with the ABDs in Texas, the Board—like the Commissioner in *Stroman*—is simply engaging in nationwide enforcement against a company that happens to be located in Texas. The Board has not purposefully availed itself of the benefits of *Texas* (as opposed to federal) law: unlike a commercial actor who transacts business in Texas, the Board receives no benefit from the protections of Texas law. Nor has the Board aimed its conduct at *Texas*: the ABDs affect Doe only, and they will have no impact on Texas or its residents more generally. Moreover, as in *Stroman*, Doe is subject to the Board's nationwide regulatory efforts only because it chose to provide public company accounting services and expressly consented to the Board's authority. 15 U.S.C. § 7212(a) (requiring registration of public accounting firms), (b)(3) (conditioning registration on "consent" to Board investigation and enforcement proceedings). Thus, there is not purposeful direction toward Texas by the Board. *Stroman*, 513 F.3d at 486.

*Stroman*'s holding is an application of the broader principle that a plaintiff's residence in a state, and the contacts between the defendant and the *plaintiff*, are not enough to support personal jurisdiction in that state. *See Walden v. Fiore*, 571 U.S. 277, 289 (2014) (explaining that contacts between the plaintiff and the forum, and the plaintiff and the defendant, are irrelevant). Thus, allegations that Doe has had more interactions with the Board than in *Stroman*, or has been injured in Texas by the burden of complying with the ABDs, would be insufficient. *Id*. at 290.[2]

---

[2] Although the Fifth Circuit distinguished *Stroman* in a subsequent decision, its basis for doing so confirms the lack of jurisdiction here. *See Def. Distributed v. Grewal*, 971 F.3d 485, 492 (5th Cir. 2020). In *Grewal*, the New Jersey Attorney general had sent cease-and-desist letters to a Texas company, demanding that it not publish information facilitating 3D printing of firearms. *Id*. at 488-89. The court found specific jurisdiction because the Attorney General sought to "crush" the

*No nationwide service of process.*  Doe cannot establish personal jurisdiction through any nationwide service of process provision.  The Exchange Act provides for nationwide service for a narrow set of claims brought to enforce enumerated provisions of the securities laws.  *E.g.*, 15 U.S.C. §§ 78aa(a) (suit "to enforce any liability or duty" created by Chapter 2B of Title 15), 77v (suits to address "violations under this subchapter," *i.e.*, Chapter 2A, subchapter I), 80a-41 ("[e]nforcement of [this] subchapter," *i.e.*, Chapter 2D, subchapter I), 80b-9 (Chapter 2D, subchapter II).  None of Doe's claims falls within those provisions.  Three arise under the Constitution, not the Exchange Act.  *See Doe v. PCAOB*, 2024 WL 1096546, at *5-6 (N.D. Tex. Mar. 13, 2024) (reaching the same conclusion).  The fourth seeks to enforce Section 105(a) of the Sarbanes-Oxley Act.  *See* Compl. ¶¶ 57-59.  That provision falls within Chapter 98 of Title 15— and no nationwide process provision applies to rights or liabilities created by that Chapter.

Because the Court lacks personal jurisdiction over the Board, it should dismiss this action.  *See Seville v. Maersk Line, Ltd.*, 53 F.4th 890, 894 (5th Cir. 2022).  The absence of personal jurisdiction over the Board also means that venue is improper in this Court, warranting dismissal.  *See* 28 U.S.C. § 1391(b).  But if the Court nonetheless believes transfer is "in the interest of justice," it may transfer this case to the U.S. District Court for the District of Columbia ("DDC").  *See* 28 U.S.C. § 1406(a); *Doe*, 2024 WL 1096546, at *3.

**B.     Even If The Court Concludes That It Has Jurisdiction, The Court Should Transfer This Case To The U.S. District Court For The District Of Columbia**

Alternatively, the Court should transfer this action to DDC pursuant to 28 U.S.C. § 1404(a).  That statute vests courts with discretion to transfer an action "[f]or the convenience of parties and

---

Texas company by prohibiting *all* its activities, not just those directed to New Jersey, and putting the Texas company out of business would implicate the interests of Texas consumers and Texas more generally.  Moreover, the Attorney General was not engaged in neutral nationwide enforcement, but instead had singled out the Texas company for enforcement.  *See id.* at 491-93.

witnesses, in the interest of justice . . . to any other district or division where it might have been brought." Assessing the "interest of justice" involves "a number of private and public interest factors." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (*Volkswagen I*). Here, DDC is the "clearly more convenient" venue for this suit. *In re Volkswagen of Am.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc). Indeed, for those reasons, the District Court for the Northern District of Texas recently invoked Section 1404(a) to transfer to DDC a constitutional challenge to the Board's authority similar to this one. *See Doe*, 2024 WL 1096546, at *7-8.

1.      **The Private Interest Factors Favor Transfer**

The private interest factors include "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen I*, 371 F.3d at 203.

Because Doe raises purely legal questions, the first three private interest factors are not relevant here—but to the extent they are, they favor transfer. None of Doe's claims turns on particular conduct or events; rather, Doe broadly challenges the Board's authority to act and the statutory and regulatory framework pursuant to which the Board issued the ABDs. Accordingly, no discovery will be required to resolve this case. Doe, however, has expressed an intent to seek both document discovery and depositions from the Board. If any such discovery occurs, it will be in DDC. The Board is headquartered there, so relevant witnesses or documents are likely to be located there, and compulsory process is available there.

Moreover, resolution of this case would be significantly more "expeditious" and less expensive if it were transferred to DDC, because that court is already handling a materially similar case against the Board, brought by another Doe plaintiff who is represented by some of the same counsel as this Doe plaintiff. *See Doe*, 2024 WL 1096546. Although the DDC case arises out of

a disciplinary proceeding rather than an investigation, both suits assert similar private non-delegation claims, and both raise Due Process Clause challenges to Board procedures. *Compare* Compl. ¶¶ 50-53, *with* Compl. ¶¶ 18-28, 65-68, *Doe v. PCAOB*, No. 24-cv-0780 (D.D.C. Jan. 19, 2023), ECF No. 1 ("DDC Compl."); *compare* Compl. ¶¶ 54-56, *with* DDC Compl. ¶¶ 79-82.

## 2. The Public Interest Factors Favor Transfer

The public interest factors include "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Volkswagen I*, 371 F.3d at 203. These factors strongly favor transfer as well. First, judicial economy strongly favors transferring this case to DDC. Doing so would "enable different cases involving the same parties or issues to be heard in a single forum," *Houston Trial Reps. v. LRP Publ'ns*, 85 F. Supp. 2d 663, 671 (S.D. Tex. 1999). Second, the District of Columbia is far less congested than this District. The parties have already agreed that this case can be resolved on cross-motions for summary judgment, so the caseload-per-judge and the time-to-resolution statistics serve as the best proxy for congestion—and those statistics favor transfer. This District currently has an average of 766 pending cases per judgeship, and the median time from filing to disposition in civil cases is 8.5 months. *See* U.S. Dist. Cts–Nat'l Judicial Caseload Profile, at 36, U.S. Courts, https://www.uscourts.gov/file/71612/download (12-Month Period Ending Mar. 31, 2023). By contrast, judges in DDC have about half as many cases (400) and resolve them almost twice as quickly (4.7 months). *See id.* at 2. Third, the District of Columbia has a stronger interest in the dispute. Plaintiff's Complaint challenges the actions and structure of the Board, which is headquartered and has its principal place of business in the District of Columbia. Any unlawful delegation of legislative (Count I) or executive (Count II) authority occurred within DDC, and the statutory and regulatory framework that Doe challenges

as unfair was promulgated in DDC.  *See In re Clarke*, 94 F.4th 502, 511 (5th Cir. 2024).  Finally, DDC is highly familiar with constitutional challenges to administrative agencies.  That familiarity is bolstered by the pending suit against the Board in DDC.

## II.     Each Of Doe's Claims Must Be Dismissed

### A.     Doe's Due Process And "Fair Procedures" Claims Must Be Dismissed For Lack Of Subject-Matter Jurisdiction And Failure To State A Claim (Claims 3 And 4)

The Complaint's third and fourth claims assert that, under due process principles and the "fair procedures" language of the Sarbanes-Oxley Act, public accounting firms are entitled to challenge ABDs in court before deciding whether to comply.  This Court lacks subject-matter jurisdiction to entertain those claims, which Congress made subject to review by a court of appeals after presentation to the SEC.  And even if this Court did have such jurisdiction, Doe's due process and "fair procedures" claims fail to state a claim and therefore must be dismissed.

### 1.     This Court Lacks Subject-Matter Jurisdiction Over Doe's Due Process And "Fair Procedures" Claims

Congress frequently "preclude[s] district courts from exercising jurisdiction over challenges to federal agency action" by "specifying a different method to resolve" those claims. *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023).  To determine whether such channeling has occurred, courts examine "whether Congress' intent to preclude district court jurisdiction [is] 'fairly discernible in the statutory scheme,'" *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9-10 (2012) (citation omitted), and, if so, "whether the particular claims brought 'of the type Congress intended to be reviewed within this statutory structure,'" *Axon*, 598 U.S. at 186 (quoting *Thunder Basin Coal v. Reich*, 510 U.S. 200, 208, 212 (1994)).

The statutory scheme at issue here follows a "typical[]" method of claim channeling by providing for "review in a court of appeals following the agency's own review process." *Axon*, 598 U.S. at 185.  Section 105 of the Sarbanes-Oxley Act provides that, if a registered public

11

**Appendix
Page 48**

accounting firm does not comply with a Board demand for testimony or document production, the Board may institute disciplinary procedures. 15 U.S.C. § 7215(b)(3), (c). "[A]ny final sanction" imposed by the Board "for noncooperation" is subject to review by the SEC, which "may enhance, modify, cancel, reduce, or require the remission" of any sanction the SEC finds "not appropriate." *Id.* § 7217(c); *see id.* § 78s(d)(2), (e)(1). "A person aggrieved by a final order of the Commission" then "may obtain review of the order" in a federal court of appeals. *Id.* § 78y(a).

Under the Supreme Court's recent decision in *Axon*, Doe's claims that the Board's ABD procedures are unfair are necessarily "'of the type' Congress thought belonged within [that] statutory [review] scheme." *Axon*, 598 U.S. at 188-89. *Axon* distinguishes between *structural* constitutional claims, over which a district court has subject-matter jurisdiction despite the existence of a statute that channels claims elsewhere, and *procedural* due process claims like the ones Doe raises here, as to which a claim-channeling statute strips the district court of subject-matter jurisdiction. The claims in *Axon* fell into the former category, because the *Axon* plaintiffs were "challenging the Commissions' power to proceed at all, rather than actions taken in the agency proceedings," and did not raise claims "address[ing] the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* at 192-93. But Doe's claims fall squarely within the latter category—they raise precisely those "sorts of . . . matters," because they target only the "procedures [the] agenc[y] use[s] to make . . . a decision" and not the agency's "structure or very existence." *Id.* at 189, 192-93.

The "three considerations designed to aid in" discerning the reach of a claim-channeling statute, commonly known as the *Thunder Basin* factors, *Axon*, 598 U.S. at 186, further confirm that Congress intended to divest this Court of jurisdiction over claims like Doe's. First, the Sarbanes-Oxley review scheme provides "meaningful judicial review" of Doe's due process and

"fair procedures" claims because those claims can be presented to the court of appeals on a petition for review of an SEC order approving any noncooperation sanctions. *Id.* at 190 (citation omitted); *see Thunder Basin*, 510 U.S. at 215; *Elgin*, 567 U.S. at 17.[3] That analysis does not change simply because Doe alleges that an ABD recipient should be able to obtain judicial review without risking disciplinary sanctions. Indeed, the petitioner in *Thunder Basin* made the very same argument—*i.e.*, that the "statutory-review process" unfairly "forced [the company] to choose" between "incurring possible escalating daily penalties" or "complying with the [statute] and suffering irreparable harm"—but the Supreme Court nonetheless held that petitioner's claim could "be meaningfully addressed in the Court of Appeals." 510 U.S. at 205, 215; *accord Elgin*, 567 U.S. at 17 n.6; *Axon*, 598 U.S. at 190 n.2. If Doe were to prevail on its due process or "fair procedures" arguments, the court of appeals could provide full redress by vacating the relevant disciplinary sanctions. *See Axon*, 598 U.S. at 191 (meaningful-review factor satisfied where "the [appellate] court could have remedied the party's injury" had it "ruled in [the party's] favor").[4]

This case is thus materially different from *Free Enterprise*, where the petitioners lacked any path to assert their Article II challenge to the Board's very "existence" because they were not subject to any order reviewable by the SEC. 561 U.S. at 490. There, the Court held that the option to "*incur* a sanction" did not provide a "'meaningful' avenue of relief," *id.* at 490-91 (citation omitted), as the injury alleged was being "subject[ed] to an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon*, 598 U.S. at 191. Doe's due process and "fair procedures"

---

[3] Moreover, under 15 U.S.C. § 7215(e)(1), any noncooperation sanction would be automatically stayed pending SEC consideration—further ensuring Doe could receive effective relief via the normal appellate-review scheme. *See* p.16, *infra*.

[4] To the extent Doe asserts injury from *compliance* with the March 14, 2024, ABD, that argument misses the mark: the relevant inquiry is whether the statutory-review scheme provides meaningful judicial review *if invoked* (*i.e.*, in a hypothetical world of noncompliance), *see Axon*, 598 U.S. at 191, and, in any event, "'the expense and disruption' of 'protracted adjudicatory proceedings' on a claim do not justify immediate review," *id.* at 192 (citation omitted).

claims do not allege similar "structural constitutional" injuries. *Id.* at 191.

Second, Doe's fairness claims are not "collateral to any decisions the Commission[] could make in individual enforcement proceedings." *Axon*, 598 U.S. at 195-96. Rather, Doe's claims that the Board's ABD review procedures are unfair are inextricably intertwined with the Commission order "from which review might be sought," *Free Enter.*, 561 U.S. at 490—that is, an SEC order affirming failure-to-comply sanctions as to the challenged ABD. And unlike the plaintiffs in *Free Enterprise* and *Axon* who "object[ed] to the Commissions' power generally," Doe complains more narrowly about "how that power was wielded." *Axon*, 598 U.S. at 193.

Third, Doe's fairness claims fall firmly within "the Commission's competence and expertise." *Free Enter.*, 561 U.S. at 491. Determining whether "administrative procedures . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The SEC is well positioned to consider those fact-bound questions in the first instance. *See Free Enter.*, 561 U.S. at 491 (agency consideration appropriate for "fact-bound inquiries that, even if 'formulated in constitutional terms,'" involve "understanding of the [regulated] industry" (citation omitted)); *Graceba Total Commc'ns v. FCC*, 115 F.3d 1038, 1042 (D.C. Cir. 1997) (same re constitutional claim raising "fact-specific, policy-laden concerns" that would "benefit from" agency "expertise").

The SEC's claim to expertise is even stronger with respect to Doe's statutory fairness claim—*i.e.*, whether the Board's ABD procedures are "fair" within the meaning of Section 105(a)—as "[a]gencies . . . have expertise and experience in administering their statutes that no court can properly ignore." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). As even Doe recognizes, *see* Compl. ¶¶ 45-49, Congress expressly delegated to the Board the authority to determine what procedures are "fair," 15 U.S.C. § 7215(a), subject to the SEC's approval, *see id.*

§ 7217(b).  It would be strange indeed if Congress—having given the Board the authority to fashion "fair procedures" by rule—did not think that challenges to those procedures were "'of the type' [that] belonged within" the Board's adjudicatory expertise.  *Axon*, 598 U.S. at 188-89.

**2.**     **Doe's Due Process Claim Fails To State A Claim For Relief**

Doe alleges that the Due Process Clause guarantees the "opportunity to seek or obtain judicial review of the [March 14, 2024] ABD" before being "subject[ed] . . . to fines, debarment," or "other sanctions" for "'noncooperation.'"  Compl. ¶ 56.  That argument fails as a matter of law.

Because the disciplinary-sanction review scheme already provides for judicial review, including in a federal court of appeals, *see* 15 U.S.C. § 7217(c), *id.* § 78y(a), Doe's due-process argument appears to rest on the notion that pre-enforcement judicial review must always be available as a matter of due process.  But post-enforcement review schemes are commonplace and hardly unconstitutional.  *See, e.g.*, *Axon*, 598 U.S. at 191-92 ("[M]any review schemes—involving not only agency action but also civil and criminal litigation—require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'"); *cf. Church of Scientology of Cal. v. United States*, 506 U.S. 9, 18 n.11 (1992) (discussing mode of review of an objection to a discovery order).[5]

Indeed, the Court in *Thunder Basin* rejected a due process argument indistinguishable from Doe's.  The petitioner there, a coal mine operator, argued that immediate judicial review was required because, in "the absence of pre-enforcement declaratory relief," noncompliance with the challenged regulation would subject the mine to an initial civil penalty, daily fines, and a possible

_____

[5] Many statutory schemes make noncompliance with an administrative investigatory demand independently unlawful (and thus punishable) without prior judicial review of the demand—in other words, recipients of those demands (like Doe here) must risk noncompliance penalties if they want to obtain judicial review, although the court ultimately decides what penalty is appropriate. *See, e.g.*, 33 U.S.C. §§ 1318-19 (authorizing EPA Administrator to require reports and information from point-source operator and imposing civil and criminal penalties for noncompliance).

shut-down order or criminal penalties. *Thunder Basin*, 510 U.S. at 204 n.4, 216. Recognizing that those "penalties unquestionably may become onerous," the Court held that "the practical effect of coercive penalties for noncompliance" did not effectively "foreclose all access to the courts" or present "a constitutionally intolerable choice" because the penalties "bec[a]me final and payable only after full review by both the Commission and the appropriate court of appeals." *Id.* at 218.

So too here. Although potential disciplinary sanctions may be "onerous," *id.*, an application for SEC review "operate[s] as a stay of any such disciplinary action," 15 U.S.C. § 7215(e)(1), and any monetary penalties for noncooperation are not due until "thirty days after exhaustion of all reviews and appeals," PCAOB R. 5304. Board Rules further provide that "[d]isciplinary proceedings instituted solely" for "noncooperation with an investigation shall be subject to . . . expedited procedures." PCAOB R. 5110(b).

To escape *Thunder Basin*, Doe characterizes its claim as a challenge to the "cost[s] and burden[s] of complying with" the challenged ABD, or to the alleged lack of "guidelines or limits on the number of ABDs the Board's staff can issue." Compl. ¶¶ 21, 56. But "because an administrative investigation adjudicates no legal rights," the "Due Process Clause is not implicated" by the mere fact of being investigated. *SEC v. Jerry T. O'Brien*, 467 U.S. 735, 742 (1984). Nor is "the expense and disruption of defending" against "protracted adjudicatory proceedings" a cognizable injury, as "the expense and annoyance of litigation"—even if "substantial"—is "part of the social burden of living under government." *FTC v. Standard Oil*, 449 U.S. 232, 244 (1980); *see, e.g.*, *Renegotiation Bd. v. Bannercraft Clothing*, 415 U.S. 1, 24 (1974). In other words, defending itself before the Board—including complying with ABDs— does not deprive Doe of any property or liberty interest for which process is constitutionally "due."

In the end, regardless of how Doe's due-process claim is characterized, application of the

*Mathews* factors to the facts alleged in the Complaint confirms that there is no due process violation here as a matter of law. "[I]n identifying the 'specific dictates of due process,' courts must consider three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Serrano v. Customs & Border Patrol*, 975 F.3d 488, 496-97 (5th Cir. 2020) (citing *Mathews*, 424 U.S. at 355).

As to the first factor, Doe's "private interest" is minimal. Typically, disciplinary sanctions are not enforceable until after all appeals have concluded, *see* p.16, *supra*, meaning that judicial review *precedes* any deprivation. And the costs and inconvenience of participating in litigation (including complying with ABDs) are given "little weight," if they are cognizable at all. *Plaquemines Par. v. Chevron USA*, 84 F.4th 362, 376 (5th Cir. 2023).

As to the second factor, the "probable value" of pre-compliance judicial review of ABDs is extremely low, *Serrano*, 975 F.3d at 496, as courts afford federal agencies significant deference in pursuing investigatory demands, *see Sandsend Fin. Consultants v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 878 (5th Cir. 1989). Judicial review of administrative subpoenas, for example, is "strictly limited" to confirming "(1) whether the investigation is for a proper statutory purpose and (2) whether the documents the agency seeks are relevant to the investigation." *Id.* at 879; *see Endicott Johnson v. Perkins*, 317 U.S. 501, 509 (1943) (district court obligated to enforce agency subpoena where "evidence sought" was not "plainly incompetent or irrelevant").

The third *Mathews* factor also favors the Board. The Board has a strong interest in being able to investigate public accounting firms' audits, *see* 15 U.S.C. § 7211(a), which means it needs

the ability to obtain information related to those audits.  Recognizing that fact, Congress gave the Board authority to "*require*" testimony and document production from registered accounting firms without immediate resort to the courts.  15 U.S.C. § 7215(b)(2) (emphasis added).

Finally, it is relevant to several *Mathews* factors that registered public accounting firms like Doe "consent" in registration applications to "cooperation in and compliance with any request for testimony or the production of documents made by the Board."  15 U.S.C. § 7212(b)(3).  Doe should not be heard to complain that procedures to which it consented are unfair.  *See, e.g.*, *Richards v. McLane*, 2023 WL 6533453, at *8 (5th Cir. Oct. 6, 2023).

### 3.  Doe's "Fair Procedures" Claim Fails To State A Claim For Relief

Doe alternatively tries to locate a right to pre-enforcement judicial review in Section 105 of the Act, which provides that the "Board shall establish, by rule, subject to the requirements of this section, fair procedures for the investigation and disciplining of registered public accounting firms."  15 U.S.C. § 7215(a); *see* Compl. ¶¶ 58-59.  That claim falters at the starting gate.

First, Doe's statutory claim suffers the same flaws as the due process claim, because procedures that comport with due process are by definition "fair."  When interpreting similar statutory language in the securities laws, several courts of appeals have concluded that a statutory guarantee of "fair procedure[s]" promises nothing more than due process.[6]  *See Cody v. SEC*, 693 F.3d 251, 257 (1st Cir. 2012); *Gold v. SEC*, 48 F.3d 987, 991 (7th Cir. 1995); *D'Alessio v. SEC*, 380 F.3d 112, 121 (2d Cir. 2004); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010).

Second, and in any event, the procedures that Doe attacks as unfair are set forth *in Section 105 itself*, meaning that they are by definition "fair" within the meaning of that statute.  Section 105(b)(2) authorizes the Board, without a subpoena, to "require" a public accounting firm

---

[6] *See, e.g.*, 15 U.S.C. § 78f(b)(7) (securities exchanges); *id.* § 78*o*-3(b)(8) (national securities associations); *id.* § 78q-1(b)(3)(H) (clearing agencies); 7 U.S.C. § 21(b)(9) (futures associations).

to give testimony or produce any document "that the Board considers relevant or material to [an] investigation." 15 U.S.C. § 7215(b)(2)(A)-(B); *see id.* § 7215(b)(2)(D). Section 105(b)(3) provides that, if a firm "refuses to testify, produce documents, or otherwise cooperate" with an investigation, the Board may institute disciplinary proceedings to "suspend or revoke" the firm's registration or impose "other lesser sanctions as the Board considers appropriate." *Id.* § 7215(b)(3); *see id.* § 7215(c)(4). And Section 107(c) provides for review by the SEC of any "final disciplinary sanctions imposed by the Board," including sanctions "for noncooperation in an investigation." *Id.* § 7217(c). It cannot be, as Doe argues, that procedures prescribed or expressly authorized by the very statute containing the provision that Doe says was violated, *see id.* § 7215(a), are irreconcilable with that provision.

**B.      Doe Cannot State A Claim Based On The Nondelegation Doctrine (Claim 1)**

Doe's claim that Section 105(a) violates the nondelegation doctrine fails as a matter of law. Delegations of legislative authority are constitutional so long as Congress provides "an intelligible principle" to guide agency rulemaking. *J.W. Hampton, Jr. v. United States*, 276 U.S. 394, 409 (1928); *see Yakus v. United States*, 321 U.S. 414, 425 (1944). That standard is "not demanding," *Big Time Vapes v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020), and is amply satisfied here.

No non-delegation problem exists "if Congress clearly delineates [its] general policy, the public agency which is to apply it, and the boundaries of th[at] delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989). As the Complaint acknowledges, in Section 105(a) Congress set out a general policy that the Board must promulgate "*fair* procedures" and directed that those procedures must be "subject to the requirements of this section." 15 U.S.C. § 7215(a) (emphasis added). The requirements of Section 105, in turn, cabin the Board's authority to conduct investigations; to collect evidence as part of those investigations; to enforce compliance with investigations; and to carry out disciplinary proceedings. 15 U.S.C. § 7215(b)(1)-(3), (c). And all

of that is in service of a clearly expressed congressional purpose: "to oversee" public-company audits "in order to protect the interests of investors and further the public interest." 15 U.S.C. § 7211(a); *Gundy v. United States*, 588 U.S. 128, 140-41 (2019) (plurality op.).

Moreover, Congress's delegation must be assessed against the backdrop of agencies' well-established discretion to fashion rules of procedure to govern their own proceedings. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015). The Supreme Court has long emphasized that agencies are best-placed to craft appropriate procedures to govern their investigations and proceedings. *See Vermont Yankee Nuclear Power v. Nat. Res. Defense Council*, 435 U.S. 519, 549 (1978). Congress's instruction to promulgate "fair" procedures provides an intelligible principle while recognizing the agency's expertise in conducting its own investigations. Indeed, were the rule otherwise, numerous federal statutes would be called into constitutional question. The U.S. Code contains various statutes that—like the one at issue here—leave it to agencies to establish "fair" internal procedures. *See, e.g.*, 49 U.S.C. §§ 44909(c)(6)(B)(i), 44903(j)(2)(G)(i).

If there were any doubt remaining, it is eliminated by the Supreme Court's repeated characterization of even broader statutory directives as sufficiently intelligible. *See, e.g.*, *NBC v. United States*, 319 U.S. 190, 216 (1943) ("public interest" under Communications Act); *Yakus*, 321 U.S. at 422 (fixing "fair and equitable" commodity prices); *FPC v. Hope Nat. Gas*, 320 U.S. 591, 602 (1944) ("just and reasonable" natural-gas rates). Section 105(a) "falls comfortably within the outer boundaries demarcated by the Supreme Court." *Big Time*, 963 F.3d at 444.

The Fifth Circuit's recent decision in *Jarkesy* does not suggest otherwise—even assuming that the Supreme Court, which is currently reviewing that decision, does not reach a different conclusion than the Fifth Circuit did. *Jarkesy v. SEC*, 34 F.4th 446, 459 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023). The Fifth Circuit's holding in *Jarkesy* is predicated on the

conclusion that Congress had provided "no guidance" regarding the SEC's choice to proceed before the agency or an Article III court, leaving that question entirely to the SEC's "open-ended" discretion.  *Id.* at 462.  Here, by Doe's own admission, there is a fairness standard in the very statutory language on which Doe focuses.  *See* p.18, *supra*.

## C.    Doe Cannot State A Claim For Unlawful Exercise Of Governmental Power By A Private Entity (Claim 2)

Doe likewise fails to state a claim for the unlawful delegation of governmental power to a private agency—*i.e.*, violation of the so-called "private non-delegation doctrine."  *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("*NHBPA*").  The Board is a governmental entity for purposes of the relevant analysis, so there is no "private" exercise of executive power at issue here.  And even if there were, the Board and its staff are adequately subject to the SEC's supervision.

First, a "private non-delegation" issue arises only where Congress delegates to a non-governmental entity, *see* 53 F.4th at 881 n.22; *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 50-55 (2015), but for purposes of a constitutional analysis the Board is treated as a governmental entity rather than a private entity.  Indeed, that proposition is so incontrovertible that the Supreme Court in *Free Enterprise* accepted without reservation the parties' "agree[ment]" that "the Board is 'part of the Government' for constitutional purposes."  561 U.S. at 485-86.

The Supreme Court's decision in *Association of American Railroads* shows why that must be so.  There, the Court rejected a private nondelegation claim on the ground that Amtrak is "a governmental entity for purposes of the Constitution's separation of powers provisions," even though Congress established it as a nominally private corporation.  575 U.S. at 51, 54-55.  The Court reasoned that "[t]he political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and

accountability mechanisms," and as a "practical" matter "set and supervise its annual budget." *Id.*; *see Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) (entity "part of the government" for constitutional purposes where "Government creates [the] corporation by special law," does so "for the furtherance of governmental objectives," and has "permanent authority to appoint a majority of the directors").

Just like Amtrak, the Board "was created by the government, is controlled by the Government, and operates for the Government's benefit." *Ass'n of Am. R.R.s*, 575 U.S. at 53. Congress created the Board to further specific governmental goals, 15 U.S.C. § 7211(a); all Board members are appointed (and removable at will) by the SEC, *id.* § 7211(e)(4); *see Free Enter.*, 561 U.S. at 492; and the qualifications of Board members are prescribed by statute, *see* 15 U.S.C. § 7211(e)(1), (2); *see also Ass'n of Am. R.R.s*, 575 U.S. at 51-52. The Board's sole purpose is to further the Sarbanes-Oxley Act's objectives by establishing and enforcing standards for public-company accounting firms. *See* 15 U.S.C. §§ 7211(a), 7213(a)(1); *see also* 575 U.S. at 53. The Board's rules go into effect only on "prior approval" by the SEC, and by statute must contain specific auditing standards (*e.g.*, a requirement to preserve audit work papers for seven years and to provide for "concurring or second partner review"), 15 U.S.C. §§ 7217(b)(2), 7213(a)(2); *see* 575 U.S. at 53. And the Board must submit annual reports on its activities to the SEC and congressional committees. *See* 15 U.S.C. § 7211(h); *see also* 575 U.S. at 52.

Second, even if the Board were a private entity, it permissibly "function[s] subordinately to" a federal agency—namely, the SEC—that has "authority and surveillance over [its] activities." *State v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021) (citation omitted). The Sarbanes-Oxley Act provides that "[n]o rule of the Board shall become effective without prior approval of the Commission," which may "abrogat[e], delet[e], or add[] to portions of the rules of the Board" as

the SEC "deems necessary or appropriate," just "as if the Board were" an SRO.  15 U.S.C. §§ 78s(c),  7217(b)(2), (5).  As the Fifth Circuit explained in *NHBPA*, SEC "power to *require* modifications" to be carried out by SROs "makes all the difference," as it ensures that an SRO's—or, as here, the Board's—"role is ultimately 'in aid of' the SEC, which has the final word on the substance of the rules."  53 F.4th at 887-88 (citation omitted).  Doe's private non-delegation claim is thus squarely foreclosed by *NHBPA*, which holds that "the SEC's power to abrogate [a] private organization's rules"—regardless of whether that power is exercised in any given circumstance—establishes "a clear hierarchy" that clears the constitutional bar for agency supervision of a private entity.  *Id.* at 888-89; *see United States* v. *Donziger*, 38 F.4th 290, 301 (2d Cir. 2022) (supervisory power need not be exercised to be adequate).  Moreover, the SEC possesses additional supervisory authority over the Board:  for instance, the SEC has authority to review any disciplinary action or sanction taken by the Board, 15 U.S.C. §§ 7215(d), 7217(c); must be notified of any Board investigation involving the securities laws so it can require coordination to protect its own investigations, 15 U.S.C. § 7215(b)(4); and may alter or limit the Board's enforcement activities or functions upon making certain findings, 15 U.S.C. § 7217(d).

## III.  The Complaint Should Be Dismissed Because Doe Failed To Exhaust Administrative Remedies And Lacks Any Cause of Action

Each of Doe's claims must be dismissed for additional, independently sufficient reasons. First, Doe failed to exhaust administrative remedies before bringing suit.  As noted, the Sarbanes-Oxley Act authorizes the SEC to review Board sanctions for noncooperation with investigations under the same provisions governing SRO proceedings.  15 U.S.C. § 7217(c)(2).  Addressing those provisions in the SRO context, courts have long held that a party must exhaust relevant administrative remedies before filing suit.  *See Merrill Lynch, Pierce, Fenner & Smith v. NASD*, 616 F.2d 1363, 1370-71 (5th Cir. 1980); *Mohlman v. FINRA*, 977 F.3d 556, 558-61 (6th Cir. 2020);

*Citadel Sec. v. CBOE*, 808 F.3d 694, 699-700 (7th Cir. 2015); *Swirsky v. NASD*, 124 F.3d 59, 62-64 (1st Cir. 1997); *First Jersey Sec. v. Bergen*, 605 F.2d 690, 695-96 (3d Cir. 1979).

There is no basis for distinguishing between that context and this one. Most notably, SEC review would not be futile. *See Carr v. Saul*, 593 U.S. 83, 93-94 (2021). The SEC has broad authority to set aside Board sanctions—including for noncooperation—as "not appropriate," including on constitutional grounds. 15 U.S.C. § 7217(c)(3). In addition, any violation of Board rules is a violation of the Exchange Act, so the SEC can enforce Board rules on its own, either administratively or in district court. 15 U.S.C. § 7202(b)(1); *id.* §§ 78u(d), 78u-2, 78u-3.

Second, Doe lacks a cause of action. *See Harris Cnty. v. MERSCORP*, 791 F.3d 545, 552 (5th Cir. 2015).[7] Doe's lone statutory claim (the "Fourth Claim for Relief") asserts a violation of Sarbanes-Oxley Act § 105(a), which does not confer any private right of action. 15 U.S.C. § 7215. And the Administrative Procedure Act, which permits judicial review only of "final agency action," 5 U.S.C. § 704, does not help Doe either. Because Congress specified by statute that the Board "not be an agency" for statutory purposes, 15 U.S.C. § 7211(b), the Board's acts are not agency action. And, in all events, no *final* agency action has occurred—that is, there has been no "consummation" of the Board's "decision making process." *Clarke v. CFTC*, 74 F.4th 627, 637 (5th Cir. 2023) (citation omitted). The challenged ABD merely requires the production of documents in an investigation, and the Complaint does not allege that Doe is subject to any sanctions for noncompliance. *See FTC v. Standard Oil*, 449 U.S. at 243 (FTC's issuance of complaint was not "final agency action" because it "had no legal force or practical effect upon [the respondent's] daily business other than the disruptions that accompany any major litigation"); *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 226 (5th Cir. 1994) (similar).

---

[7] Doe cannot avoid the cause-of-action requirement by seeking declaratory relief. *See MERSCORP*, 791 F.3d at 552-53.

Doe also lacks an implied right of action for equitable relief on its constitutional claims. "Where Congress has created a remedial scheme" to enforce a federal right, courts "refuse[] to supplement that scheme with one created by the judiciary." *Seminole Tribe v. Florida*, 517 U.S. 44, 74 (1996); *see Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 328 (2015); *cf. Green Valley v. City of Schertz*, 969 F.3d 460, 499-502 (5th Cir. 2020) (Oldham, J., concurring). Congress has enacted a detailed review scheme for Board disciplinary proceedings and noncooperation sanctions. 15 U.S.C. §7217(c)(1)-(3); *id.* §78y(a). As Doe is not raising the kind of structural claims that fall outside of that review scheme, *see Free Enter.*, 561 U.S. at 491 & n.2 (citing *Ex parte Young*, 209 U.S. 123 (1908)), Doe cannot invoke implied equitable remedies instead.

## IV. Doe Cannot Establish Entitlement To Injunctive Or Declaratory Relief Given The Pendency Of Agency Proceedings

Finally, the Complaint fails to allege facts plausibly demonstrating a right to injunctive or declaratory relief—the only relief the Complaint seeks. A party seeking a permanent injunction must establish "immediate harmful consequences irreparable in any other manner." *Posada v. Lamb Cnty.*, 716 F.2d 1066, 1070 (5th Cir. 1983). And courts have repeatedly barred plaintiffs confronted with imminent or pending agency proceedings from suing agencies for declaratory relief, deeming such suits to be "forum shopping" that seeks to escape the "agency process." *Total Gas & Power N. Am. v. FERC*, 2016 WL 3855865, at *22-25 (S.D. Tex. July 15, 2016), *aff'd on other grounds*, 859 F.3d 325 (5th Cir. 2017); *see, e.g.*, *Swish Mktg. v. FTC*, 669 F. Supp. 2d 72, 76-80 (D.D.C. 2009). All of Doe's requested relief is impermissible under those principles, as Doe can seek relief at the SEC and then in a court of appeals.

### CONCLUSION

The Complaint should be dismissed with prejudice or, at minimum, transferred to DDC.

DATED: June 17, 2024                          Respectfully submitted,

                                              */s/ John K. Edwards*
                                              John K. Edwards
                                              *Attorney-in-Charge*
                                              State Bar No. 24002040
                                              Federal ID No. 21645
                                              Gabriela M. Barake
                                              State Bar No. 24099794
                                              Federal ID No. 3006704
                                              JACKSON WALKER LLP
                                              1401 McKinney Street, Suite 1900
                                              Houston, Texas 77010
                                              Phone (713) 752-4200
                                              Fax (713) 752-4221
                                              jedwards@jw.com
                                              gbarake@jw.com

                                              Donald B. Verrilli, Jr. (*pro hac vice* pending)
                                              Elaine J. Goldenberg (*pro hac vice* pending)
                                              Ginger D. Anders (*pro hac vice* pending)
                                              Rachel G. Miller-Ziegler (*pro hac vice* pending)
                                              MUNGER, TOLLES & OLSON LLP
                                              601 Massachusetts Avenue NW, Suite 500 E
                                              Washington, D.C. 20001
                                              Telephone:  (202) 220-1100
                                              Fax:  (202) 220-1100

                                              Jeffrey A. Lamken (*pro hac vice* forthcoming)
                                              Robert K. Kry (*pro hac vice* forthcoming)
                                              MOLOLAMKEN LLP
                                              600 New Hampshire Ave., NW, Suite 500
                                              Washington, D.C. 20037
                                              Telephone: (202) 556-2000

                                              *Attorneys for Public Company Accounting*
                                              *Oversight Board*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


DATED: June 17, 2024                    */s/ John K. Edwards*
_____
John K. Edwards
*Attorneys for Public Company Accounting Oversight Board*

**Exhibit D**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE CORPORATION, | : | |
| *Plaintiff*, | : | Civil Action No.: 4:24-cv-1103 (LHR) |
| | : | |
| v. | : | **FIRST AMENDED COMPLAINT FOR** |
| | : | **INJUNCTIVE AND DECLARATORY** |
| PUBLIC COMPANY ACCOUNTING | : | **RELIEF** |
| OVERSIGHT BOARD, | : | |
| *Defendant*. | : | |

Plaintiff John Doe Corporation[1] seeks declaratory and injunctive relief to stop defendant Public Company Accounting Oversight Board (the "Board") from enforcing an excessively intrusive and burdensome investigative "Accounting Board Demand" ("ABD") ostensibly authorized by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). As explained herein, the Board's ABD—the sixth in a succession of similar demands issued by the Board's non-governmental staff employees ("Staff")[2] over the course of a prolonged non-public investigation—is not just abusive, retaliatory, and excessively burdensome; it is the most recent salvo in a secretive, unaccountable Board investigative process that (i) is the product of an unlawful

---

[1] "John Doe Corporation" is a pseudonym used to protect Plaintiff's true identity. In connection with Plaintiff's motion for leave to allow Plaintiff to prosecute this lawsuit pseudonymously filed contemporaneously with the original Complaint, the Court determined that "[g]iven the unique position of the suit, the court will allow John Doe Corporation to litigate under a pseudonym until the defendant enters an appearance, either answers or moves to dismiss the complaint, and can take a position on John Doe Corporation's desire to proceed pseudonymously. The court will then hold a hearing on whether to allow John Doe Corporation to continue to proceed under a pseudonym with a fuller record supporting the decision." (Dkt. 007). The parties agreed, as memorialized in a Joint Case Management Stipulation filed with this Court on May 24, 2024 (Dkt. 006), on a briefing schedule on Plaintiff's Motion for Leave to Litigate This Case Pseudonymously, or a statement by Defendant that Defendant does not oppose such motion, following decision by the Court on Defendant's Motion to Dismiss under Fed. R. Civ. P. 12.

[2] All references to "Staff" contemplate the Board's non-governmental staff employees, regardless of the Board's Division to which such Staff are or were assigned.

delegation of legislative, executive, and quasi-judicial power to the Board; (ii) is the product of an unlawful delegation of executive and quasi-judicial power to non-governmental employees; (iii) is structurally unconstitutional; and (iv) deprives Plaintiff of the due process of law mandated by the Fifth Amendment and the "fair procedures" mandated by Sarbanes-Oxley. For clarity, this lawsuit does not relate to an already-instituted adversarial non-public administrative proceeding by the Board's Staff, despite the Board's conduct of unsupervised investigations in an adversarial and non-objective fact-finding manner. Instead, this case relates expressly and solely to the Board's non-public investigative process conducted entirely by the Staff of the Board's Division of Enforcement and Investigations ("DEI"), none of whom is a government employee yet wields against Plaintiff punitive executive law enforcement power under color of federal law without meaningful direction and supervision by any principal officer of the executive branch in violation of Article II of the Constitution.

Through its most recent ABD, the Board yet again purports to command Plaintiff to turn over reams of private documents or suffer fines, debarment, additional punishment, and potentially even referral for criminal prosecution for purported "noncooperation." Absent the declaratory and injunctive relief sought herein, Plaintiff will have no opportunity to obtain pre-enforcement judicial review of the ABD and will be left with the Hobson's choice of either obeying the Board's unconstitutional demand or "betting the farm" on potential future judicial review that would occur, if ever, long after the Board has effectively put Plaintiff out of business.

The Court should declare the Board's investigative demand unconstitutional and enjoin its enforcement.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction under Article III, section 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651. *See also Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 489-91 (2010) ("*Free Enterprise Fund*"); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 897 (2023).

2.      Jurisdiction is further proper in this District because of the Board's extensive contacts with and directly in this District.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff is headquartered in this District, a substantial part of the events or omissions giving rise to the claims herein occurred in this District and the Board is subject to the court's personal jurisdiction with respect to the claims asserted herein. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(e) because the Board is an arm, agency or instrumentality of the United States, Plaintiff resides in this District, and no real property is involved in this action.

## PARTIES

4.      Plaintiff John Doe Corporation is registered with the Board as a "registered public accounting firm" within the meaning of Sarbanes-Oxley § 2(a)(12), 15 U.S.C. § 7201(a)(12). At all times relevant hereto, John Doe Corporation was -- and still is -- incorporated in Texas, headquartered in the Southern District of Texas, and licensed to perform accounting services by the State of Texas. Moreover, John Doe Corporation maintains and retains all audit and other attest engagement files in the Southern District of Texas. All Certified Public Accountants ("CPAs") who are Partners in and employees of John Doe Corporation are licensed as CPAs by the State of Texas. John Doe Corporation's registration with the Board reflects that the firm is domiciled and at all times has been domiciled in the Southern District of Texas.

5.    Defendant Board is established and organized as a private, nonprofit corporation created by Sarbanes-Oxley § 101, 15 U.S.C. § 7211, and organized under the laws of the District of Columbia. The Board is headquartered in the District of Columbia and, at all times relevant to the Complaint, had at least a dozen other offices across the United States, including at least two in Texas, one of which was in the Southern District of Texas, in Houston. The Board has more than 800 employees and claims regulatory jurisdiction over more than 1,500 registered public accounting firms worldwide, including 58 in Texas, along with innumerable individuals employed by and associated with those firms and others that are headquartered elsewhere but have offices in Texas. Of the 58 registered firms in Texas, it appears as if 27 are based in the Southern District of Texas, including 26 in the greater Houston area. That number equates to 46% of PCAOB-registered public accounting firms in Texas being located in the Southern District of Texas.

6.     The accounting firms registered with the Board and located in the Southern District of Texas, as is true for all registered firms, are required to comply with the Board's Rules, Auditing Standards, and document demands under threat of enforcement sanctions and possible criminal prosecution.

7.    Among the functions that the Board's Staff performs is conducting periodic inspections of registered public accounting firms. The inspectors who perform the inspections are part of the Board's Division of Registration and Inspections ("DRI"). The Board's DRI Staff inspection team leader for the inspection that led to the investigation at issue in this lawsuit was assigned to the Board's Houston, Texas office.

8.    Prior to the Covid pandemic, Board DRI Staff conducting inspections of Plaintiff conducted all of those inspections onsite at Plaintiff's headquarters office in the Southern District of Texas.  Moreover, to the extent certain of the DRI Staff who participated in the inspections were

4

**Appendix
Page 68**

not assigned to the Houston, Texas office of the Board, those DRI Staff traveled to the Southern District of Texas to work on the inspection for the Board. Those DRI Staff reviewed audit workpapers and interviewed Plaintiff's partners and staff in-person in the Southern District of Texas.

9.    During the Covid pandemic, the DRI Staff who conducted inspections of Plaintiff conducted all such inspections remotely via videoconference platform, and Plaintiff's partners and staff who participated in the inspections were located at the Plaintiff's headquarters office in the Southern District of Texas.

10.    All documents, including audit workpapers, that Plaintiff and its partners and employees produced pursuant to requests and demands issued to them in connection with inspections were documents, including business records, that were created in, maintained in, and produced from within the Southern District of Texas, and were obtained by DRI Staff pursuant to requests and demands purposefully sent by DRI Staff into this District.

11.    The Board's DRI Staff conducting the next already-planned inspection of Plaintiff has scheduled the inspection to occur at least in part in-person at Plaintiff's headquarters office in the Southern District of Texas.

12.    All communications, including e-mails, telephone calls, and videoconferences, by the Board's Staff directly to Plaintiff at all times have been to Plaintiff's headquarters office in the Southern District of Texas.

13.    Plaintiff conducted the audit(s) that is (are) the subject of the investigation from and within the Southern District of Texas.

14.    To the extent that Plaintiff's audit engagement team members conduct audits and perform other attest engagements on the premises of clients, those audit engagement team

members travel from the Southern District of Texas and return thereafter to the Southern District of Texas.

15.     Plaintiff issued all audit opinions from the Southern District of Texas for the issuer, the audits of which are the subject of the Board investigation and the ABD challenged herein, and Plaintiff, through an audit partner of the firm, signed all audit opinions in the Southern District of Texas.

16.     All documents, including audit workpapers, that John Doe Corporation and its partners and employees, pursuant to voluntary requests and compulsory demands issued to them by ABDs, produced to DEI Staff were documents, including business records, that were created in, maintained in, and produced from within the Southern District of Texas, and were obtained by DEI Staff pursuant to requests and demands purposefully sent by DEI Staff into this District.

17.     John Doe Corporation never has been licensed to perform accounting services in the District of Columbia and never has conducted an audit of an issuer headquartered in the District of Columbia.

18.     Board Rule 5303 provides, in pertinent part, that "… all civil money penalties shall be used to fund a merit scholarship program for undergraduate and graduate students enrolled in accredited accounting degree programs, administered by the Board or by an entity or agent identified by the Board." *Section 5: Investigations and Adjudications*, PCAOB, https://pcaobus.org/about/rules-rulemaking/rules/section_5 (last visited July 1, 2024). For each of the nine academic school years for the period 2015 through 2024, the Board awarded merit-based scholarships to students at universities in the Southern District of Texas. These scholarship awards, by academic year and university, were 2015-2016 to one Texas college student attending the University of Houston; 2016-2017 to two students attending the University of Houston; 2017-2018

to a non-specified number of students attending the University of Houston; 2018-2019 to a non-specified number of college students attending Prairie View A&M University, Texas A&M University – Corpus Christi campus, Texas Southern University, University of Texas – Rio Grande Valley campus, and the University of Houston; 2019-2020 to five students attending Texas A&M University – Corpus Christi campus, University of Texas – Rio Grande Valley campus, and the University of Houston; 2020-2021 to seven students attending Texas A&M University – Corpus Christi campus, University of Texas – Rio Grande Valley campus, and the University of Houston; 2021-2022 to seven students attending the University of Houston, University of Texas – Rio Grande Valley campus, and Texas A&M University – Corpus Christi campus; 2022-2023 to a non-specified number of students attending the University of Houston, University of Texas – Rio Grande Valley campus, and Texas A&M University – Corpus Christi campus; and 2023-2024 to nine students attending the University of Houston, University of Texas – Rio Grande Valley campus, Texas A&M University – Corpus Christi campus, and Texas Southern University.

## FACTS

**A.    "This Unprecedented Extra-Constitutional Stew" and "Extra-Constitutional" Existence[3]**

19.    The Board is not a federal agency, although it is treated as such for constitutional purposes. Sarbanes-Oxley created the Board as a private, nonprofit, non-governmental corporation under the laws of the District of Columbia:

> The Board shall not be an agency or establishment of the United States Government, and, except as otherwise provided in this Act, shall be subject to, and have all the powers conferred upon a nonprofit corporation by, the District of Columbia Nonprofit Corporation Act. No member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service.

---

[3] *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477 (2010).

7

**Appendix
Page 71**

15 U.S.C. § 7211(b). As the Supreme Court noted in *Free Enterprise Fund*, this allows the Board to "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale." 561 U.S. at 485.

20. The Board is led by five members whom the Securities and Exchange Commission ("SEC"), acting collectively as a "Head of Department" within the meaning of the Appointments Clause of the Constitution, appoints as "inferior" constitutional officers. 15 U.S.C. § 7211; *see generally Free Enter. Fund*, 561 U.S. at 484-87.

21. Notwithstanding its legal status as a private corporation, the Board "is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Id.* at 484-85.

> Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards. To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and "such other requirements as the Board may prescribe."

*Id.* at 485 (internal citations omitted).

22. The Board's investigative, prosecutorial, and pseudo-judicial adjudicative powers are massive and largely unchecked. Although the Board may claim to be accountable to the SEC, the Board in fact operates as a rogue and secretive entity with a track record of suffocating and punishing small and mid-sized auditing firms. In fact, upon information and belief, on the rare occasions on which the SEC's Division of Enforcement requests that DEI Staff share information from investigations, DEI Staff makes it extremely difficult for its purported overseeing federal agency to receive the requested information. After years of investigation, the Board can impose

severe punitive sanctions against individual accountants and accounting firms within its regulatory reach, up to the permanent revocation of a firm's registration, a permanent ban on an individual associating with any Board-registered accounting firm, and civil monetary penalties of up to $1.1 million per violation for natural persons and $22 million per violation for firms. 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001. These felony-sized penalty amounts are *five times higher* for natural persons and *20 times higher* for firms than the maximum penalties SEC itself can impose. *See, e.g.*, 15 U.S.C. § 78u-2(b); 17 C.F.R. § 201.1001.

23.     Employment bans, termed "bars from association," imposed by the Board on individual accountants can be extremely broad and onerous—and frequently career-ending.  For example, the Board can bar individual accountants from being "associated with" registered public accounting firms in even a non-accounting capacity; bar them from associating with any issuer, broker, or dealer in any financial capacity; and even require them to obtain prior Board or SEC approval before taking any job whatsoever (professional or otherwise) with any issuer, broker, or dealer. 15 U.S.C. § 7215(c)(7)(B). Although a barred auditor may apply to the Board for reinstatement and the ability to resume association with a registered firm, it is widely known that a time-limited bar is illusory, as any "bar from association" functionally operates as a lifetime bar. Moreover, it is widely known that the Board, as currently constituted, rarely permits a barred auditor to re-associate with a registered firm. Thus, the imposition of even a time-limited bar or suspension frequently operates as a lifetime deprivation of an auditor's ability to ever again audit financial statements of public companies.  And only the fortunate few are able to sell their practices in a fire sale to meet the start-date of the bar or suspension.

24.     As nominally private actors, the Board and its staff function beyond the purview of many of the basic checks, balances, and transparency requirements designed to protect individuals

from overzealous governmental coercion and punishment. For example, upon information and belief, the Board and its staff are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, the Paperwork Reduction Act, and countless other laws applicable to nearly all other regulators. Ironically, these constraints do apply directly to the SEC, which has limited oversight responsibility for the Board, but not to the Board itself. Upon information and belief, Board staff members (other than perhaps hearing officers), unlike their governmental counterparts, are not even required to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same." 5 U.S.C. § 3331.

25.     While the Board itself is and acts as a government agency, Board Staff are not government employees. On information and belief, Board Staff carry out Board functions with minimal, if any, oversight from either the Board itself or the SEC, and Board Staff carry out Board functions through solely discretionary acts. Moreover, on information and belief, Board Staff is compensated differently from, in fact over and above, typical government employees, and Board Staff do not work a schedule typical of other government employees.[4] In other words, Board Staff are employed and act at all times as private citizens, with minimal oversight.

26.     Congress has increasingly relied on various similar models of outsourcing vast governmental powers to private actors who are neither elected by the citizenry nor appointed by the President with the Senate's advice and consent. The trend has elicited understandable scorn from several current Supreme Court justices in cases involving other nominally private regulators:

> One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern. Given this incentive to regulate without saying so, everyone should pay close attention when Congress

---

[4] For example, similar to registered public accounting firms that register with the Board, the Board closes altogether for the winter holidays from approximately December 24 through January 2.

10

**Appendix
Page 74**

"sponsor[s] corporations that it specifically designate[s] not to be agencies or establishments of the United States Government."

. . . .

When it comes to private entities . . . there is not even a fig leaf of constitutional justification. Private entities are not vested with "legislative Powers." Art. I, § 1. Nor are they vested with the "executive Power," Art. II, § 1, cl. 1, which belongs to the President . . . . By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form."

*Dept. of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57, 62 (2015) (Alito, J., concurring) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995) and *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). *Accord Texas v. Comm'r of Internal Revenue*, 596 U.S. __, 142 S. Ct. 1308, 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch, J.) ("To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity" (internal citations omitted)).

27.     The Board is subject to at least *some* constitutional limitations, such as the requirement that its leadership be constitutionally appointed and accountable to the President. *See Free Enter. Fund*, 561 U.S. at 492. After all, the Board exercises vast powers that are "typically carried out" by governmental officials. *Id*. at 504-05. As one scholar explains, Congress initially considered creating the Board as a division or office within the SEC, a government agency; instead, Congress deliberately rejected that model because it wished to create a "strong, independent" private regulator that would wield "massive power, unchecked power, by design." *See* Donna M. Nagy, *Is the PCAOB a "Heavily Controlled Component" of the SEC?: An Essential Question in the Constitutional Controversy*, 71 U. Pitt. L. Rev. 361, 375-85 (2010) (quoting statement of Sen. Gramm). It is no surprise, therefore, that current Supreme Court justices have variously described the Board as "highly unusual," *Free Enter. Fund*, 561 U.S. at 505, "uniquely structured," *Free*

*Enter. Fund v. PCAOB*, 537 F.3d 667, 668 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), and an "unprecedented extra-constitutional stew," *id*. at 713.

**B.     The Board's Unsupervised Exercise of Executive and Pseudo-Judicial Powers**

28.     One of the few theoretical checks on the Board's autonomy and massive power is the direction, oversight, and supervision purportedly exercised by the presidentially appointed, Senate-confirmed SEC Commissioners who are "principal" constitutional officers under the Appointments Clause of the Constitution.  When the Board flexes its delegated *legislative* muscle through rulemaking, for example, SEC Commissioners play a critical preemptive gatekeeper function:  Before any Board rule can become effective and bind anyone, the SEC Commissioners first must approve the rule through the public rulemaking process.  15 U.S.C. § 7217(b).

29.     But SEC Commissioners play no similar gatekeeper role when the Board flexes its enormous *executive* and *pseudo-judicial* powers—*i.e.*, the investigative and looming disciplinary and adjudicative powers challenged in this case.  To the contrary, the Board wields those executive and pseudo-judicial powers autonomously and unilaterally, with *zero* real-time direction, oversight, supervision, or framework for prompt review by the presidentially-appointed SEC Commissioners.

30.     For example, upon information and belief, SEC Commissioners—the only "principal" constitutional officers anywhere in sight—play no role in deciding whom the Board will investigate; what should be investigated; what documentary evidence and testimony should be demanded; from whom documents and testimony should be demanded; how voluminous and burdensome those demands should be; whether to accomplish the request through voluntary means or by the threat-centered compulsory ABD process at issue here; whether formal disciplinary charges should be filed; if so, who should be charged and what charges should be alleged; what

**Appendix**
**Page 76**

evidence should be admitted and considered; how to weigh that evidence; whether to accept a negotiated settlement; and what sanctions, if any, should be imposed in any settlement.

31.     All those executive and pseudo-judicial powers are left to the largely unfettered discretion of the Board—or more precisely, as explained below, pushed down to the unfettered discretion of wholly unaccountable private citizens employed by the Board.  Upon information and belief, the Board has never rejected a recommendation by the Board's Division of Enforcement and Investigations ("DEI") to initiate a formal investigation or to institute a formal disciplinary (enforcement) action.  Moreover, as explained below, the Board has adopted no formal rules or procedures through which recipients of ABDs and other DEI staff investigative demands can seek the Board's intervention to retract or limit the scope and burden of any unreasonable demands.

32.     Upon information and belief, the Board has not established formal written procedures for sharing information with the SEC's Division of Enforcement, which would be central to the ability of the SEC to supervise the Board's activities through its Staff.

33.     Upon information and belief, the only time SEC Commissioners play any meaningful role in a typical Board investigation or disciplinary proceeding is in the exceptionally rare case where the "target" of a Board investigation:  (1) is charged formally with wrongdoing after investigation by DEI staff; (2) neither agrees to settle charges nor defaults; (3) is sanctioned after a full disciplinary proceeding, including an evidentiary hearing on the merits before a Board hearing officer; (4) appeals the hearing officer's decision to the Board members; (5) loses the appeal at the Board level; *and only then* (6) subsequently appeals the adverse result to the SEC Commissioners (or SEC reviews the sanctions on its own initiative—a theoretical possibility under the relevant statute but one that, to Plaintiff's knowledge, never has in fact happened).  This full gauntlet typically takes many years and is extraordinarily punitive given the financial expense and

**Appendix
Page 77**

stress for the exceptionally rare Board targets who endure the entire process. Moreover, DEI staff, as agents of the Board, take advantage of this imbalance, in particular against smaller and mid-sized audit firms and the persons associated with them, making it effectively impossible for a target to defend itself through the laborious, time-consuming, and cost-prohibitive process.

34. For these reasons among others, most Board investigative targets settle rather than defend themselves. Over the Board's entire 22-year history, only *eight* of the Board's several hundred disciplinary cases—about two percent—have ever been appealed to the SEC Commissioners. (A ninth appeal was filed on January 30, 2024, but it will likely be several months—and perhaps a year more—before the SEC Commissioners decide that case.) The last time the SEC Commissioners decided such an appeal was nearly five years ago in May 2019. And only two of the eight Board cases ever reviewed by the SEC—that is, less than one half of one percent of all Board enforcement cases thus far made public—have ever been reviewed subsequently by any federal court of appeals.[5] In its hundreds of other enforcement cases, the Board has investigated, charged, and penalized its targets with no meaningful direction, oversight, supervision, or after-the-fact review by even the SEC Commissioners, much less by any Article III Judge. And, that punishment includes muzzling the charged firm's or associated persons' First Amendment right of free speech by prohibiting, under penalty of further sanction, either the ability to explain the true reasons for agreeing to a settled disposition or criticizing the Staff's conduct of the investigation.

35. This absence of SEC direction and supervision is especially problematic because even the five SEC-appointed Board members—the Board's only validly appointed constitutional

---

[5] In one of the two cases to reach federal court, the court ultimately set aside the Board's sanctions and the charges were dismissed, but that result came more than *nine years* after the Board initiated the case. *Laccetti v. SEC*, 885 F.3d 724 (D.C. Cir. 2018). In the other, the court upheld the Board's sanctions in an unpublished order issued more than six years after the Board initiated the case. *Kabani & Co. v. SEC*, 733 F. App'x 918 (9th Cir. 2018).

14

**Appendix**
**Page 78**

officers—play only a limited, episodic role in typical Board investigative or disciplinary proceedings. Upon information and belief, those proceedings are conducted and supervised almost entirely by the Board's private staff employees within DEI—the Staff, none of whom is constitutionally appointed even as an inferior officer. Upon information and belief, these non-governmental employees make countless significant, discretionary, legally binding decisions over the years-long course of typical Board investigations and disciplinary proceedings, without any day-to-day direction or supervision by even the SEC-appointed Board members, much less by the SEC's Commissioners. Also upon information and belief, rather than respect an investigative target's assertion of rights in response to investigative demands, DEI staff routinely react by threatening "noncooperation" either as a stand-alone or companion charge.[6] To use a criminal law analogy, that reaction is akin to treating the assertion of rights by a criminal investigative target as obstruction of justice. Indeed, the Board's unchecked exercise of executive and pseudo-judicial powers renders the Board the type of carte blanche interpretive and adjudicatory authority that was recently condemned by the United States Supreme Court. *See Loper Bright Enterprises v. Raimondo* and *Relentless, Inc. v. Dep't of Commerce*, 144 S.Ct. 2244, 2267 (2024) ("[D]elegating ultimate interpretive authority to agencies is simply not necessary to ensure that the resolution of statutory ambiguities is well informed by subject matter expertise. The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive

---

[6] In fact, DEI Staff portend DEI's free-wheeling unrestrained use of the threat of charging noncooperation by including in its form that accompanies ABDs and is presented to witnesses as an exhibit in ABD-compelled investigative testimony the language "[c]onduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand … (3) abusing the Board's processes for the purpose of obstructing an investigation, or (4) otherwise failing to cooperate in connection with an investigation (*See* PCAOB Rule 5110(a))."

Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.")

36.     Upon information and belief, the SEC-appointed Board members are involved meaningfully at only three discrete points in a typical Board investigation and disciplinary proceeding: (1) they typically review and approve DEI staff's decision to commence a formal investigation, which then unleashes DEI staff's unfettered discretion to issue an unlimited number of investigative demands of any breadth and burden without further approval from Board members—and to threaten recipients with severe punishment for "noncooperation" if the recipients object to those demands or fail to comply; (2) after the staff's investigation is completed, they typically review and approve DEI staff's decision to file formal charges (and in most cases they approve one or more contemporaneous settlement agreements already negotiated and finalized by DEI staff); and (3) after a hearing officer has conducted any necessary hearings and issued a decision, they decide any appeals from that decision. With respect to appeals from hearing officer decisions, upon information and belief, the Board often overturns hearing officer decisions favorable to a charged firm or individual, but rarely (if ever) overturns hearing officer decisions favorable to DEI.  At all other times throughout the years-long process, upon information and belief, Board members are largely oblivious to what private DEI staff are doing in any given investigation or disciplinary proceeding.

37.     Yet the coercive and discretionary power wielded by these private Board employees is extraordinary.  For example, when conducting investigations, DEI Staff routinely issue multiple intrusive and burdensome ABDs that can force recipients to search for and produce troves of private documents and other information, and to submit to multiple days of interrogation under oath, all backed by the threat of punishment for "noncooperation"—which can include loss of

**Appendix
Page 80**

livelihood, substantial monetary penalties, and even incarceration—if recipients fail to obey DEI Staff's commands. The cost and burden of complying with these demands can be staggering. And the Board allows no process by which recipients of these intrusive and coercive DEI Staff demands can seek even the Board members' intervention (much less that of the SEC Commissioners or a court) to challenge the appropriateness or breadth of the demands. Unsurprisingly, most Board targets cannot afford to risk their livelihoods and life savings—not to mention the wrath of their principal regulator and potential incarceration—so they predictably choose to obey DEI Staff's demands, thereby forgoing any meaningful opportunity to challenge those demands as unconstitutional or otherwise improper.

38. Board disciplinary proceedings that follow DEI Staff investigations are no less coercive and no less expensive to defend. The Board's procedural rules and hearing officer orders require respondents to comply with numerous commands and deadlines, again upon threat of punishment for noncooperation or being found in default. At the end of a process that typically involves voluminous briefing and live testimony at a hearing, the hearing officer is empowered to punish the accused with fines, industry suspensions or bars, and other potential sanctions, which become final and enforceable unless appealed to the Board members.

39. To reiterate, *all* of this core executive and pseudo-judicial activity is performed and superintended by *private* citizens, none of whom is constitutionally appointed as even an "inferior" officer of the United States. Upon information and belief, the activity is subject to only limited, sporadic direction and supervision by the Board members, while the SEC's Commissioners—the only principal constitutional officers in the vicinity with statutorily mandated oversight responsibility—are entirely uninvolved and oblivious to the facts and proceedings as this vast and

17

coercive power is wielded against regulated accountants and accounting firms over the course of a multi-year process.

40.     The target of an investigation and disciplinary enforcement action by the Board's private-sector employees theoretically has the right to appeal any sanction imposed by the hearing officer to the SEC-appointed Board members (and then to the SEC Commissioners and, finally, to a federal appeals court, as previously noted), but for most targets that remote prospect of eventual appellate review is not only cost-prohibitive but also ephemeral.  Of the several hundred targets investigated and prosecuted by Board staff members over the Board's 22-year history, very few have had the resources and perseverance to appeal their sanctions even to the Board members, much less to the SEC or a federal court.  As best Plaintiff can tell from the available public record, targets in only 12 Board enforcement cases have ever appealed their sanctions even to the Board members, and the last time Board members decided such an appeal on the merits appears to have been more than six years ago (in December 2017).

## C.     The Unavailability of a Venue, Process, or Mechanism to Challenge Board Staff-Issued ABDs

41.     Sarbanes-Oxley authorizes the Board to investigate suspected violations of the Act, Board Rules, the securities laws applicable to preparing and issuing audit reports, the obligations and liabilities of accountants concerning them (including SEC rules issued under Sarbanes-Oxley), and professional auditing standards. Sarbanes-Oxley § 105(b)(1), 15 U.S.C. § 7215(b)(1).

42.     Sarbanes-Oxley further empowers the Board to: (a) compel testimony from a firm or its associated persons about any matter that the Board considers relevant to the investigation; (b) require a firm or its associated persons to produce audit work papers and other documents or information in their possession that the Board considers relevant to the investigation, and inspect the books and records of the firm or its associated persons to verify the accuracy of the documents

or information supplied; (c) with appropriate notice, request testimony and document production from third parties, including a firm's audit clients, concerning any matter that the Board considers relevant to the investigation; and (d) establish procedures for seeking subpoenas from the SEC for testimony or documents. Sarbanes-Oxley § 105(b)(2), 15 U.S.C. § 7215(b)(2).

43. The Board also may punish firms and their associated persons for refusing to cooperate with investigations. Potential sanctions include public censures, draconian fines, industry bars or suspensions, and "other lesser sanctions." Any such sanctions can be appealed in the first instance only to the SEC, but only after the sanctions become "final" with the Board. Sarbanes-Oxley §§ 105(b)(3), 107(c)(2), 15 U.S.C. §§ 7215(b)(3), 7217(c)(2); 17 CFR § 201.440(a).

44. Sarbanes-Oxley also directed the Board to promulgate rules to provide "fair procedures" for investigating and disciplining registered public accounting firms and their associated persons. Sarbanes-Oxley § 105(a), 15 U.S.C. § 7215(a). But the statute did not define "fair procedures" and provided no intelligible principle to guide or constrain the Board in promulgating such rules. As a predictable result, the Board's investigative and disciplinary process is notoriously one-sided, lacking in transparency, and abusive—and anything but fair.

45. As relevant here, for example, neither Sarbanes-Oxley nor Board Rules impose any limit on the number of years DEI Staff can investigate a targeted firm or individual. Unlike federal rules governing civil litigation, Board Rules also do not limit the number of ABDs and other investigative demands DEI Staff may issue during an investigation, nor the scope of those demands, nor the cost and burden inflicted upon recipients to comply with those demands. There are likewise no limits on the number of hours the recipient of an ABD may be interrogated under oath by the Board's DEI Staff. Not surprisingly, therefore, the Board's overall investigative and

disciplinary process typically takes many years to complete, features multiple successive ABDs requiring targeted firms and auditors to produce reams of private documents at great burden and expense, and compels witnesses to endure lengthy testimony sessions—often for several days on end. DEI's investigation of Plaintiff has been no exception.

46.     Particularly troublesome is that neither Sarbanes-Oxley nor Board Rules provide any process, procedure, or mechanism for a party to challenge the validity, scope, or legality of a Board investigation or of any ABD issued by DEI Staff in connection with a Board investigation. This blatant denial of due process of law contrasts sharply with the pre-enforcement judicial relief available in the context of government investigations, particularly those conducted by the SEC.

47.     Under the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC must invoke the jurisdiction of a court of the United States to secure compliance with a subpoena issued in connection with one of its own investigations. 15 U.S.C. § 78u(c). Stated otherwise, "such subpoenas are unenforceable absent a court order." *Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983). Then, "[t]o win judicial enforcement of an administrative subpoena, the SEC 'must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required ... have been followed....'" *RNR Enters. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)).

48.     This crucial constitutional safeguard—the availability of Article III judicial review *before* testimony or production of documents can be compelled—is completely absent in the context of Board Staff-issued ABDs, which thereby become self-executing. Indeed, with DEI Staff-issued ABDs in Board investigations, Board Rules do not even allow recipients to seek prior

20

**Appendix**
**Page 84**

review of the ABD by the SEC-appointed Board members or the SEC Commissioners before obedience is compelled, much less by an Article III court. Indeed, "because the matter before [the Board] is one which, from its nature is the subject of a suit at the common law, the responsibility for deciding [it] rests with Article III judges in Article III courts." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2145 (2024) (Gorsuch, J., concurring) (internal quotation marks and citations omitted) (second alteration in original). "And that tells us all we need to know that the [Board's] scheme violates Article III by withdrawing the matter from judicial cognizance and handing it over to the Executive Branch for an in-house trial." *Id.* (internal quotation marks and citations omitted).

49.     ABD recipients have only two options: (1) obey the DEI Staff-issued ABD, and thereby effectively forgo any meaningful opportunity to challenge it; or (2) disobey the ABD and be punished (and possibly even be referred for criminal prosecution) for violating Board Rules that prohibit "noncooperation." As previously discussed, punishment for noncooperation could be challenged eventually through belated judicial review, but any such review comes far too late to provide meaningful relief or to satisfy the constitutional requirement of due process of law and the statutory requirement of fair procedures.

50.     Another crucial due process safeguard is "fair notice," a "basic principle of administrative law." *SNR Wireless License Co., LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). As the Fifth Circuit stated in an oft-cited case, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). The agency "must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Id.* "In the absence of notice—for example, where the regulation is not sufficiently clear

to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)).

51.     The lack of venue or mechanism to challenge Board-issued ABDs also implicates ABD recipients' rights to a jury trial under the Seventh Amendment, as made clear by the United States Supreme Court's recent decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). There, the Court considered whether the SEC's in-house adjudicatory procedures violate the Seventh Amendment right to a jury trial. *Jarkesy*, 144 S. Ct. at 2125. The Court explained that, in its in-house procedures, the SEC "presides and finds facts while its Division of Enforcement prosecutes the case," and the SEC "may also delegate its role as judge and factfinder to one of its members or to an administrative law judge (ALJ) that it employs." *Id.* (citing 15 U.S.C. § 78d-1). "In these proceedings, the [SEC] or its delegee decides discovery disputes . . . and the SEC rules govern." *Id.* at 2126. The SEC "or its delegee also determines the scope and form of permissible evidence and may admit hearsay and other testimony that would be inadmissible in federal court." *Id.* "Judicial review is . . . available once the proceedings have concluded . . . [b]ut such review is deferential" because "a reviewing court must treat the agency's factual findings as 'conclusive' if sufficiently supported by the record, even when they rest on evidence that could not have been admitted in federal court." (*Id.*) (citations omitted).

52.     The *Jarkesy* Court explained that the remedies available to the SEC in its in-house proceedings, civil penalties, are "punitive" because the tiered structure of civil penalties "conditions the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied" and "the SEC is not obligated to return any money to victims" which "by definition does not 'restore the status quo' and can make no pretense of

being equitable." *Id*. at 2130. Because the "Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature,'" the Court held that the SEC's in-house procedures run afoul of the Seventh Amendment right to a jury trial. *Id*. at 2128.

53.     Where sanctions amount to "penalties," that are "designed to punish and deter, not to compensate," those penalties "are therefore a type of remedy at common law that could only be enforced in courts of law." *Id*. at 2130. Indeed, "'a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment.'" *Id*. (quoting *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.E.2d 488 (1993). Based on the type of penalties and sanctions that are available to the Board in the present case, *see* ¶ 22, *supra*, "this suit implicates the Seventh Amendment right," and decides that an ABD recipient "would be entitled to a jury" as a result of an ultimate Board disciplinary action. *Id*.

54.     The Board's investigation of Plaintiff relates to the audit of cryptoassets. Despite the explosive growth of the cryptocurrency industry, prior to the audits now under scrutiny in the Board's investigation of Plaintiff, the Board never promulgated any auditing standards expressly governing crypto-related assets and issuers; so, auditors like Plaintiff had no fair notice of regulatory expectations for such audits. Of the Board's nearly 60 auditing standards, three quality control standards, and 17 Board staff interpretations, at all times relevant to the audits at issue, none expressly addressed or addresses audits of cryptoassets, cryptocurrency, or crypto-mining issuers. Without Board standards or rules providing fair notice, auditors are left only with the option of selecting from a wide range of opinions on the best method of auditing assets of crypto-related issuers.[7] In fact, in November 2023, one SEC Commissioner criticized the practice of

---

[7] In December 2023, well after the audits at issue, the Financial Accounting Standards Board ("FASB") issued ASU No. 2023-08, "Intangibles—Goodwill and Other—Crypto Assets (Subtopic 350-60): Accounting for and Disclosure

"regulation by enforcement," and focused precisely on the absence of notice in the cryptoassets arena.[8]  Commissioner Mark T. Uyeda, "Remarks to the 2023 Conference on SEC Regulation Outside the United States: Fifth Annual Scott Friestad Memorial Lecture" (Nov. 6, 2023), https://www.sec.gov/news/speech/uyeda-remarks-sec-reg-outside-us-5th-annual-scott-friestad-memorial-lecture. Commenters have likewise recognized the "absence of recognized accounting standards for cryptoassets." *See* Elizabeth Chan, Nicole Tang, Edward Taylor, *Crypto Disputes: The Valuation Challenge*, 17 Disp. Resol. Int'l 21, 39 (2023).

55.     Because there are no formal standards, rules, or regulations articulating any regulatory expectations related to cryptocurrencies, cryptoassets, or crypto-mining issuers, Plaintiff did not have fair notice of the audit expectations underlying DEI Staff's now-expanded substantive investigation through its new ABD and any potential future disciplinary proceedings. And, with the absence of such fair notice, the applicable auditing standards effectively are whatever the Board's DEI Staff claim them to be.

**D.     Plaintiff's "Here-and-Now" Constitutional Injury**

56.     Plaintiff's ongoing nightmare in the Board's enforcement maw is not atypical, with the exception that Plaintiff possesses the rare degree of fortitude and resolve necessary to fight back and challenge the Board.

---

of Crypto Assets." FASB makes clear that "[t]he FASB issues an Accounting Standards Update (ASU) to communicate changes to the FASB Codification, including changes to non-authoritative SEC content. ASUs *are not authoritative* standards." (emphasis added)

[8] "[O]ne of the most discussed areas of the U.S. federal securities laws when someone mentions regulation by enforcement [is] cryptocurrencies and digital assets. For years, market participants have expressed concern about a lack of regulatory guidance in the crypto space. Let's be clear about it—enforcement actions are not well-suited for providing guidance…. Accordingly, the Commission should consider proposing rules or issuing interpretive guidance with respect to cryptocurrencies and digital assets. It's unfortunate that, despite the large number of rule proposals issued by the SEC during the last two years, cryptocurrency was not among them. A responsible regulator considers how the laws and rules apply to new types of securities and then develops or modifies those provisions so that the regulatory requirements can be satisfied….The SEC could have proactively contributed to the creation of a body of law regarding cryptocurrencies and digital assets. Unfortunately, the SEC did not take this approach and instead is pursuing a case-by-case approach through enforcement actions."

24

57.     Following an informal request in October 2021 with which Plaintiff complied fully, and non-compliance with which likely would have resulted in the Board initiating a formal investigation and DEI issuing ABDs, on August 16, 2022, the Board issued its Order of Formal Investigation. DEI Staff issued to Plaintiff and its personnel six compulsory ABDs (including the ABD of March 14, 2024 challenged by this Complaint) requiring them to produce tens of thousands of pages of documents in an onerous format not even required by the SEC, and to sit for seven full days of formal, on-the-record sworn testimony so far.  Yet DEI Staff remains unsatiated; so, it now seeks to expand and prolong its investigation even further.  DEI Staff's most recent ABD demands audit documentation and information from an entirely different year's audit than what had consumed the preceding two-and-one-half years of investigation.

58.     When the Board issued its Order of Formal Investigation, the Board set forth a kitchen-sink list of possible violations to investigate without providing Plaintiff any meaningful notice as to the precise issues under investigation.  None of the auditing standards or quality control standards cited in the investigation order included the word "crypto," let alone cryptocurrencies, cryptoassets, or crypto-mining.  Nevertheless, the investigation, in substance, was entirely about the audit of crypto-mining assets and cryptocurrencies.

59.     Each ABD issued by DEI Staff during its investigation—including the most recent one—has featured similar threats of punishment for "noncooperation":

> Noncooperation with the Board in connection with an investigation may result in the imposition of sanctions as described below. Conduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand….[I]f a *registered public accounting firm* refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or revoke the registration of the firm, or invoke such lesser sanctions as the Board considers appropriate. Similarly, if a *person associated with* a registered public accounting firm refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or bar such person from being associated with

a registered public accounting firm, or may require the registered public accounting firm to end such association….”

60.     In October 2023, DEI Staff notified Plaintiff's counsel that DEI Staff intended to recommend that the Board initiate a formal disciplinary proceeding that would charge various violations of Board Rules.

61.     In November 2023, Plaintiff's counsel submitted a formal written Statement of Position pursuant to Board Rule 5109(d) that vigorously challenged DEI Staff's proposed charges and disputed the analysis underlying DEI's recommendation.

62.     DEI Staff subsequently informed counsel that DEI Staff -- not the Board but DEI Staff -- was not persuaded by the Statement of Position.  Following several weeks of further discussion, DEI Staff informed counsel, on February 8, 2024, that DEI Staff would proceed with recommending to the Board the initiation of a formal disciplinary proceeding.  DEI Staff further informed counsel that the next notification to counsel would be upon the initiation of the formal disciplinary proceeding. At the time, DEI Staff knew unequivocally that anyone accused in the anticipated proceeding intended to contest vigorously DEI's charges, because the Statement of Position made clear that any enforcement disciplinary proceedings would be litigated.

63.     Over a month later, on March 14, 2024, rather than advising counsel of the initiation of a formal disciplinary proceeding, DEI Staff issued *yet another* ABD compelling Plaintiff to produce *still more* documents within two weeks, under renewed threat of punishment for noncooperation.  This latest ABD would expand DEI's endless investigation to probe an entirely different audit than the previous subject matter of the investigation.

64.     Upon information and belief, DEI Staff issued its latest ABD in the middle of March, with only a two-week compliance deadline, knowing that it would cause severe burden and disruption to Plaintiff during the busiest period of the year for Plaintiff and most other audit

26

**Appendix**
**Page 90**

firms and auditors. Many year-end issuer audits need to be completed by mid- to late March to comply with SEC statutes and regulations, and tax season follows just around the corner in April. At a minimum, DEI staff's strategic timing shows little regard for the Board's professed mission to improve audit quality.

65. Upon information and belief, DEI Staff issued its latest ABD in retribution and retaliation for refusing to settle on DEI Staff's terms and invoking the right to formal adjudication.

### FIRST CLAIM FOR RELIEF

### (Unlawful Delegation of Legislative Power Without an Intelligible Principle)

66. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

67. Article I of the Constitution vests all legislative powers in Congress. Under existing Supreme Court precedent, Congress may delegate legislative power only if it provides the delegatee with an "intelligible principle" to direct the delegatee in exercising those delegated powers.

68. Sarbanes-Oxley purported to delegate vast legislative power to the Board, including the power to promulgate rules governing virtually every audit of every publicly-traded corporation and broker-dealer with access to U.S. securities markets, and virtually every audit firm and individual participating in those audits.

69. Sarbanes-Oxley also purported to delegate to the Board the legislative power and mandate to establish, by rule, "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." As previously discussed, however, Congress did not define "fair procedures" and provided the Board with no intelligible principle to direct or constrain the Board in exercising this delegated legislative function. The Board's

resulting rules for investigating and disciplining registered public accounting firms and their associated persons, including Plaintiff, are therefore constitutionally illegitimate and unenforceable.

70. By enforcing and continuing to exploit its illegitimate and unenforceable rules, thereby prolonging its investigation of Plaintiff with yet another compulsory ABD and threatening Plaintiff with punishment for "noncooperation" if it fails to comply with the ABD, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article I of the Constitution, inflicting substantial here-and-now injury against Plaintiff.

### SECOND CLAIM FOR RELIEF

### (Exercise of Private, Unsupervised Executive Power in Violation of Article II of the Constitution)

71. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

72. "A cardinal constitutional principle is that federal power can be wielded only by the federal government. Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939); and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Id*. at 880 (quoting THE FEDERALIST No. 51); *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("When it comes to private entities . . . there is not even a fig leaf of constitutional justification" for delegation).

28

73.     The Board's investigation of Plaintiff, including the succession of compulsory ABDs issued by the private citizens employed in the Board's DEI and the anticipated prosecution of Plaintiff in a forthcoming formal disciplinary proceeding, constitute exercises of core governmental executive power under color of federal law.  However, as detailed above, these exercises of core executive power are being performed, and continue to be performed, by private non-governmental actors without any meaningful supervision, oversight, or direction by the SEC or any other governmental agency within the Executive Branch led by principal officers of the U.S. government, much less by the President.  Worse yet, they are being performed, and will continue to be performed, with only minimal, sporadic supervision and direction from the inferior officers whom the SEC appointed to lead the Board.

74.     By exercising core executive law enforcement power against Plaintiff without meaningful direction, oversight, and supervision by principal officers of the Executive Branch, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article II of the Constitution, inflicting substantial ongoing harm against Plaintiff.

### THIRD CLAIM FOR RELIEF

**(Denial of Due Process of Law in Violation of the Fifth Amendment to the Constitution)**

75.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

76.     Due process of law forbids a person from being compelled to produce personal papers or to provide involuntary testimony in a federal investigation or proceeding unless and until directed to do so by an independent court of law after notice and an opportunity to be heard.

77.     In violation of these requirements, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs,

including the one recently issued to Plaintiff as described herein. Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients. Board Rules likewise provide no meaningful process or procedure for recipients of DEI Staff-issued ABDs to obtain Article III judicial review of those ABDs, nor even administrative review by the Board members or the SEC commissioners. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential criminal prosecution for "noncooperation," the Board is depriving Plaintiff of due process of law in violation of the Fifth Amendment, and will continue to do so unless enjoined.

### FOURTH CLAIM FOR RELIEF

### (Denial of Fair Procedures in Violation of Sarbanes-Oxley § 105(a))

78.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

79.     Sarbanes-Oxley Section 105(a) requires the Board to establish "fair procedures" for its investigative and disciplinary proceedings.

80.     In violation of this requirement, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs, including the one recently issued to Plaintiff as described herein. Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients. Board Rules likewise provide no meaningful process or procedure for recipients of DEI Staff-issued ABDs to obtain Article III judicial review of those ABDs, nor even administrative review by the Board members or the SEC commissioners. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before

subjecting Plaintiff to fines, debarment, other sanctions, and potential referral for criminal prosecution for "noncooperation," the Board is depriving Plaintiff of fair procedures in violation of Sarbanes-Oxley § 105, and will continue to do so unless enjoined.

### FIFTH CLAIM FOR RELIEF

### (Denial of Right to Jury Trial in Violation of the Seventh Amendment to the Constitution)

81.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

82.    The Seventh Amendment guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved…." The Seventh Amendment extends to a particular claim if the claim is legal in nature. Because the claims at issue in this case are legal in nature, the Board may not avoid a jury trial by preventing the case from being heard before an Article III tribunal.

83.    In violation of the Seventh Amendment, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs, including the one recently issued to Plaintiff as described herein. Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients. Board Rules likewise provide no meaningful process or procedure for recipients of staff-issued ABDs to obtain pre-enforcement Article III judicial review of those ABDs, nor even prior review by the Board members or the SEC commissioners.  Moreover, Board Rules do not provide for jury trials or otherwise afford accused parties to invoke their constitutional right to trial by jury. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential referral for criminal prosecution for "noncooperation," and by failing to provide a Rule or mechanism to enable Plaintiff ultimately to

31

Appendix
Page 95

invoke the constitutional right to trial by jury, the Board is depriving Plaintiff of its right to jury trial under the Seventh Amendment, and will continue to do so unless enjoined.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor granting the following relief:

(i)     A declaratory judgment, pursuant to 28 U.S.C. § 2201(a), declaring that the ABD issued to Plaintiff on March 14, 2024 is unconstitutional, unenforceable, void, and quashed;

(ii)    An injunction prohibiting the Board or its staff from (a) enforcing the ABD issued to Plaintiff on March 14, 2024; (b) threatening or imposing punishment or sanctions for "noncooperation" in connection with the ABD; and/or (c) issuing any further ABDs to Plaintiff in connection with its ongoing investigation unless and until it promulgates rules or other protocols disclaiming any power to sanction Plaintiff for failure to comply with the ABD before seeking judicial review and enforcement of the ABD or without a trial by jury;

(iii)   An award of attorneys' fees and costs to Plaintiff; and

(iv)    Such other and further relief as the Court deems just and appropriate.

Dated:  August 9, 2024                     Respectfully submitted,

                                           By:     /s/*John R. Nelson*
                                                   John R. Nelson
                                                   State Bar No. 00797114
                                                   Federal ID No. 32683
                                                   DICKINSON WRIGHT PLLC
                                                   607 West 3rd Street
                                                   Austin, TX 78703
                                                   (512) 770-4200
                                                   jnelson@dickinsonwright.com

Jacob S. Frenkel (*admitted pro hac vice*)
MD Bar No. 199206092
DICKINSON WRIGHT PLLC
International Square
1825 I St., N.W., Suite 900
Washington, DC 20006
(202) 466-5953
jfrenkel@dickinsonwright.com

Brooks T. Westergard
(admitted *pro hac vice*)
NV Bar No. 14300
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, NV 89501
(775) 343-7510
bwestergard@dickinsonwright.com

Russell G. Ryan (*admitted pro hac vice*)
Sheng Li (*admitted pro hac vice*)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street, N.W., Suite 450
Washington, DC  20036
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff John Doe Corporation*

United States District Court
Southern District of Texas

**ENTERED**

August 22, 2024

Nathan Ochsner, Clerk

**Exhibit E**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-24-1103 |
| | § | |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

John Doe Corporation, a public accounting firm, was issued an investigative Accounting Board Demand by the Public Accounting Oversight Board. Doe alleges that the Board had been investigating its audit of crypto-mining assets and cryptocurrencies. The Demand sought documents and testimony from Doe. (Docket Entry No. 1). Rather than following the statutory procedure to object, John Doe sued the Board, seeking a declaratory judgment that the Board's Demand was issued in violation of the law and an injunction against enforcement of the Demand.

The Board has moved to dismiss for lack of personal jurisdiction, for lack of subject matter jurisdiction, and for failure to state a claim. The Board alternatively moves to transfer to the District Court of the District of Columbia. (Docket Entry No. 17). The United States has intervened to defend the challenged provisions of the Sarbanes-Oxley Act. (Docket Entry No. 35). For the reasons stated below, the court transfers this action to the District Court of the District of Columbia. Because the motion to transfer is granted, the remaining motions in this court are moot.

The Sarbanes-Oxley Act, 15 U.S.C. § 7211(a) *et seq.*, includes provisions establishing the Public Company Accounting Oversight Board to oversee audits of public companies subject to the

securities laws. The Board is a nonprofit organization under D.C. law, operating under the supervision of the Securities and Exchange Commission. Accounting firms that audit publicly traded companies and certain broker-dealers must register with the Board. The Board may investigate acts or omissions by a registered public accounting firm that may violate the Act, the Board's rules, or securities laws relating to preparing and issuing audit reports. The Board has disciplinary and sanctions powers if it finds violations. *Id*. at §§ 7215(b)(1), (c).

The Board informally sought documents or testimony from Doe, then issued an Order of Formal Investigation and five Accounting Board Demands for documents and testimony, including a Demand concerning a March 2024 audit that is the subject of this complaint. (Docket Entry No. 1). Doe alleges that Board staff revealed plans to recommend that the Board begin a formal disciplinary proceeding. (*Id.*).

Doe alleges that the Board's procedures violate due process and are not "fair." (*Id.*). Doe also alleges that § 105(a) violates the nondelegation doctrine and that the delegation of governmental power to a private agency violates the "private nondelegation doctrine." (*Id.*). The Board responds that Doe's allegations fail to identify any Texas connection that would allow personal jurisdiction over the Board in Texas. (Docket Entry No. 17 at 15).

The court need not reach the question of whether this court may exercise personal jurisdiction over the Board. Title 28 U.S.C. § 1404(a) gives district courts "broad discretion in deciding whether to order a transfer" of a case to another district where it could have been brought. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311 (5th Cir. 2008) (en banc) (citation omitted). Transfer under § 1404(a) is proper "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotations omitted).

2

**Appendix**
**Page 99**

To determine "whether a § 1404(a) venue transfer is for the convenience of parties and witnesses and in the interest of justice," a district court must consider eight private and public interest factors: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *In re Volkswagen*, 545 F.3d at 315.

These factors support the transfer of this case.  First, because the Board is in the District of Columbia, any discovery against the Board will most easily take place there.  Second, the District Court for the District of Columbia is already handling a similar case. *See Doe v. Pub. Co. Acct. Oversight Bd.*, No. 3:23-CV-0149-S, 2024 WL 1096546 (N.D. Tex. Mar. 13, 2024).  Third, the public interest factors are consistent with transfer to the District of Columbia, which has a strong interest in the challenges to the Board's authority, given that the Board is headquartered and has its principal place of business in the District of Columbia.

 This court finds that the interests of justice favor transfer and that transfer would facilitate "convenience and fairness." *Van Dusen*, 376 U.S. at 622.  This action is transferred to the District Court for the District of Columbia, under 28 U.S.C. § 1404(a).  That court will be the one to decide the Board's motion to dismiss.

SIGNED on August 22, 2024, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

3

**Appendix
Page 100**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.: 4:24-cv-1103 |
| | § | |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, | § | |
| | § | |
| *Defendant*. | § | |

## PLAINTIFF JOHN DOE CORPORATION'S NOTICE
## OF DISTRICT OF COLUMBIA ORDERING RETURN OF
## CASE TO SOUTHERN DISTRICT OF TEXAS

PLEASE TAKE NOTICE that, on November 19, 2024, the United States District Court for the District of Columbia entered an Order (ECF No. 59) in Case No. 24-2443 (JEB) directing that this case to be transferred "back to the District Court for the Southern District of Texas." The District Court for the District of Columbia's Order is attached hereto as **Exhibit 1**.

Dated: November 19, 2024

Respectfully submitted,

By: _____

John R. Nelson
State Bar No. 00797114
Federal ID No. 32683
DICKINSON WRIGHT PLLC
607 West 3rd Street
Austin, TX 78703
(512) 770-4200
jnelson@dickinsonwright.com

Jacob S. Frenkel (*pro hac vice*)
MD Bar No. 199206092
DICKINSON WRIGHT PLLC
International Square
1825 I St., N.W., Suite 900

1

## Appendix
## Page 101

Washington, DC 20006
(202) 466-5953
jfrenkel@dickinsonwright.com

Brooks T. Westergard (*pro hac vice*)
NV Bar No. 14300
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, NV 89501
(775) 343-7510
bwestergard@dickinsonwright.com

Russell G. Ryan (*pro hac vice*)
Sheng Li (*pro hac vice*)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA  22203
Washington, DC  20036
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff John Doe Corporation*

2

## CERTIFICATE OF SERVICE

This is to certify that on November 19, 2024, Plaintiff served a true and correct copy of the foregoing to all counsel on record via CM/ECF.

John K. Edwards
Gabriela M. Barake
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Phone (713) 752-4200
Fax (713) 752-4221
jedwards@jw.com
gbarake@jw.com

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
Telephone: (202) 220-1100
Fax: (202) 220-1100

donald.verrilli@mto.com
elaine.goldenberg@mto.com
ginger.anders@mto.com
rachel.miller-ziegler@mto.com

Jeffrey A. Lamken
Robert K. Kry
MOLOLAMKEN LLP
600 New Hampshire Ave., NW, Suite 500
Washington, D.C. 20037
Telephone: (202) 556-2000

jlamken@mololamken.com
rkry@mololamken.com

_____
John R. Nelson

**Appendix**
**Page 103**

**Exhibit G**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No.: 4:24-cv-1103 |
| v. | § | |
| | § | |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**PLAINTIFF JOHN DOE CORPORATION'S REQUEST
FOR STATUS CONFERENCE**

Plaintiff hereby requests that this Court, pursuant to Federal Rule of Civil Procedure 16(a), convene a status conference at the Court's earliest convenience to address procedures and further proceedings in this case.

On August 9, 2024, Plaintiff filed an Unopposed Motion for Leave to File Amended Complaint (ECF No. 36) and its Amended Complaint (ECF No. 36-1). The Court granted that motion on August 16, 2024 and deemed the Amended Complaint filed as of that day (ECF Nos. 37 and 38), thereby effectively mooting Defendant's then-pending motion to dismiss or transfer the case (to which Plaintiff had not yet responded). On August 22, 2024, this Court issued an Order transferring the matter to the District of the District of Columbia ("DDC") and a related Opinion of the Court. (ECF No. 39, 40, collectively the "Transfer Order"). On September 11, 2024, within 21 days of this Court's Transfer Order, Plaintiff filed a Petition for Writ of Mandamus with the United States Court of Appeals for the Fifth Circuit. (*In re John Doe Corp.*, No. 24-20407). Following briefing, the Fifth Circuit, on October 3, 2024, held that this Court's immediate transfer of the case violated this Court's General Order requiring that all contested transfers be "stayed for

1

21 days from the date the order [is] entered on the docket," (quoting S.D. Tex. Gen. Ord. 2024-2), and directed this Court "to request that DDC transfer Doe Corporation's case against the Board back to SDTX." *Id.* at 2. On October 4, 2024, this Court requested that DDC return the case. (ECF No. 45, Return Request Order). By Order dated November 19, 2024, "out of respect for this Court," DDC "follow[ed] the overwhelming consensus among other courts and return[ed] this prematurely transferred case." ECF No. 46, Ex. 1 (Order), citing *Clarke v. CFTC*, No. 24-167 (D.D.C. May 22, 2024), at 4 (citing cases taking this approach).

REQUEST FOR STATUS CONFERENCE AND RELEVANT AUTHORITY: Rule 16(a) provides that a court may, in its discretion, direct attorneys for the parties to appear before it for a conference in order to expedite matters. Because of Plaintiff's uncertainty and the uncertainty from the record as to whether the automatic 21-day stay of all out-of-circuit transfers as set forth in the District's General Order No. 2024-2 is operative and what matters the Court deems pending before it, Plaintiff respectfully request that the Court schedule a status conference at its earliest convenience to address procedures and a schedule for future proceedings. To be clear, Plaintiff agrees with Defendant that the 21-day automatic day period began running on November 19, 2024, and that the stay will expire on December 10, 2024. Plaintiff also agrees with Defendant that any status conference this Court convenes should be conducted telephonically so the conference can be held as expeditiously as possible.

There are a few specific issues Plaintiff would appreciate this Court addressing at the status conference. The first is whether this Court would like to address the parties' respective positions regarding the Transfer Order in the first instance, or whether this Court would prefer that Plaintiff immediately seek review from the Fifth Circuit Court of Appeals. If this Court prefers to address the parties' positions in the first instance, then Plaintiff would appreciate guidance from this Court

2

**Appendix**
**Page 105**

regarding whether this Court would prefer the parties present their positions through a motion for reconsideration of the Transfer Order, or through a separate motion to transfer based on the Amended Complaint. If this Court agrees that the Amended Complaint mooted Defendant's initial request for transfer, then Plaintiff's position is that the 21-day automatic stay is not implicated, and this case can proceed in the ordinary course with Defendant's motion to dismiss (and motion to transfer). If, however, this Court prefers that Plaintiff either seek immediate review from the Fifth Circuit Court of Appeals or review from this Court through a motion for reconsideration, then Plaintiff will request that this action, including the transfer, be further stayed until the transfer issue is resolved.

Counsel for Plaintiff are available for a status conference any time during the balance of this week.

Dated: November 20, 2024

Respectfully submitted,

By: _____
    John R. Nelson
    State Bar No. 00797114
    Federal ID No. 32683
    DICKINSON WRIGHT PLLC
    607 West 3rd Street
    Austin, TX 78703
    (512) 770-4200
    jnelson@dickinsonwright.com

    Jacob S. Frenkel (*pro hac vice*)
    MD Bar No. 199206092
    DICKINSON WRIGHT PLLC
    International Square
    1825 I St., N.W., Suite 900
    Washington, DC 20006
    (202) 466-5953
    jfrenkel@dickinsonwright.com

3

Brooks T. Westergard (*pro hac vice*)
NV Bar No. 14300
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, NV 89501
(775) 343-7510
bwestergard@dickinsonwright.com

Russell G. Ryan (*pro hac vice*)
Sheng Li (*pro hac vice*)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA  22203
Washington, DC  20036
(202) 869-5210
russ.ryan@ncla.legal
*Counsel for Plaintiff John Doe Corporation*

## CERTIFICATE OF CONFERENCE

On November 20, 2024, counsel for Plaintiff, at 12:41 a.m. (Eastern Standard Time), sent an e-mail to Donald Verrilli, lead counsel for Defendant, with a copy to the three other attorneys in Mr. Verrilli's law firm who are on the service list, that read as follows: "We will be filing today, likely this morning, a request that the Court, pursuant to Federal Rule of Civil Procedure 16(a), convene a status conference at the Court's earliest convenience to address further proceedings in this case. Do you have any objection to the request for a status conference?  The purpose is to ascertain the Court's position as to the status of the case and pleading deadlines, particularly given the current uncertainty as to what motions, if any, the Court considers pending before it, and whether the Court considers the automatic 21-day stay of all out-of-circuit transfers as set forth in the District's General Order No. 2024-2 to be operative."

On November 20, 2024, Mr. Verrilli, at 9:57 a.m. (Eastern Standard Time), responded to Plaintiff's counsel's email as follows: "The Board does not oppose a status conference.  To be clear, however, the Board's position is that the 21-day stay on the SDTX district court's transfer

4

**Appendix**
**Page 107**

order began running yesterday, November 19, when the case was transferred back, such that the stay will end on December 10.  As you know, the Fifth Circuit's mandamus order directed SDTX to request the case back solely 'to allow for the requisite 21-day stay period' during which you may, if you choose, attempt to seek review of SDTX's transfer order.  Order at 2.  And in order to maximize the chance that the conference can occur promptly, we would appreciate it if the conference could be held telephonically."

_____

John R. Nelson

## CERTIFICATE OF SERVICE

This is to certify that on November 20, 2024, Plaintiff served a true and correct copy of the foregoing to all counsel on record via CM/ECF.

John K. Edwards
Gabriela M. Barake
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Phone (713) 752-4200
Fax (713) 752-4221
jedwards@jw.com
gbarake@jw.com

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
Telephone: (202) 220-1100
Fax: (202) 220-1100
donald.verrilli@mto.com
elaine.goldenberg@mto.com
ginger.anders@mto.com
rachel.miller-ziegler@mto.com

**Appendix**
**Page 108**

Jeffrey A. Lamken
Robert K. Kry
MOLOLAMKEN LLP
600 New Hampshire Ave., NW, Suite 500
Washington, D.C. 20037
Telephone: (202) 556-2000
jlamken@mololamken.com
rkry@mololamken.com

_____

John R. Nelson

<u>**Exhibit N**</u>

| | |
|---|---|
| **From:** | DCECF_LiveDB@txs.uscourts.gov |
| **Sent:** | Wednesday, November 20, 2024 6:02 PM |
| **To:** | DC_Notices@txsd.uscourts.gov |
| **Subject:** | Activity in Case 4:24-cv-01103 John Doe Corporation v. Public Company Accounting Oversight Board Notice of Setting (FORM, noticing) - Civil |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### SOUTHERN DISTRICT OF TEXAS

### Notice of Electronic Filing

The following transaction was entered on 11/20/2024 at 5:01 PM CST and filed on 11/20/2024
**Case Name:**      John Doe Corporation v. Public Company Accounting Oversight Board
**Case Number:**   4:24-cv-01103
**Filer:**
**Document Number:** 48

**Docket Text:**
**NOTICE of Setting. Parties notified. Status Conference set for 12/17/2024 at 02:10 PM by video before Judge Lee H Rosenthal, filed. \*\*\*The Zoom information can be located on Judge Rosenthal's home page, at the bottom of the page, in the Interactive calendar link. (gmh4)**

**4:24-cv-01103 Notice has been electronically mailed to:**

Ginger D Anders   ginger.anders@mto.com

Gabriela Maria Barake   jsauceda@jw.com, gbarake@jw.com

Robert K Kry   rkry@mololamken.com

Elaine J Goldenberg   elaine.goldenberg@mto.com

Rachel Miller-Ziegler   rachel.miller-ziegler@mto.com

John Robinson   john.j.robinson@usdoj.gov, fedprog.ecf@usdoj.gov

Jeffrey A. Lamken   adam-collins-1996@ecf.pacerpro.com, jlamken@mololamken.com

Donald B Verrilli   donald.verrilli@mto.com

Brooks T. Westergard   bwestergard@dickinson-wright.com

Russell Ryan   russ.ryan@ncla.legal

Daniel David Hu   cheryl.carey@usdoj.gov, meiching.chentang@usdoj.gov, daniel.hu@usdoj.gov, caseview.ecf@usdoj.gov, sydnie.kempen@usdoj.gov

John Kiley Edwards   amalone@jw.com, jedwards@jw.com

Jacob S Frenkel   jfrenkel@dickinsonwright.com

John Robert Nelson   jnelson@dickinsonwright.com, rgarza@dickinsonwright.com

Sheng Tao Li   sheng.li@ncla.legal

**4:24-cv-01103 Notice has not been electronically mailed to:**

Exhibit I

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE CORP.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 24-2443 (JEB)** |
| **PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,** | |
| **Defendant.** | |

## ORDER

Plaintiff John Doe Corporation filed this statutory and constitutional challenge against the Public Company Accounting Oversight Board in the Southern District of Texas last March. See ECF No. 1 (Compl.). On August 22, 2024, Judge Lee H. Rosenthal of that district issued an Order transferring the matter to the District of the District of Columbia. See ECF No. 39 (Transfer Order). Doe Corporation then moved to stay proceedings in this district while it sought a writ of mandamus from the Fifth Circuit directing the Southern District of Texas to request a return of the case. See ECF No. 42 (Motion to Stay). This Court denied that motion, observing that Plaintiff had not yet even sought such an order or any other relief from the Fifth Circuit. See ECF No. 48 (Stay Order) at 2. Doe Corporation subsequently petitioned for and received that writ. See ECF No. 51 (Notice of Mandamus). The Fifth Circuit there held that the immediate transfer of the case violated the Southern District of Texas's General Order requiring that all contested transfers be "stayed for 21 days from the date the order [is] entered on the docket," ECF No. 51-2 (Mandamus) at 1 (quoting S.D. Tex. Gen. Ord. 2024-2), and it directed the district court "to request that DDC transfer Doe

1

Corporation's case against the Board back to SDTX." Id. at 2. It "expresse[d] no view," however, "as to the merits" of the transfer order. Id. On October 4, 2024, the Southern District of Texas requested this Court to return the matter. See ECF No. 51-1 (Return Request Order).

Plaintiff now proposes that the Court honor that request. See Notice of Mandamus; ECF No. 51-3 (Proposed Order). Defendant opposes this course of action, arguing that the Fifth Circuit, by ruling on "narrow procedural grounds," implicitly conceded that the original transfer was correct on the merits. See ECF No. 52 (Opp.) at 2–3 (quotation marks omitted). It also contends that Doe Corporation will face an uphill climb in reversing the original transfer decision if the case is sent back, see id. at 4–10, so returning the case will only delay its resolution and waste judicial resources. See id. at 10–11. This Court, however, will not take up the Board's invitation to read the tea leaves of the Fifth Circuit's narrow mandamus or to otherwise opine on the appropriateness of the transfer decision at this juncture. Out of respect for its sister district, it will follow the overwhelming consensus among other courts and return this prematurely transferred case. See Clarke v. CFTC, No. 24-167 (D.D.C. May 22, 2024), ECF No. 78 (Order) at 4 (citing cases taking this approach). The matter may well return here, but that will be for the judges in Texas to determine.

For the foregoing reasons, the Court ORDERS that the case be TRANSFERRED back to the District Court for the Southern District of Texas.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: November 19, 2024

**Appendix
Page 113**

United States District Court
Southern District of Texas
**ENTERED**
August 22, 2024
Nathan Ochsner, Clerk

**Exhibit J**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL CASE NO. H-24-1103 |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, *et al.*, | § | |
| | § | |
| Defendant. | § | |

## ORDER

For the convenience of the parties and witnesses and in the interest of justice, the court

transfers this case to the U.S. District Court for the District of Columbia under 28 U.S.C. § 1404(a).

SIGNED on August 22, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

**Exhibit K**

United States District Court
Southern District of Texas

**ENTERED**

October 04, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL CASE NO. H-24-1103 |
| PUBLIC COMPANY ACCOUNTING | § | |
| OVERSIGHT BOARD, *et al.*, | § | |
| | § | |
| Defendant. | § | |

### ORDER

The clerk of court of the Southern District of Texas has, at the request of the chief judge of this district, requested the District Court for the District of Columbia to return this civil action, *In re: John Doe Corporation*, No. 4:24-cv-1103, to the Southern District of Texas, Houston Division, to allow for the requisite 21-day stay period.   In addition, the Southern District of Texas judge to whom the case was assigned has requested the return of the case from the chief judge of the District of Columbia, to whom the case was assigned in that district.

SIGNED on October 4, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

**Appendix**
**Page 115**